# Exhibit 11

Exhibit 3

## INCUMBENCY CERTIFICATE

The undersigned, Thomas A. Proulx, hereby certifies as follows:

1.      He is the duly elected, qualified and acting Chief Executive Officer and Secretary of each of Nextpulse, LLC, a Delaware limited liability company ("Seller"), and Virtual Active, Inc., a California corporation (the "Company").

2.      That certain Stock Purchase and Sale Agreement by and among Seller, the Company and Forward Motion Pictures LLC, a California limited liability company ("Buyer") attached hereto as Exhibit A, has been adopted and approved by each of the Board of Managers of Seller, and the Board of Directors of the Company, including the forms of secured promissory note and security agreement referenced thereunder.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Secretary as of February 28, 2019.

NEXTPULSE, LLC

By:_____
      Thomas A. Proulx
      CEO and Secretary

VIRTUAL ACTIVE, INC.

By:_____
      Thomas A. Proulx
      CEO and Secretary

## Exhibit A

**Stock Purchase and Sale Agreement**

## STOCK PURCHASE AND SALE AGREEMENT

THIS STOCK PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into as of February 28, 2019, by and among Nextpulse, LLC, a Delaware limited liability company ("Seller"); Virtual Active, Inc., a California corporation (the "Company"); and Forward Motion Pictures LLC, a California limited liability company ("Buyer").  Seller, the Company, and Buyer are each sometimes individually referred to as "a party," and collectively as "the parties."

WHEREAS, Buyer is a fitness entertainment company;

WHEREAS, the Company licenses first-person video content to manufacturers of exercise equipment;

WHEREAS, Seller owns all of the issued and outstanding shares of capital stock of the Company, consisting of 1,000 shares of common stock (with a par value of $0.001) and zero (0) shares of preferred stock of the Company, and all shares of common stock and options to acquire shares of common stock in the Company under stock option and stock purchase agreements entered into by the Company prior to the execution of this Agreement (collectively, the "Shares");

WHEREAS, the Company owns various intellectual property and personal property assets, as described more fully on Exhibit A attached hereto; and

WHEREAS, Seller wishes to sell, and Buyer wishes to purchase, the Shares on the terms and conditions of this Agreement for a total purchase price of $330,000;

NOW, THEREFORE, in consideration of the premises and the mutual promises, representations, and warranties contained in this Agreement, the parties agree as follows:

1.     PURCHASE AND SALE OF SHARES

1.1     Purchase and Sale of Shares

Subject to and on the terms and conditions contained in this Agreement, at the closing provided for in Paragraph 1.3 (the "Closing"), Seller shall sell and deliver to Buyer, and Buyer shall purchase from Seller, all of the Shares.

1.2     Purchase Price; Promissory Note; Assignment by Buyer

On the terms and subject to the conditions contained in this Agreement, Buyer shall purchase the Shares from Seller for consideration in the aggregate amount of $330,000 (the "Purchase Price"), which payment obligation shall be evidenced by a Secured Promissory Note (the "Note") and Security Agreement (the "Security Agreement"), each in the form attached to this Agreement as collective Exhibit B, and which, upon full execution thereof, shall be delivered to Seller at the Closing, as provided in Paragraph 1.4(a).  The Note shall evidence a loan from Seller to Buyer in the principal amount of $330,000 ("Principal"), together with simple interest thereon at the rate of six percent (6%) per annum ("Interest"), and shall be secured by the

assets of the Company described on Exhibit A hereto.  The maturity date for repayment of the Note shall be three (3) years from the Closing Date (as defined in Paragraph 1.3) (the "Maturity Date").  Buyer shall pay Interest only on the Principal on a monthly basis for the first fifteen (15) months of the term of the Note, commencing on the one-month anniversary of the Closing Date.  Thereafter, Buyer shall pay Seller on a monthly basis the accrued Interest on the Note, plus Principal payments necessary to fully amortize the Principal over that 21-month period.  On the Maturity Date, all outstanding amounts due under the Note shall be paid in full to Seller.

Seller and the Company represent and warrant that as of immediately prior to the Closing, there is (or will be as of the Closing) a total sum of $80,000 (the "Remaining Balance") in the Company's two bank accounts, both currently located at Bank of America, Buena Vista Park Branch, 1275 Fell Street, San Francisco, California, identified as follows: Checking Account No. 02697-41862; and Clearing Account No. 2971777592 (for credit cards) (collectively, the "BofA Accounts").  Seller and the Company agree to transfer (e.g., via ACH transfer) all funds in the BofA Accounts to comparable accounts at UBS (the "UBS Accounts"), or, in alternative, write a check to Buyer for the total sum of $80,000 (subject to the reduction referenced in Section 1.3.b.(ii)), which sum Buyer agrees to deposit in the UBS Accounts in the event Seller and the Company provide Buyer with a check therefor.  The UBS Accounts shall be in Buyer's name only,  and Buyer shall have all rights and control over such UBS Accounts.  The UBS Accounts shall be working capital accounts for the Company with a maximum balance of $10,000 for each account.  In the event of a balance in excess of $10,000 in either of the UBS Accounts, Buyer agrees to transfer, as soon as practicable, such excess amount(s) to a bank account subject to the DACA described in the next paragraph.  Seller and the Company further represent and warrant that that any portion of funds remaining in the Company's bank accounts above-and-beyond the Remaining Balance shall be applied to pay down the loan Principal, with Interest and all payments on the Note calculated and amotized (as applicable) on such reduced Principal amount.

Buyer agrees to enter into (and to maintain, until the Note is paid off in full) a Deposit Account Control Agreement ("DACA") with Seller and a mutually-agreeable financial institution such as a state or local bank at or around the date of Closing, in a form reasonably acceptable to Buyer, which DACA shall perfect Seller's security interest in the Note, as evidenced by the Security Agreement thereto.  Buyer further agrees that until the obligations under the Note  have been completely and irrevocably satisfied, Buyer and the Company's cash shall be kept in one or more bank accounts subject to the DACA.  Notwithstanding anything to the contrary hereinabove, Buyer shall be permitted to transfer all Company funds and bank accounts, including, without limitation, the Remaining Balance, to a new financial institution anytime after Closing if, in Buyer's sole business judgment, Buyer determines that such a transfer would be beneficial to the Company; provided, however, that (a) Seller provides its consent to such a transfer in writing before any such transfer of funds occurs; and (b) a DACA, as described above, shall be first established with any new bank where funds may be transferred by Buyer, until the Note is paid off in full.  Buyer and Seller hereby acknowledge that they have already, as of the date of this Agreement, initiated the process of entering into a DACA, as described above, with UBS, which DACA shall govern one or more accounts in Buyer's name over which Buyer shall have all rights and control, and the parties agree to make best efforts to finalize such DACA with UBS as soon as practicable prior to or around the date of Closing.  In the event a DACA cannot be entered into by the parties with UBS, the parties agree to make best

efforts to locate a mutually-agreeable financial institution with which to enter into a DACA, as described above. Notwithstanding anything to the contrary herein, Seller and the Company agree to keep the BofA Accounts open for a period of six (6) months following the date of this Agreement and to promptly provide Buyer with any funds received by them either in the BofA Accounts or otherwise in connection with the Company's licenses or other business dealings.

The Company assigns any and all rights that it may have against Brunswick Corporation and/or Life Fitness to Seller.

1.3    Closing

a. On the terms and subject to the conditions contained in this Agreement, the Closing shall take place at 5:00 p.m. on February 28, 2019 (the "Closing Date") by electronic means (i.e., via facsimile or scanned/emailed exchange of documents), or at such time or by such other means or other place as the parties may mutually agree in writing. Facsimile signatures and scanned/emailed signatures shall each be effective as originals for all purposes under this Agreement, as set forth above.

b. Buyer shall pay for all fees and costs associated with the following:

(i)    Moving all of the Company's equipment (as set forth on Exhibit A) from its current office, located at 50 Osgood Place, San Francisco, California, to a new location, as designated by Buyer;

(ii)    Buyer's acquisition of the Company, as set forth in this Agreement, including Seller's reasonable attorneys' and/or tax and accounting fees related thereto, in cash, at the Closing, by reduction of the $80,000 balance in the Company's bank accounts, as referenced in Section 1.2.

1.4    Execution and Delivery of the Note and Closing Documents

At the Closing:

a.    Buyer shall deliver the Note to Seller by hand-delivery or by other means, pursuant to instructions given to Buyer by Seller prior to Closing.

b.    Seller shall deliver certificates representing all of the Shares, duly endorsed or accompanied by stock powers executed and in form sufficient to vest title fully in Buyer to all of such Shares, or, in the absence of any such certificates, an affidavit from Seller representing and warranting that all of the Shares are hereby transferred to Buyer pursuant to this Agreement.

c.    The Company or Seller shall deliver the stock books, stock ledgers, minute books, corporate seals, and all other documents, instruments, opinions, writings and other materials required to be delivered by the Company or Seller under this Agreement.

       c.  The Company and/or Seller shall deliver evidence substantiating the due authorization of the documents executed and delivered on behalf of the Company and Seller under this Agreement, in accordance with Paragraph 6.4.

       d.  Buyer shall deliver documentation reasonably requested by Seller pursuant to the last paragraph of Section 1.2

       e.  Buyer shall deliver evidence substantiating the due authorization of the documents executed and delivered on behalf of Buyer under this Agreement, in accordance with Paragraph 7.3.

       f.  All actions taken at the Closing shall be deemed to have been taken simultaneously at the time the last of any such actions is taken or completed.

2.      REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND SELLER

Except as set forth in the disclosure schedule attached as Exhibit C to this Agreement (the "Disclosure Schedule"), and except as to matters that are to the "Knowledge" of Buyer (with "Knowledge" being defined as to: (1) Buyer as the actual knowledge of Chris Galipo, Ruben Grijalva and Marcus Marotto, and (2) Seller and the Company, the actual knowledge of Thomas Proulx):

       (i) Seller represents and warrants to Buyer, as of the date of this Agreement and as of the Closing Date (A) with respect to the representations set forth in Paragraphs 2.1(a), 2.1(b), 2.1(d), 2.2(a), 2.2(b), 2.2(c), 2.3, 2.4(a), and 2.5(a), to its Knowledge, and (B) with respect to all other Surviving Representations and Warranties (as that term is defined in Paragraph 2.24) only as to itself; and

       (ii) the Company represents and warrants to Buyer as of the date of this Agreement, and, except for changes that are beyond the reasonable control of the Company, as of the Closing Date, as follows:

      2.1    Due Incorporation, Qualification, and Corporate Power

       a.  Incorporation

The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

       b.  Authority of Company

The Company has the full corporate power and authority, and all material authorizations and permits required by governmental or other authorities, to carry on its business as now being conducted, and the authority to execute, deliver and perform this Agreement. This Agreement has been duly authorized, executed and delivered by the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or to consummate and perform the transactions contemplated by this Agreement. This Agreement is a

legal, valid and binding obligation of the Company enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, reorganization, insolvency, or similar laws and subject to general principles of equity.

### c.  Authority of Seller

Each person or entity signing on behalf of Seller represents as to itself that: (i) he, she, or it has the legal capacity and authority to execute, deliver, and perform this Agreement; (ii) this Agreement has been duly authorized, executed, and delivered by Seller and no other action by Seller is necessary to authorize this Agreement or to consummate and perform the transactions contemplated by this Agreement; and (iii) this Agreement is a legal, valid, and binding obligation of Seller enforceable against Seller in accordance with its terms, except as enforceability may be limited by bankruptcy, reorganization, insolvency, or similar laws and subject to general principles of equity.

### d.  Articles of Incorporation and Bylaws

The Company has delivered (or will cause to be delivered prior to the Closing Date) to Buyer true and complete copies of the Articles of Incorporation and Bylaws of the Company as in effect on the date of this Agreement.  The Company is not in default under or in violation of any provision of its Articles of Incorporation or Bylaws.

### 2.2  Outstanding Capital Stock; Title

### a.  Capitalization

The authorized capital stock of the Company consists of 1,000 shares of common stock, of which 1,000 shares of common stock are issued and outstanding, with options or rights to acquire zero (0) additional common Shares remaining outstanding and unexercised.  Seller represents and warrants that zero (0) shares of preferred stock have been issued or are outstanding.  The Shares have been duly authorized and validly issued and are fully paid, nonassessable and at the time of delivery at the Closing will be free and clear of all liens, claims, pledges, and encumbrances, and the Shares constitute 100 percent (100%) of the outstanding capital stock of the Company.

### b.  Ownership

Seller represents and warrants that: (i) Seller is the lawful record and beneficial owner of 1,000 shares of common stock of the Company; (ii) except as set forth in the Disclosure Schedule, there are no voting trusts, voting agreements, proxies, or other agreements, instruments, or understandings with respect to the voting of the Shares of Seller; and (iii) Seller has and, on the Closing Date, will transfer to Buyer, good, valid, and marketable title to Seller's Shares, free and clear of any and all liens, pledges, encumbrances, and restrictions.

### c.  Options or Other Rights Obligating Company

Except as set forth in the Disclosure Schedule, there are no outstanding or authorized Shares, options, warrants, or purchase, subscription, call, conversion, exchange or other contracts

or instruments convertible into Shares ("Securities") obligating the Company to sell, exchange or otherwise deliver, or to purchase, redeem or otherwise receive or acquire Securities of the Company.  No dividends have been declared that remain unpaid by the Company.

### d.  Options or Other Rights Obligating Seller

Except as set forth in the Disclosure Schedule, Seller represents and warrants that there are no outstanding or authorized Securities obligating Seller to sell, exchange or otherwise deliver, or to purchase or otherwise receive or acquire Securities of the Company.

### 2.3    Subsidiaries and Other Affiliates

Except as set forth in the Disclosure Schedule, the Company does not own, directly or indirectly, any capital stock of, or other investment or interest in, any corporation, partnership, limited liability company, joint venture or other entity.

### 2.4    Consents

### a.  Consents Relating to the Company

Except as required by the Hart-Scott-Rodino Act or as set forth in the Disclosure Schedule, there are no authorizations, consents, permits, licenses or approvals of, or declarations, registrations or filings with, any governmental or regulatory authority required by the Company in connection with the execution, delivery or performance by the Company of this Agreement or the consummation by the Company of the transactions contemplated hereby.

### b.  Consents Relating to Seller

Seller represents and warrants that except as required by the Hart-Scott-Rodino Act, or as set forth in the Disclosure Schedule, there are no authorizations, consents, permits, licenses, or approvals of, or declarations, registrations, or filings with, any governmental or regulatory authority required by Seller in connection with the execution, delivery, or performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby.

### 2.5    No Material Breach

### a.  No Material Breach by the Company

Except as set forth in the Disclosure Schedule, the execution, delivery, and performance of this Agreement by the Company of the transactions contemplated hereby will not violate, breach, conflict with, constitute a default under or result in the imposition of any lien, claim, or encumbrance on the Shares or any property or asset of the Company under: (i) any provision of the Articles of Incorporation or Bylaws of the Company; (ii) any law, statute, rule, or regulation or order, writ, judgment, injunction, award, or decree of any court, arbitrator, or governmental or regulatory body to which the Company or any of its respective properties is subject; or (iii) any license, lease, or other agreement to which the Company is a party, by which the Company is bound, or to which any of the assets or properties are subject.

b.  No Material Breach by Seller

Seller represents and warrants that except as set forth in the Disclosure Schedule, the execution, delivery and performance of this Agreement by Seller of the transactions contemplated hereby will not materially violate, breach, conflict with, constitute a default under or result in the imposition of any lien, claim or encumbrance on the Shares or any property or asset of the Company under: (i) any provision of the Articles of Incorporation or Bylaws of the Company; (ii) any law, statute, rule, or regulation or order, writ, judgment, injunction, award, or decree of any court, arbitrator or governmental or regulatory body to which Seller or any of their properties are subject; or (iii) any license, lease, or other agreement to which Seller is a party, by which Seller is bound, or to which any of Seller's assets or properties are subject.

2.6    Financial Statements of the Company

a. On or about June 7, 2018, the Company delivered to Buyer true, correct, and complete copies of the following financial statements of the Company (collectively, "Financial Statements"):

(i)   Profit & loss ("P&L") statement for the period May 2015 – April 2018, with financial projections for the period May 2018 – April 2021.

(ii) Income and cash flow statement (for DVDs and download/licensing revenues) for the period January 2012 – May 2018.

(iii) Expense statement for the period January 2012 – April 2018 (actual expenses), with projected budgets for the period May 2018 – December 2018.

b. Seller and the Company represent and warrant that the Financial Statements described in Paragraph 2.6(a) were all: (i) prepared by the Company's CEO in accordance with generally accepted accounting principles consistently applied by the Company throughout the periods indicated and fairly present the financial position of the Company as of the respective dates thereof and the results of its operations for the periods indicated, subject only to matters which are not Material (as that term is defined in Paragraph 2.7); and (ii) certified by the Company's in-house accountant.  Except as set forth in the Disclosure Schedule, Seller and the Company represent and warrant that there are no debts, liens, claims, encumbrances, or other liabilities of the Company or of Seller that might have a Material Adverse Effect on the Company.

c. Prior to and following the Closing, Seller and the Company agree to provide Buyer, in a timely manner, with all financial information relating to the Company's products or services, costs, revenues, and other information relevant to the Company's business or operations, or the Financial Statements that are in Nextpulse's actual possession, upon Buyer's reasonable request therefor.

2.7    Absence of Certain Changes

Except as set forth in the Disclosure Schedule, Seller represents and warrants that since January 1, 2018, the affairs of the Company have been conducted in the ordinary course of business and the Company has not suffered any change in its business, results of operations, working capital, assets, or liabilities, or the manner of conducting its business other than changes that have not had and will not have a material adverse effect on the business, results of operations, working capital assets or liabilities, or the manner of conducting the Company's business (a "Material Adverse Effect," where in this Agreement, the term "Material" refers to matters having an after-tax consequence of more than $25,000 per year).  In particular, and without limiting the generality of the foregoing, except as set forth in the Disclosure Schedule, since the Balance Sheet Date none of the following has caused a Material Adverse Effect:

a. any Material transaction contracted for or concluded by the Company except in the ordinary course of business;

b. any Material change in accounting methods or practices by the Company;

c. any increase in salary, bonus or other compensation payable or to become payable by the Company to any of its officers, directors or employees in an amount in excess of the Company's periodic bonuses and increases;

d. any sale or transfer of any of the Company assets in excess of $50,000, except in the ordinary course of business or as may be contemplated in connection with the Closing of the transactions contemplated by this Agreement;

2.8    Tax Matters

For purposes of this Agreement, the term "Taxes" means all taxes of any kind or nature, including but not limited to U.S., state, local and foreign income taxes, withholding taxes, branch profit taxes, gross receipts taxes, franchise taxes, sales and use taxes, business and occupation taxes, property taxes, VAT, custom duties or imposts, stamp taxes, excise taxes, payroll taxes, intangible taxes and capital taxes and any penalties or interest thereon.  Except as set forth in the Disclosure Schedule:

a. The Company has filed within the time and in the manner prescribed by law all tax returns and reports required to be filed by it under the laws of the United States and each state or other jurisdiction in which it conducts business activities requiring the filing of tax returns or reports and has paid all taxes shown due on such returns or subsequent assessments.

b. There are no tax liens, whether imposed by the United States, any state, local, foreign or other taxing authority, outstanding against the Company or any of its assets, other than liens for taxes not yet due and owing.

c. All Taxes that the Company is required to withhold or to collect have been duly withheld or collected and all withholdings and collections either have been duly and

timely paid over to the appropriate governmental authorities or are, together with the payments due or to become due in connection therewith, set forth in the Disclosure Schedule.

2.9     Litigation

Except as shown in the Disclosure Schedule, there is no (i) suit, action, litigation or other similar proceeding pending or, to the Company's Knowledge, threatened against the Company, Materially affecting the Company or its business, assets, properties or operations, or (ii) order, judgment or decree to which the Company or its business, assets, properties or operations is subject, where in this Agreement, the term "Material" refers to matters with an amount in controversy or after-tax consequence of more than $25,000 per year.

2.10    Compliance with Laws

To the Company's Knowledge, and except as shown in the Disclosure Schedule, the Company is in compliance with all laws, ordinances, regulations and orders applicable to its business or operations ("Laws"), except with respect to such Laws the noncompliance with which by the Company would not have a Material Adverse Effect, which, in this Agreement, means a Material effect on the Company that is adverse to the Company, and has not received any notification of any asserted past or present failure to comply with any law, ordinance, regulation or order.

Seller represents and warrants that the Disclosure Schedule contains, to Seller's and the Company's Knowledge, a complete list of all of the governmental licenses and permits, consents, orders, decrees and other compliance requirements under which the Company is operating or bound.

2.11    Title to and Condition of Assets

To the Company's Knowledge, the tangible personal property included in the Company's assets is in usable condition subject to exceptions which are, in the whole, not Material. Except as set forth in the Disclosure Schedule, to the Company's Knowledge, the Company has good and marketable and unencumbered legal title to each of its assets, free and clear of any claim, charge, easement, encumbrance, security interest, lien, option, pledge, right of others, or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, law, equity or otherwise except for any restrictions on transfer generally arising under any applicable federal or state securities law. To the Company's Knowledge, there is no pending, or threatened action that would Materially interfere with the quiet enjoyment of such leaseholds by the Company.

2.12    [Intentionally Left Blank]

2.13    [Intentionally Left Blank]

2.14    Labor Matters

Except as set forth in the Disclosure Schedule, the Company is not a party to any labor agreement with respect to its employees with any labor organization, group or association. To

the Company's Knowledge, the Company has not experienced any attempt by organized labor or its representatives to make the Company conform to demands of organized labor relating to its employees or to enter into a binding agreement with organized labor that would cover the employees of the Company.  To the Company's Knowledge,  (a) there is no unfair labor practice charge or complaint against the Company pending before the National Labor Relations Board or any other governmental agency, and (b) the Company has not experienced a work stoppage or other labor difficulty.

2.15    Intellectual Property

To the Company's Knowledge, and subject to the assignment referenced in the last paragraph of Section 1.2, set forth in the Disclosure Schedule is a list of all trade names, fictitious or assumed names, trademarks, trademark applications, service marks, service mark applications, registered copyrights, copyright applications, license agreements, and all other similar proprietary rights (collectively, "Intellectual Property").  To the Company's Knowledge, and subject to the assignment referenced in the last paragraph of Section 1.2, except as set forth in the Disclosure Schedule, the Company owns or possesses adequate licenses or other rights to use all Intellectual Property necessary to conduct its business as now operated.

Seller and the Company hereby irrevocably sell, assign, and transfer to Buyer, in each case without additional consideration, all right, title, and interest throughout the world in and to the Intellectual Property.  As of the Closing Date, and subject to the assignment referenced in the last paragraph of Section 1.2, neither Seller nor the Company shall have any right or license to use any Intellectual Property of the Company. Upon the reasonable request of Buyer and at Buyer's cost and expense, the Company shall, with reasonable promptness (and subject to the assignment referenced in the last paragraph of Section 1.2), take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be reasonably necessary to assist Buyer to prosecute, register, perfect or record its rights in or to any Intellectual Property of the Company.

2.16    [Intentionally Left Blank]

2.17    [Intentionally Left Blank]

2.18    Employment Contracts

The Disclosure Schedule contains, to the Company's Knowledge, a list of all employment contracts, deferred compensation, profit-sharing, stock purchase, stock option, stock appreciation right, bonus, and severance plans and agreements or similar agreements by which the Company is bound.  Except as set forth in the Disclosure Schedule, to the Company's Knowledge,  (i) all the contracts and arrangements described in this Section 2.18 are in full force and effect, and there is no default by the Company under any of them, and (ii) the Company has not entered into any written severance agreement or similar arrangement in respect of any present or former employee that will result in any obligation (absolute or contingent) of Buyer or the Company to make any payment to any present or former employee following termination of employment.

2.19    Contracts

To the Company's Knowledge, all Material Contracts, which means any agreement of the Company involving more than $50,000 that is not terminable on notice of ninety (90) days or less without a Material Adverse Effect to which the Company is a party are listed in the Disclosure Schedule.  To the Company's Knowledge, the Company is not in Material default under any such contract.

### 2.20    Insurance

The Disclosure Schedule contains a list of all insurance policies held by the Company concerning its business.  To the Company's Knowledge, there is no current default with respect to the payment of premiums under any such contract or otherwise.

### 2.21    Environmental Compliance

The representations made in this Section 2.21 are to the Company's Knowledge.  The Company has not generated, used, transported, treated, stored, released, or disposed of, and has not expressly permitted anyone else to generate, use, transport, treat, store, release, or dispose of any Hazardous Substance including substances that are defined or listed in, or otherwise classified under, any applicable Laws as "hazardous substances," "hazardous materials," "hazardous wastes," or "toxic substances" (collectively, "Hazardous Substances") in violation of any Law.  Any Hazardous Substance handled or dealt with in any way in connection with operation of the Company, whether by the Company or the Company's agents, during Seller's ownership, has been dealt with in all respects in compliance with applicable Laws.  There has not been any generation, use, transportation, treatment, storage, release, or disposal of any Hazardous Substance by the Company or the use of any property or facility of the Company which has created or might reasonably be expected to create any liability under any laws or which would require reporting to or notification of any governmental entity.

### 2.22    Related Transactions

Except as set forth in the Disclosure Schedule or as contemplated by this Agreement, to the Company's Knowledge: (a) the Company is not, directly or indirectly, a party to any transactions with any officer, director or shareholder of the Company or their affiliates which will survive the Closing, and (b) none of such persons has any direct or indirect interest in any, supplier or customer of the Company which will survive the Closing.

### 2.23    Intentionally Left Blank]

### 2.24    Survival

All representations and warranties contained in Paragraphs 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.10 and 2.21  (the "Surviving Representations and Warranties") shall survive the Closing Date.  All other representations and warranties of the Company and Seller contained in this Article 2 shall terminate at the Closing.

### 3.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Company and Seller as follows:

### 3.1 Due Incorporation

Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

### 3.2 Power and Authority

Buyer has the corporate power and authority and all authorizations and permits required by governmental or other authorities, to carry on its business as currently being conducted and to execute, deliver and perform this Agreement and the other documents required to be executed by it in connection with this Agreement, and the execution, delivery, and performance by it of this Agreement and the other agreements and documents executed or to be executed by it in connection with this Agreement have been duly authorized, executed, and delivered by Buyer and no other corporate proceedings on the part of Buyer are necessary to authorize this Agreement and the agreements and instruments entered into by Buyer in connection with it or to consummate and perform the transactions contemplated. This Agreement and the agreements and instruments entered into by Buyer in connection herewith constitute valid and binding agreements enforceable against Buyer in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, or similar laws and subject to general principles of equity. Buyer acknowledges that it is a sophisticated investor, familiar with the Company's industry generally, has made a reasonable investigation of the Company and its business, and is aware of the risks inherent in an investment in a business such as that of the Company. Because of its experience and business acumen it has the expertise to ask the questions necessary to make an informed decision as to whether to purchase the Shares as contemplated by this Agreement. Buyer has made reasonable investigation and inquiry of all matters related to this Agreement and the Disclosure Schedules. Buyer acknowledges that it is not relying on any projections or forecasts contained in any materials supplied by Seller or the Company or on any budgets for future periods prepared by the Company.

### 3.3 Consents

There are no authorizations, consents, permits, licenses, or approvals of, or declarations, registrations, or filings with, any governmental or regulatory authority or agency required by Buyer that have not been received in connection with the execution, delivery, or performance by Buyer of this Agreement or the other agreements executed or to be executed by it in connection with this Agreement or the consummation by Buyer of the transactions contemplated by this Agreement.

### 3.4 No Breach

The execution, delivery, and performance of this Agreement and the consummation by Buyer of the transactions contemplated hereby, will not constitute a default under, or permit the termination or the acceleration of maturity or performance of: (i) any provision of the Articles of Incorporation or Bylaws of Buyer; (ii) any law, statute, rule, or regulation or order, writ, judgment, injunction, award, or decree of any court, arbitrator, or governmental or regulatory body to which Buyer or its properties are subject; or (iii) any material contract or obligation to

which Buyer is a party, by which Buyer is bound, or to which any of its assets or properties are subject.

### 3.5    Investment Intent

Buyer is acquiring the Shares for investment for its own account, not as nominee or agent, and not with a view to the sale, distribution, subdivision, transfer or fractionalization of the Shares.  Buyer acknowledges that the Shares (a) have not been registered under the Securities Act of 1933 or any state securities law by reason of an exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Buyer's investment intent as expressed herein and there is no commitment to register the Shares, and (b) cannot be resold, unless they are subsequently registered or an exemption from registration is available.

### 3.6    Survival

All representations and warranties of Buyer contained in Paragraphs 3.1 to 3.5 shall survive the Closing Date.

### 4.    POST-CLOSING COVENANTS OF THE COMPANY AND SELLER

The Company and Seller covenant and agree that after the Closing:

### 4.1    Third Parties

Attached hereto as Exhibit D is a list of all third parties with whom the Company currently has contracts with, that are not parties to the Material Contracts.

### 4.2    Delivery of Certificates

If Buyer is in full compliance of its obligations under the Note, Seller shall deliver an affidavit for certificates representing one hundred percent (100%) of the Shares on Closing. n

### 4.3    Access to Records

Until the Closing and subject to the terms of the existing agreements with Buyer regarding confidentiality, Seller and the Company shall afford to Buyer, its officers, employees, counsel, accountants, and other representatives reasonable access on reasonable prior notice, to inspect and copy the books, records, contracts, and other documents of the Company (including, without limitation, all information relating to the Company's financial affairs, business operations, intellectual property, existing agreements, and previously confidential information regarding the Company) (collectively, "Company Records") at the Company's offices in order that Buyer may have full opportunity to make such investigations as it shall desire to make of the affairs of the Company; and Seller and the Company will cause its officers and accountants to furnish such additional financial and operating data and other information relating to the business and assets of the Company that are in the actual possession of Seller as Buyer may, from time to time, prior to or after the Closing, reasonably request.  At the Closing, Seller shall turn over to Buyer all Company Records. [send the paper versions of the pre-merger docs to your Spear Street office?]

Stock Purchase Agreement VA-FMP 2019-02-28.docx

4.4    Nondisparagement; Confidentiality

Seller and the Company (each as an entity and through its respective officers and directors) agree that neither Seller, nor the Company, nor anyone acting at the direction of either Seller or the Company, shall disparage Buyer, its board members, officers, subsidiaries or business, either orally or in writing, at any time.  In connection with third parties to which the Company was contracted at the time of the Closing, Seller agrees to: (i) provide a recommendation to such third parties that they use or work with, or continue to use or work with, as applicable, the Company, its products, or services, without making any disparaging statement, review, comment, or feedback about the Company or Buyer; and (ii) refrain from taking any action that is intended, or might reasonably be expected, to harm the Company or Buyer or their respective reputations, or which might reasonably be expected to lead to unwanted or unfavorable publicity to the Company or Buyer.

The parties shall at all times hold all Confidential Information (as hereinafter defined) of the other parties in trust and strict confidence, and shall not disclose the same to third parties other than "Authorized Recipients (as definied below) of a party without the prior written consent of the other party(ies) from whom such Confidential Information was first obtained.  If any party hereto is under an obligation to reveal the Confidential Information by operation of law, it shall do so only after giving prior notice to the other party(ies) from whom such Confidential Information was first obtained well in advance in order to enable such other party(ies) to obtain a protective or any other order to prevent disclosure of the Confidential Information.  "**Authorized Recipients**" of a party means its, and those of its "Affiliates" officers, directors, managers, stockholders, members, employees, consultants, and legal and financial advisors who have a legitimate need-to-know such Confidential Information with respect to such party and who are obligated to protect such Confidential Information pursuant to terms and conditions no less protective than those contained in this Agreement.  **Affiliate**" means an entity that, directly or indirectly, controls, is controlled by, or is under common control with a party to this Agreement, but only for so long as such control exists, and where "control" shall mean ownership of more than 50% of the stock or other equity interests entitled to vote for the election of directors or an equivalent governing body.

As used herein, "Confidential Information" shall mean all knowledge and information that a party has acquired or may acquire as a result of, or related to, its relationship with another party hereto, whether in oral, written, graphic or electronic form, and whether designated as confidential or not, including, without limitation, the terms and conditions of this Agreement (including, without limitation, the indemnification obligations set forth in Section 8 below), and information concerning another party's business operations, finances, operations, strategic planning, research and development activities, products, inventions, research developments, improvements, processes, trade secrets, services, cost and pricing policies, formulae, diagrams, schematics, notes, data, memoranda, methods, know-how, techniques, inventions, marketing strategies, future products, ongoing research, business, sales, subscribers, suppliers, clients, employees, ideas, creative works belonging to another party hereto (regardless of whether such information is protectable under copyright, patent, trademark or trade secret law), trade secrets, proprietary information, data, techniques, business forecasts, research, works in progress, program formats, projects, sales, marketing plans, future development, and personnel information, and shall also include information received by any party hereto from a third party

under an obligation of confidentiality, which information a party may gain access to in the course of fulfillment of the purposes of this Agreement. Notwithstanding the foregoing sentence, Confidential Information shall not include (i) information that is or becomes publicly available (except as may be disclosed by a party in violation of this Agreement), (ii) information acquired by a party from a third-party source other than one of the other parties hereto or any of its employees, consultants or shareholders, which source legally acquired such information under no obligation of confidentiality, or (iii) information of a general nature, and specifically information regarding the Company's business, known to a party prior to entering into this Agreement or acquired by a party during the term hereof by reason of its other business activities (i.e., apart from the Company's business).

5.      BUYER'S COVENANTS

Buyer covenants and agrees as follows after the Closing:

5.1      Company Records

Buyer agrees for a period of seven (7) years after the Closing Date, on the reasonable request of Seller, to make available to such Seller: (i) all information and statements in the Company's possession with regard to periods before the Closing Date; and (ii) after the Closing Date, all information and statements in the Company's actual possession directly related to the Note or Security Agreement, as reasonably required by Seller.

5.2      Content deal with Les Mills

Buyer agrees to split proceeds actually received by Buyer or the Company (or any successor-in-interest to, or affiliates of, either the Company or Buyer, including from any subsidiaries or joint ventures) from any licensing of existing content, sale, or other monetization of content deal either directly or indirectly entered into between the Company and Les Mills International Ltd. ("Les Mills") (or any successor-in-interest to, or affiliates of, Les Mills, including from any subsidiaries or joint ventures) in excess of $75,000, on a 50/50 basis with Seller, after first deducting reasonable attorneys' and/or tax and accounting fees incurred by Buyer or the Company in connection with any such deal for a term of three (3) years or repayment of the Note in full., whichever occurs first.

6.      CONDITIONS TO BUYER'S OBLIGATIONS

Buyer's obligation to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or before the Closing, of each of the following conditions, unless waived in writing by Buyer:

6.1      Representations and Covenants

The Company and Seller shall have performed and complied in all material respects with all representations and warranties, agreements, covenants, and conditions on their part required to be performed or complied with on or before the Closing Date.

6.2      Resignation of Officers and Directors

The Company shall have provided the resignations of all current officers and directors of the Company effective immediately following the Closing.

>    6.3    No Knowledge of Breach by Other Parties

Buyer shall have received from Seller a certificate dated as of the Closing Date certifying that Seller, to its Knowledge, is not aware of any breach of representation and warranty or covenant by Buyer under this Agreement.

>    6.4    Evidence of Due Authorization

Buyer shall have received from the Company and/or Seller evidence substantiating the due authorization of the documents executed and delivered on behalf of the Company and Seller under this Agreement.

>    7.    CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of the Company and Seller to consummate the transaction contemplated by this Agreement shall be subject to the satisfaction, at or before the Closing, of each of the following conditions, unless waived in writing by the Company and Seller:

>    7.1    Representations and Covenants

Buyer shall have performed and complied in all Material respects with all representations and warranties agreements, covenants, and conditions on its part required to be performed or complied with on or prior to the Closing Date.

>    7.2    No Knowledge of Breach by Other Party

Seller and the Company shall have received from Buyer a certificate dated as of the Closing Date certifying that Buyer, to its best knowledge, is not aware of any breach of representation or warranty or covenant of Seller or the Company under this Agreement.

>    7.3    Seller shall have received from Buyer an incumbency certificate as to the due authorization of the documents executed and delivered on behalf of Buyer under this Agreement.

>    8.    INDEMNIFICATION AND CERTAIN REMEDIES

>    8.1    Obligation of Seller to Indemnify for Certain Liabilities

Seller agrees to indemnify and hold harmless Buyer and defend Buyer, or its affiliates, subsidiaries, directors, officers, employees, agents, and assigns (each, an Indemnified Party, and collectively, the "Indemnified Parties") from and against any claims, demands, causes of action, proceedings, or other losses, liabilities, damages, deficiencies, interest, penalties, expenses, judgments, and costs (including reasonable attorneys', consultants', and accountants' fees and disbursements, court costs, amounts paid in settlement, and expenses of investigation) incurred by Buyer on an after-tax basis after the Closing Date (collectively, "Losses") based on, arising

out of, or otherwise in respect of the Content License & Distribution Agreement between ICG AG & Co. KG ("ICG") and Seller dated March 5, 2015 (the "ICG Agreement"), up to a maximum of $90,000. The foregoing indemnification does not constitute any admission by Seller or the Company as to any matters related to the ICG Agreement. As a condition to the indemnification provided in this Section 8.1, the Indemnified Parties will not disclose to ICG, directly or indirectly, any information to ICG regarding this indemnification or any potential Losses based on the ICG Agreement.

### 8.2    Obligation of Buyer to Indemnify for Certain Liabilities

Buyer agrees to indemnify and hold harmless Seller and defend Seller, or its affiliates, subsidiaries, directors, officers, employees, agents, and assigns (each, an Indemnified Party, and collectively, the "Indemnified Parties") from and against any claims, demands, causes of action, proceedings, or other losses, liabilities, damages, deficiencies, interest, penalties, expenses, judgments, and costs (including reasonable attorneys', consultants', and accountants' fees and disbursements, court costs, amounts paid in settlement, and expenses of investigation) incurred by Seller on an after-tax basis after the Closing Date (collectively, "Losses") based on, arising out of, or otherwise in respect of any representation or warranty made by Buyer under this Agreement.

### 8.3    Claims

If any Indemnified Party receives notice of circumstances that would give rise to a claim by that party or notice of any claim or the commencement of any action or proceeding with respect to which any other party(ies) is/are obligated to provide indemnification (the "Indemnifying Party") under Paragraph 8.1 above (a "Claim"), the Indemnified Party shall promptly give the Indemnifying Party notice thereof.  Within 30 days after such notice, the Indemnifying Party shall notify the Indemnified Party whether it irrevocably elects to make payment of the amount claimed or, with respect to third party claims, to contest such claim by appropriate legal proceedings.  The failure of the Indemnifying Party to notify the Indemnitee of its intention within that 30 days shall constitute an irrevocable election by them that it shall pay the amount claimed, as appropriate.  Any defense of a claim shall be conducted by counsel of good standing chosen by Indemnifying Party and and reasonably satisfactory to Indemnified Party.  Such defense shall be conducted at the expense of Indemnifying Party, except that if any proceeding involves both claims against which indemnity is granted hereunder and other claims for which indemnification is not granted hereunder, the expenses of defending against such claims shall be borne by the Indemnifying Party and the Indemnified Party in respective proportions to the dollar amount of the claims for which they may be liable based on the aggregate dollar amount of the claims.

### 9.    TERMINATION AND ABANDONMENT

### 9.1    Methods of Termination

The transactions contemplated by this Agreement may be terminated at any time before the Closing as follows:

17.

a.  By mutual consent of the parties to this Agreement evidenced in a writing signed by the parties;

b.  By Buyer, if a condition set forth in Article 6 has not been satisfied;

c.  By Seller or the Company, if a condition set forth in Article 7 has not been satisfied.

9.2     Procedure on Termination

In the event of termination pursuant to this Article 9, a written notice shall forthwith be given by the terminating party to the other party and the transactions contemplated by this Agreement shall be terminated and abandoned without further actions.  If the transactions contemplated by this Agreement are terminated and/or abandoned as provided herein, then:

a.  Each party will redeliver all documents, work papers, and other material of any other party relating to the transactions contemplated by this Agreement, whether obtained before or after the execution hereof, to the party furnishing the same; and

b.  The confidentiality of all confidential information received by any party with respect to the business of any other party or its subsidiaries shall survive the termination of this Agreement.

10.     MISCELLANEOUS

10.1     Counterparts.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one original.  Executed counterparts of this Agreement may be delivered by facsimile transmission or by delivery of a scanned counterpart in portable document format (PDF) by email, in either case with delivery confirmed.  On such confirmed delivery, the signatures in the facsimile or PDF data file shall be deemed to have the same force and effect as if the manually signed counterpart had been delivered to the other party in person.

10.2     Notices

All notices, demands, requests, or other communications that may be or are required to be given, served, or sent by any party to any other party under this Agreement shall be in writing and shall be delivered: (i) in person; (ii) by registered or certified mail (return receipt requested), or Priority Mail (with delivery confirmation); (iii) by a commercial courier guaranteeing overnight delivery (e.g., FedEx); or (iv) by email (with delivery confirmation), addressed as follows:

a.  If to Seller:
    Nextpulse, LLC
    560 Fletcher Drive
    Atherton, CA 94027
    Email: tomp@netpulse.com

    With a copy to:
    Jeffrey Y. Suto, A Professional Corporation
    751 Laurel Street, Suite 721
    San Carlos, CA 94070
    Fax: 650.472.9064
    Email: jeff@jsuto.com

b.  If to the Company:
    Virtual Active, Inc.
    c/o Forward Motion Pictures LLC
    6161 S. Rockridge Blvd.
    Oakland, CA 94618
    Email: chrisgalipo@gmail.com, marcusmarotto@gmail.com,
    ruben.grijalva@gmail.com

    And:

    Nextpulse, LLC
    560 Fletcher Drive
    Atherton, CA 94027
    Email: tomp@netpulse.com

    With a copy to:
    Brandstetter Law, PC
    One Market, Spear Tower, 36th Floor
    San Francisco, CA 94105
    Fax: (415) 571-8601
    Email: brandstetterlaw@gmail.com

    And:

    Jeffrey Y. Suto, A Professional Corporation
    751 Laurel Street, Suite 721
    San Carlos, CA 94070
    Fax: 650.472.9064
    Email: jeff@jsuto.com

  c. If to Buyer:
   Forward Motion Pictures LLC
   6161 S. Rockridge Blvd.
   Oakland, CA 94618
   Email: chrisgalipo@gmail.com, marcusmarotto@gmail.com,
   ruben.grijalva@gmail.com

   With a courtesy copy to:
   Brandstetter Law, PC
   One Market, Spear Tower, 36th Floor
   San Francisco, CA 94105
   Fax: (415) 571-8601
   Email: brandstetterlaw@gmail.com

Delivery shall be effective on delivery or refusal of delivery, with the receipt or affidavit of the United States Postal Service or overnight delivery service deemed conclusive evidence of such delivery or refusal. Each party may designate by notice in writing a new address to which any notice, demand, request, or communication may thereafter be so given, served, or sent.

  10.3 Public Announcement

Neither the Company, Seller, nor Buyer shall, without the approval of the other parties, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except to the extent that any such party shall be so obligated by law, in which case the other parties shall be advised in advance of the legal requirement and the parties shall use their best efforts to cause a mutually agreeable release, announcement or disclosure to be timely issued; *provided* that the foregoing shall not preclude communications or disclosures necessary to implement the provisions of this Agreement.

  10.4 Successors and Assigns

This Agreement and the rights, interests, and obligations hereunder shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

  10.5 Governing Law

This Agreement shall be construed and enforced in accordance with the laws of the State of California, without giving effect to principles of conflicts of laws.

  10.6 Waiver and Other Action

This Agreement may be amended, modified, or supplemented only by a written instrument executed by the party against which enforcement of the amendment, modification, or supplement is sought.

10.7    Entire Agreement

This Agreement, its Exhibits, and the other documents executed or delivered under the Agreement contain the complete agreement among the parties with respect to the transactions contemplated hereby and supersede all prior agreements and understandings among the parties with respect to the transactions contemplated by this Agreement. Paragraph and other headings are for reference purposes only and shall not affect the interpretation or construction of this Agreement.

10.8    Severability

If any provision of this Agreement is held to be illegal, invalid, or unenforceable, that provision shall be fully severable, and this Agreement shall be construed and enforced as if the illegal, invalid, or unenforceable provision were never a part of the Agreement; the remaining provisions shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance (except to the extent the remaining provisions constitute obligations of another party to this Agreement corresponding to the unenforceable provision); and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this Agreement, a provision as similar in its terms to the illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

10.9    Interpretation

This Agreement shall be construed according to the fair meaning of its language. The rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in interpreting this Agreement. Whenever the term "including" is used in this Agreement, it shall be interpreted as meaning "including, but not limited to" the matter or matters thereafter enumerated. The word "or" is not exclusive.

10.10   Third Party Beneficiaries

Nothing in this Agreement is intended to confer upon any person other than the parties hereto and their successors and permitted assigns any rights or remedies under or by reason of this Agreement.

10.11   Arbitration of Disputes

Any dispute arising from, or relating to, this Agreement shall be resolved at the request of any party through binding arbitration. Within 14 business days after demand for arbitration has been made by a party, the parties, or their counsel, shall meet to discuss the issues involved, to discuss a suitable arbitrator and arbitration procedure, and to agree on arbitration rules particularly tailored to the matter in dispute, with a view to the dispute's prompt, efficient, and just resolution. On the failure of the parties to agree on arbitration rules and procedures within a reasonable time (not longer than thirty (30) days from the demand), the Commercial Arbitration Rules of the American Arbitration Association shall be applicable. Likewise, on the failure of the parties to agree on an arbitrator within a reasonable time (not longer than thirty (30) days from the demand), there shall be a panel comprised of one (1) arbitrator, to be appointed by the American Arbitration Association. At least thirty (30) days before the arbitration hearing, the

parties shall allow each other reasonable written discovery, including the inspection and copying of documents and other tangible items relevant to the issues that are to be presented at the arbitration hearing.  The arbitrator shall be empowered to decide any disputes regarding the scope of discovery.  Fees for the arbitrator shall be divided equally between the parties, and the parties will be individually responsible for the payment of the fees.  The prevailing party in any arbitration, proceeding or legal action arising out of, or in connection with, this Agreement shall be entitled to recover its reasonable attorneys' fees and costs incurred in connection with such arbitration, proceeding or legal action.  The arbitrator shall determine who the prevailing party is for this purpose.  All attorneys' fees and other expenses incurred by a party in enforcing a judgment in its favor under this Agreement shall be recoverable separate from, and in addition to, any judgment amount.  This attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment.

The award rendered by the arbitrator shall be final and binding on the parties.  The arbitration shall be conducted in Oakland, California.  The California State Superior Court located in Alameda County, California shall have exclusive jurisdiction over disputes between the parties in connection with the arbitration and its enforcement.  The parties consent to the jurisdiction and venue of the California State Superior Court located in Alameda County, California, California.  Notwithstanding the fact that the parties have agreed to have any disputes arising from, or related to, this Agreement resolved by binding arbitration, this arbitration provision shall not prevent the parties from seeking ancillary or equitable relief in connection therewith from the California State Superior Court, including specific performance.

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION.  IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.  YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

BUYER _____            SELLER _____


COMPANY _____

10.12   Exhibits and Schedules

All exhibits and schedules referenced in this Agreement and attached hereto are hereby incorporated herein by this reference.

IN WITNESS WHEREOF, the parties have executed this Agreement with the intention of being bound by it as of the day and year first above written.

Date: February 28, 2019            "Seller"
                                   Nextpulse, LLC
                                   A Delaware limited liability company


                                   By: _____
                                       Thomas A. Proulx
                                   Its:  CEO



Date: February 28, 2019            "The Company"
                                   Virtual Active, Inc.
                                   A California corporation


                                   By: _____
                                       Thomas A. Proulx
                                   Its:  CEO



Date: February 28, 2019            "Buyer"
                                   Forward Motion Pictures LLC
                                   A California limited liability company


                                   By: _____
                                       Christopher Galipo
                                   Its:  CEO

**SIGNATURE PAGE TO**
**VIRTUAL ACTIVE**
**STOCK PURCHASE AND SALE AGREEMENT**

**Exhibit A**
**COMPANY PERSONAL PROPERTY & INTELLECTUAL PROPERTY**

The Company's assets include the following:

A. Intellectual Property:
   1. All of the Company's content library (as itemized in Schedule 1 by Marcus Marotto), including finished content and unfinished content (e.g., scripts, production plans, shot but unreleased or unedited footage, etc.).
   2. All of the Company's content metadata and supporting data.
   3. All of the Company's computer code to create and/or manage Company media.
   4. The Company brand, trademarks, service marks, trade names, copyrights, patents, software, IT systems, domains, and trade secrets.

B. Inventory:
   1. All of the Company's production/shooting equipment.
   2. All of the Company's computer and office equipment located in the storage closet at 50 Osgood Place, San Francisco, CA 94133.
   3. All of the Company's DVD/product inventory as stated by acutrack.com.

c. Platform:
   1. The Company's Shopify store (vafitness.com).
   2. The Company's Amazon store.
   3. All of the Company's partner relationships.

**Exhibit B**
**PROMISSORY NOTE AND SECURITY AGREEMENT**

# SECURED PROMISSORY NOTE

$330,000                                                                February 28, 2019

FOR VALUE RECEIVED, each of the undersigned, Forward Motion Pictures LLC, a California limited liability company, and Virtual Active, Inc., a California corporation (collectively ***"Makers"***), whose addresses are as set forth on the signature page below, promises to pay to the order of Nextpulse, LLC, a Delaware limited liability company (***"Holder"***), at 560 Fletcher Drive, Atherton, California 94027, or at such other place as Holder may from time to time designate in writing, the principal sum of Three Hundred Thirty Thousand Dollars ($330,000) in lawful money of the United States of America (the ***"Secured Obligations"***).

1.      INTEREST RATE:  Makers additionally promise to pay interest on the unpaid principal balance from March 1, 2019), prorated accordingly for any partial month payments, until payment in full at the rate of six and 0/100 percent (6%) per annum (the ***"Secured Obligations Rate"***).  Interest at the Secured Obligations Rate shall be calculated on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed. Upon the occurrence (i) of an Event of Default as defined herein, or under the Security Agreement dated as of February 28, 2019 by and among Makers and Holder (the ***"Security Agreement"***); and/or (ii) after maturity of this secured promissory note (this ***"Note"***) (whether maturity occurs by demand, acceleration, lapse of time or otherwise), the unpaid principal and interest due on this Note and all other sums owed by Makers to Holder shall bear interest until paid at a default rate of interest that will be fifteen percent (15%) per annum, but not in excess of the maximum interest rate permitted by law (the ***"Default Rate"***).

2.      PAYMENTS:  Interest shall be due and payable in advance and in monthly installments, except that the first interest payment shall be due and payable on April 1, 2019 and cover the period from March 1, 2019 through March 31, 2019.  Thereafter, interest payments shall be due and payable on the first business day of each month and shall cover the interest due for the preceding month (e.g., interest due on May 1, 2019 shall cover the period from April 1, 2019 to April 30, 2019).  Beginning on July 1, 2020, Makers shall also be required to make partial principal payments in the amount of $15,715 per month at the time monthly interest installments are due.

3.      MATURITY DATE:  On January 1, 2022 (the ***"Maturity Date"***), the Secured Obligations will mature, and the entire outstanding principal balance plus accrued interest and all other outstanding amounts owed by Makers to Holder under this Note; the Stock Purchase and Sale Agreement dated as of February 28, 2019 by and among Makers and Holder; the Security Agreement; or any other agreement or other instrument securing this Note or evidencing Makers' obligation to repay the Secured Obligations (collectively referred to herein as the ***"Secured Obligations Documents"***) will be due.

4.      LATE CHARGE:  Makers shall have a seven (7) business day grace period in which to make the required payments other than any payments due on the Maturity Date for which there is no grace period.  In the event Makers fail to make the required payments within this grace period, Holder shall be entitled to collect, and Makers agree to pay, a late charge, in addition to the amount of the late payment, equal to interest accruing on the amount of

the late payment from the date such payment was due (without giving effect to the grace period) to the date payment is made at a rate of interest equal to fifteen percent (15%) per annum of the delinquent payment until paid.

      5.     APPLICATION OF PAYMENTS:  Subject to Paragraph 5 of this Note, Every payment received with respect hereto may be applied by Holder to any portion of the obligations of Makers to Holder then due and owing as follows:  (a) first, to recovery, with interest thereon at the Default Rate, of any expenses, costs, or fees, including attorneys' fees, funds paid or advanced by Holder or any similar charges pursuant to any of the Secured Obligations Documents; (b) second, to any scheduled escrow for tax, insurance or similar items; (c) third, to any late charge or default interest due hereunder or under any of the other Secured Obligations Documents; (d) fourth, to the payment of accrued interest on the principal balance from time to time remaining unpaid; and (e) fifth, to reduce the principal balance hereunder, whether or not due and payable.  If any partial payment is accepted on this Note at a time when an amount in excess of such partial payment is then in arrears, such partial payment shall be applied to the oldest outstanding amount in arrears in the order of the arrearage unless Holder elects to apply such payment in some other order.  Notwithstanding any other provision hereof or of any of the other Secured Obligations Documents, from and after the occurrence of an Event of Default, all payments and other amounts received by Holder may be applied by Holder in such manner and to such indebtedness (whether to payment of advances made by Holder pursuant to any provision of any of the Secured Obligations Documents, interest, principal, interest at the Default Rate, prepayment premium, fees and expenses or otherwise) and in such amounts and order of priority as Holder may determine in the exercise of its sole and absolute discretion.

      6.     PREPAYMENTS: Makers may pay at any time, without penalty or premium, all or any portion of the outstanding principal amount of this Note prior to the Maturity Date.  Notwithstanding Paragraph 5 of this Note, if no Event of Default exists at the time of such prepayment, then any prepaid amounts shall be credited to the next principal payment due.

      7.     EVENTS OF DEFAULT AND REMEDIES:  The occurrence of one or more of the following shall constitute an ***"Event of Default"*** under this Note:

      (a)     Any payment of principal or interest due hereunder is not paid within seven (7) business days of when such payments become due (other than amounts due on the Maturity Date for which there is no grace period), or any amount other than principal or interest owed by Makers to Holder under any Secured Obligation Document is not paid when due;

      (b)     An Event of Default shall occur under any other Secured Obligations Document, specifically including, without limiting the generality of the foregoing, any unpermitted transfer of the Property conveyed as security for this Note;

      (c)     Holder shall at any time provide notice to Makers that Holder, in good faith, believes that the prospect of due and punctual payment of this Note is impaired, or any change takes place in the conditions or affairs of Makers which impairs Holder's security, which good faith belief is not changed within 15 days of such notice;

(d)     Default in the observance or performance of any covenant or agreement of Makers set forth in this Note or in any Secured Obligations Document;

(e)     Any warranty, representation, certificate, schedule or other information made or furnished by either of Makers is untrue or misleading in any material respect;

(f)     Makers or any guarantor of this Note shall liquidate, merge, dissolve, terminate its existence, suspend business operations, have a receiver appointed for all or any part of its property, make an assignment for the benefit of its creditors, become insolvent, or file any petition under any existing or future bankruptcy or insolvency law or have an order for relief entered under any such law or have filed against it a petition under any existing or future bankruptcy or insolvency law which has not been dismissed within ninety (90) days after it was filed.

Upon the occurrence of one or more Events of Default, Holder may, at its option, declare the entire unpaid principal balance and accrued interest under this Note or other sums owed from Makers to Holder under any Secured Obligations Document, to be immediately due and payable. Upon the occurrence of one or more Events of Default, Holder shall also have the right to exercise any right or remedy Holder has under the terms of any Secured Obligations Document or under any state or federal law.  Any consent by Holder, or any waiver of any Event of Default shall not constitute a consent to, or waiver of, any right, remedy or power of Holder upon a subsequent Event of Default.

8.     ATTORNEYS' FEES:  If Holder shall employ the services of legal counsel in connection with (i) any request made by Makers to Holder for a modification, amendment, waiver, or consent in connection with the Secured Obligations Documents, (ii) defending or protecting Holder's interests in any Secured Obligations Document or any property securing the Secured Obligations from and against any claim or assertion made by any third party, (iii) rendering advice or other legal services to Holder concerning the Secured Obligations or any Secured Obligations Document, (iv) rendering advice to Holder, enforcing Holder's legal rights, or performing other legal services for Holder upon the occurrence of an Event of Default, (v) representing the interests of Holder in any lawsuit arising out of or in connection with the Secured Obligations Documents or Holder's position as secured party or beneficiary under any Secured Obligations Document, or (vi) any other judicial or nonjudicial action, suit or proceeding instituted by Holder or any other person connected with or related to or with reference to the Secured Obligations or to reclaim, seek relief from a judicial or statutory stay, sequester, protect, preserve or enforce Holder's interest in this Note or any other Secured Obligations Document (including proceedings under federal bankruptcy law, in eminent domain, under probate proceedings, or in connection with any state or federal tax lien), then in such event Makers promise to pay reasonable attorney's fees and reasonable costs and expenses and any other professional's fees incurred by Holder and/or its attorney in connection with the above-mentioned events.

9.     ACTIONS BY HOLDER:  If Makers fail to make any payment that Makers are required by any Secured Obligations Document to make to a third party, whether for real estate taxes, insurance premiums, attorneys' fees or otherwise, or fails to do any act as may

be required under any Secured Obligations Document, Holder may, at the discretion of Holder, without obligation to do so and without releasing Makers from any obligation, make or do the same in such manner and such event as Holder shall deem necessary. Without notice to Makers, Holder may either add such payments and expenses *("Advancements")* to the principal to accrue interest at the Default Rate until maturity of the Secured Obligations or bill Makers for such Advancements plus interest at the Default Rate from the date of Advancement until repaid.

10.    MAXIMUM INTEREST RATE/CHARGES:  It being the intention of Holder and Makers to comply with the laws of the State of California with regard to the rate of interest charged hereunder, it is agreed that, notwithstanding any provision to the contrary in this Note or any of the other Secured Obligations Documents, no such provision shall require the payment or permit the collection of any amount *("Excess Interest")* in excess of the maximum amount of interest permitted by law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the indebtedness evidenced by this Note.  If any Excess Interest is provided for, or is adjudicated to be provided for, in this Note or any of the other Secured Obligations Documents, then in such event:

(a)    the provisions of this paragraph shall govern and control;

(b)    Makers shall not be obligated to pay any Excess Interest;

(c)    any Excess Interest that Holder may have received hereunder shall, at the option of Holder, be (i) applied as a credit against the then outstanding principal balance due under this Note, accrued and unpaid interest thereon not to exceed the maximum amount permitted by law, or both, (ii) refunded to the payor thereof, or (iii) any combination of the foregoing;

(d)    the applicable interest rate or rates shall be automatically subject to reduction to the maximum lawful rate allowed to be contracted for in writing under the applicable usury laws of the aforesaid State, and this Note and the other Secured Obligations Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in such interest rate or rates; and

(e)    Makers shall not have any action or remedy against Holder for any damages whatsoever or any defense to enforcement of the Note or any of the other Secured Obligations Documents arising out of the payment or collection of the Excess Interest.

11.    GOVERNING LAW AND OTHER AGREEMENTS:  Makers agree that: (i) this Note and the rights and obligations of the parties hereunder shall be governed by the laws of the State of California, without reference to the conflict of law principles of such state; (ii) the obligation evidenced by this Note is an exempted transaction under the Truth In Lending Act, 15 U.S.C. Section 1601, et seq.; and (iii) said obligation constitutes a business obligation and is not intended by Makers for use for personal, family, or household purposes.

12.    SECURITY:  This Note is secured by the Security Agreement covering certain intellectual property located in Alameda County, California, and more particularly described in the Security Agreement.  All covenants, conditions and agreements contained in the

Security Agreement are hereby made a part of this Note. Each of Makers acknowledge and agree that the Secured Obligations and the other obligations secured by the Security Agreement are full recourse and that, subject to the provisions of this Note, the Security Agreement and applicable law, Holder's remedies upon default by Makers are not limited to foreclosure.

13.     WAIVERS:  Makers and any and all others who may become liable for all or part of the obligations of Makers under this Note (collectively the ***"Obligors"***) agree to be jointly and severally bound hereby and jointly and severally, to the extent permitted by law:  (i) waive and renounce any and all redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or by any extension or renewal hereof; (ii) waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest; (iii) waive all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder; (iv) waive any and all lack of diligence and delays in the enforcement of the payment hereof; (v) agree that the liability of each Obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by Holder to any Obligor or any such other person or entity; (vi) consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Holder with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; and (vii) consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such obligors or security shall not affect the liability of any of Obligors for the payment hereof.

14.     ENTIRE AGREEMENT:   This instrument, together with the other Secured Obligations Documents as defined above, constitutes and sets forth the entire understanding and agreement between the parties, and no party hereto has relied upon any representations, agreements or understandings, verbal or written, not set forth herein, or in such other Secured Obligations Documents, whether made by any party hereto or by any agent, employee or representative of any party hereto.  Specifically, without limiting the generality of the foregoing, the parties agree that Holder has made no agreement to extend or renew this Note in any way, and no such agreement will be binding upon Holder unless made in writing, subsequent to the date hereof, and executed by a duly authorized representative of Holder.

15.     HEADINGS AND INTERPRETATION:  Headings are for convenience only and are not intended as a limitation on the content of the paragraph following, nor as an aid to the construction thereof.  The parties hereto intend and believe that each provision in this Note comports with all applicable law.  However, if any provision in this Note is found by a court of law to be in violation of any applicable law, and if such court should declare such provision of this Note to be unlawful, void or unenforceable as written, then it is the intent of all parties to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note shall be construed as if such unlawful, void or unenforceable provision were not contained therein, and that the rights, obligations and interests of Makers and Holder hereof under the remainder of this Note shall continue in full force and effect; provided, however, that if any provision of this

Note which is found to be in violation of any applicable law concerns the imposition of interest hereunder, the rights, obligations and interests of Makers and Holder with respect to the imposition of interest hereunder shall be governed and controlled by the provisions of this Note. TIME IS OF THE ESSENCE OF THIS NOTE.  Use of the word "including" shall not be construed as a limitation and the word "including" shall be deemed to mean "including, but not limited to."

16.    MISCELLANEOUS:

(a)    The remedies of Holder as provided herein or any of the other Secured Obligations Documents, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of Holder, and may be exercised as often as occasion therefor shall arise.  Failure of Holder, for any period of time or on one or more than one occasion, to exercise its option to accelerate the Maturity Date of this Note shall not constitute a waiver of the right to exercise the same at any time thereafter or in the event of any subsequent default.  No act of omission or commission of Holder, including specifically any failure to exercise any right, remedy, or recourse, shall be deemed to be a waiver or release of the same; any such waiver or release is to be effected only through a written document executed by Holder and then only to the extent specifically recited therein.  A waiver or release in connection with any one event shall not be construed as a waiver or release of any subsequent event or as a bar to any subsequent exercise of Holder's rights or remedies hereunder.  Notice of the exercise of any right or remedy granted to Holder by this Note is not required to be given.

(b)    Upon any endorsement, assignment, or other transfer of this Note by Holder or by operation of law, the term "Holder," as used herein, shall mean such endorsee, assignee, or other transferee or successor to Holder then becoming the holder of this Note.  This Note shall inure to the benefit of Holder and its successors and assigns and shall be binding upon the undersigned and its successors and assigns.

(c)    Makers agree that Holder and any future Holders or participants may grant or sell participation interests in this Note to other persons without notice to or approval of Makers.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, Makers have executed this Note as of the date first above written.

NOTICE TO MAKERS:  DO NOT SIGN THIS PROMISSORY NOTE BEFORE YOU READ IT OR IF YOU BELIEVE THAT THERE ARE ANY ORAL UNDERSTANDINGS, PROMISES, OR AGREEMENTS NOT SET FORTH IN WRITING IN THE SECURED OBLIGATIONS DOCUMENTS.

*Maker*:                                         FORWARD MOTION PICTURES LLC


By:    _____

Name:  _____

Title:  _____

*Address*:                                      6161 S. Rockridge Blvd.
                                                        Oakland, CA 94618




*Maker*:                                         VIRTUAL ACTIVE, INC.


By:    _____

Name:  _____

Title:  _____

*Address*:                                      c/o Forward Motion Pictures LLC
                                                        6161 S. Rockridge Blvd.
                                                        Oakland, CA 94618




**SIGNATURE PAGE TO**
**FMP SECURED PROMISSORY NOTE**

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT dated as of February 28, 2019 ("*Security Agreement*"), is made by FORWARD MOTION PICTURES LLC, a California limited liability company and Virtual Active, Inc., a California corporation (collectively, "*Grantors*" and individually, a *"Grantor"*), in favor of NEXTPULSE, LLC, a Delaware limited liability company ("*Secured Party*").

## RECITALS

A.    Secured Party has made and has agreed to make certain advances of money and to extend certain financial accommodations to Grantors as evidenced by that certain Secured Promissory Note dated February 28, 2019 executed by Grantors in favor of Secured Party and such other Secured Promissory Notes which may be executed by Grantors in favor of Secured Party after the date hereof (individually, the "*Note*" and, collectively, the "*Notes*") and that certain Stock Purchase and Sale Agreement dated February 28, 2019 by and among Grantors and Secured Party (the "*Purchase Agreement*"), such advances, future advances, and financial accommodations being referred to herein as the "*Loans*".

B.    Secured Party is willing to make the Loans to Grantors, but only upon the condition, among others, that Grantors shall have executed and delivered to Secured Party this Security Agreement.

## AGREEMENT

NOW, THEREFORE, in order to induce Secured Party to make the Loans and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, Grantors hereby represent, warrant, covenant and agree as follows:

1.    DEFINED TERMS.  When used in this Security Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC.

"*Bankruptcy Code*" means Title XI of the United States Code.

"*Collateral*" shall have the meaning assigned to such term in **Section 2** of this Security Agreement.

"*Contracts*" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or Instruments), whether in written or electronic form, in or under which Grantor now holds or hereafter acquires any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof.

"*Copyright License*" means any agreement, whether in written or electronic form, in which Grantor now holds or hereafter acquires any interest, granting any right in or to any Copyright or Copyright registration (whether Grantor is the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which Grantor has obtained the exclusive right to use a copyright owned by a third party.

"*Copyrights*" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of Grantor) by Grantor or in which Grantor now holds or hereafter acquires or receives any right or interest, in whole or in part: (a) all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of Grantor) or acquired by Grantor, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"*Event of Default*" means (i) any failure by Grantors forthwith to pay or perform any of the Secured Obligations (provided, however, that an Event of Default with respect to late or nonpayment of principal or interest under the Notes shall be as defined in paragraph 7.(a) of the Note dated as of February 7, 2019), (ii) any report, information or notice made to, obtained or received by Secured Party at any time after the date hereof shall indicate that Secured Party's security interest in the Collateral is not prior to all other security interests or other interests in the Collateral reflected in such report, information or notice, except for Permitted Liens, (iii) any breach by Grantors of any warranty, representation, or covenant set forth herein, and (iv) any "Event of Default" as defined in the Notes or the Purchase Agreement.

"*Intellectual Property*" means any intellectual property, in any medium, of any kind or nature whatsoever, now or hereafter owned or acquired or received by Grantor or in which Grantor now holds or hereafter acquires or receives any right or interest, and shall include, in any event, any Copyright, Trademark, Patent, License, trade secret, customer list, marketing plan, internet domain name (including any right related to the registration thereof), proprietary or confidential information, mask work, source, object or other programming code, invention (whether or not patented or patentable), technical information, procedure, design, knowledge, know-how, software, data base, data, skill, expertise, recipe, experience, process, model, drawing, material or record.

"*License*" means any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by Grantor or in which Grantor now holds

or hereafter acquires or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"**_Lien_**" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"**_Patent License_**" means any agreement, whether in written or electronic form, in which Grantor now holds or hereafter acquires any interest, granting any right with respect to any invention on which a Patent is in existence (whether Grantor is the licensee or the licensor thereunder).

"**_Patents_**" means all of the following in which Grantor now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"**_Permitted Lien_**" means: (a) any Liens existing on the date of this Security Agreement and set forth on **Schedule A** attached hereto; (b) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Secured Party's security interests created hereunder; (c) Liens (i) upon or in any Equipment acquired or held by Grantors to secure the purchase price of such Equipment or indebtedness (including capital leases) incurred solely for the purpose of financing the acquisition of such Equipment or (ii) existing on such Equipment at the time of its acquisition, provided that the Lien is confined solely to the Equipment so acquired, improvements thereon and the Proceeds of such Equipment; (d) leases or subleases and licenses or sublicenses granted to others in the ordinary course of Grantors' business if such are not otherwise prohibited under this Security Agreement and do not interfere in any material respect with the business of Grantors; (e) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution; (f) liens in favor of a securities intermediary pursuant to such securities intermediary's customary customer account agreement; provided that any such Liens shall at no time secure any indebtedness or obligations other than customary fees and charges payable to such securities intermediary; (g) materialmen's, mechanic's, repairmen's, or other like Liens arising in the ordinary course of business and which are not delinquent; (h) Liens to secure payment of worker's compensation, employment insurance, old age pensions or other social security obligations of either Grantor in each case arising in the ordinary course of business of Grantor; and (i) Liens incurred in the extension, renewal or refinancing of the indebtedness secured by Liens described in (a) or (c), but any extension, renewal or replacement Lien must be limited to

the property encumbered by the existing Lien and the principal amount of the indebtedness may not increase.

"*Secured Obligations*" means (a) the obligation of Grantors to repay Secured Party all of the unpaid principal amount of, and accrued interest on (including any interest that accrues after the commencement of bankruptcy), the Loans, (b) the obligation of Grantors to pay any fees, costs or expenses of Secured Party under the Notes, the Purchase Agreement, this Security Agreement, and (c) all other indebtedness, liabilities and obligations of Grantors to Secured Party, whether now existing or hereafter incurred, and whether created under, arising out of or in connection with any written agreement or otherwise.

"*Security Agreement*" means this Security Agreement and all Schedules hereto, as the same may from time to time be amended, modified, supplemented or restated.

"*Trademark License*" means any agreement, whether in written or electronic form, in which Grantor now holds or hereafter acquires any interest, granting any right in and to any Trademark or Trademark registration (whether Grantor is the licensee or the licensor thereunder).

"*Trademarks*" means any of the following in which Grantor now holds or hereafter acquires any interest: (a) any trademarks, tradenames, corporate names, company names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "*Marks*"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

"*UCC*" means the Uniform Commercial Code as the same may from time to time be in effect in the State of California (and each reference in this Security Agreement to an Article thereof (denoted as a Division of the UCC as adopted and in effect in the State of California) shall refer to that Article (or Division, as applicable) as from time to time in effect; *provided, however,* in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, the term "*UCC*" shall mean the Uniform Commercial Code (including the Articles thereof) as in effect at such time in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2.    **GRANT OF SECURITY INTEREST**.  As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by

acceleration or otherwise) of all the Secured Obligations and in order to induce Secured Party to cause the Loans to be made, Grantors hereby assign, convey, mortgage, pledge, hypothecate and transfer to Secured Party, and hereby grants to Secured Party, a security interest in all of Grantors' right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "***Collateral***"):

        **(a)**     All Accounts of Grantors;

        **(b)**     All Chattel Paper of Grantors;

        **(c)**     The Commercial Tort Claims of Grantors more particularly described on **Schedule F** attached hereto;

        **(d)**     All Commodity Accounts of Grantors;

        **(e)**     All Contracts of Grantors;

        **(f)**     All Deposit Accounts of Grantors;

        **(g)**     All Documents of Grantors;

        **(h)**     All General Intangibles of Grantors, including, without limitation, Intellectual Property;

        **(i)**     All Goods of Grantors;

        **(j)**     All Instruments of Grantors, including, without limitation, Promissory Notes;

        **(k)**     All Investment Property of Grantors;

        **(l)**     All Letter-of-Credit Rights and Letters of Credit of Grantors;

        **(m)**     All Money of Grantors;

        **(n)**     All Securities Accounts of Grantors;

        **(o)**     All Supporting Obligations of Grantors;

        **(p)**     All property of Grantors held by Secured Party, or any other party for whom Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of Grantors, or as to which Grantors may have any right or power;

        **(q)**     All other goods and property of Grantors, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to Grantors; and

**(r)**     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

If either Grantor shall at any time acquire a Commercial Tort Claim, Grantor shall immediately notify Secured Party in a writing signed by Grantor of the brief details thereof and grant to Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Security Agreement, with such writing to be in form and substance satisfactory to Secured Party.

**3.     RIGHTS OF SECURED PARTY; COLLECTION OF ACCOUNTS.**

**(a)**     Notwithstanding anything contained in this Security Agreement to the contrary, Grantors expressly agree that they shall remain liable under each of its respective Contracts, Chattel Paper, Documents, Instruments and Licenses to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions of each such Contract, Chattel Paper, Document, Instrument, and License. Secured Party shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument, or License by reason of or arising out of this Security Agreement or the granting to Secured Party of a lien therein or the receipt by Secured Party of any payment relating to any such Contract, Chattel Paper, Document, Instrument, or License pursuant hereto, nor shall Secured Party be required or obligated in any manner to perform or fulfill any of the obligations of Grantors under or pursuant to any such Contract, Chattel Paper, Document, Instrument, or License, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument, or License, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

**(b)**     Secured Party authorizes Grantors to collect their Accounts, provided that such collection is performed in a prudent and businesslike manner, and Secured Party may, upon the occurrence and during the continuation of any Event of Default and without notice, limit or terminate said authority at any time.  At the request of Secured Party, Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

**(c)**     Secured Party may at any time, upon the occurrence and during the continuance of any Event of Default, without notifying Grantors of its intention to do so, notify Account Debtors of Grantors, parties to the Contracts of Grantors, and obligors in respect of Instruments of Grantors and obligors in respect of Chattel Paper of Grantors that the Accounts and the right, title and interest of Grantors in and under such Contracts, Instruments and Chattel Paper have been assigned to Secured Party and that payments shall be made directly to Secured Party.  Upon the occurrence and during the continuance of any Event of Default, upon the request of Secured Party, Grantors shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper.

Secured Party may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to Secured Party's satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

4.    **REPRESENTATIONS AND WARRANTIES**.  Each Grantor hereby represents and warrants to Secured Party that:

**(a)**    Except for the security interest granted to Secured Party under this Security Agreement and Permitted Liens, Grantor is the sole legal and equitable owner of each item of the Collateral in which it purports to grant a security interest hereunder, having good and marketable title thereto, free and clear of any and all Liens.

**(b)**    No effective security agreement, financing statement, equivalent security or lien instrument or continuation statement covering all or any part of the Collateral exists, except such as may have been filed by Grantor in favor of Secured Party pursuant to this Security Agreement and except for Permitted Liens.

**(c)**    This Security Agreement creates a legal and valid security interest on and in all of the Collateral in which Grantor now has rights and will create a legal and valid security interest in the Collateral in which Grantor later acquires rights.

**(d)**    Grantor's name and taxpayer identification number are correctly set forth on the signature page hereof.  The jurisdiction under whose law Grantor was organized is set forth on the signature page hereof.  Grantor's chief executive office, principal place of business, and the place where Grantor maintains its records concerning the Collateral are presently located at the address set forth on the signature page hereof.  The Collateral consisting of Goods, other than motor vehicles and other mobile goods, is presently located at such address and at such additional addresses set forth on **Schedule B** attached hereto.

**(e)**    All Collateral of Grantor existing as of the date hereof consisting of Chattel Paper, Instruments or Investment Property comprising certificated securities is set forth on **Schedule C** attached hereto. All action necessary or desirable to protect and perfect such security interest in each item set forth on **Schedule C**, including the delivery of all originals thereof, duly endorsed to Secured Party, has been duly taken.  The security interest of Secured Party in the Collateral listed on **Schedule C** is prior in right and interest to all other Liens (other than Permitted Liens) and is enforceable as such against creditors of and purchasers from Grantor.

**(f)**    The name and address of each depository institution at which Grantor maintains any Deposit Account and the account number and account name of each such Deposit Account are listed on **Schedule D** attached hereto.  The name and address of each securities intermediary or commodity intermediary at which Grantor maintains any Securities Account or Commodity Account and the account number and account name of each such Securities Account or Commodity Account are listed on **Schedule D** attached hereto.  Grantor agrees to amend **Schedule D** from time to time within ten (10) business days after opening any additional Deposit

7.

Account, Securities Account or Commodity Account, or closing or changing the account name or number on any existing Deposit Account, Securities Account, or Commodity Account.

(g)    None of the Investment Property of Grantor has been transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such transfer may be subject.

(h)    All Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses now owned, held or in which Grantor otherwise has any interest are listed on **Schedule E** attached hereto.  Grantor shall amend **Schedule E** from time to time in accordance with Section 5.9 below to reflect any additions to or deletions from this list.  Except as set forth on **Schedule E**, none of the Patents, Trademarks or Copyrights have been licensed to any third party.

(i)    All Commercial Tort Claims now owned, held or in which Grantor otherwise has any interest are described on **Schedule F** attached hereto.

5.    COVENANTS.  Each Grantor covenants and agrees with Secured Party that from and after the date of this Security Agreement and until the Secured Obligations have been performed and paid in full and any commitment of Secured Party to make Loans to Grantors has expired or terminated:

5.1    **Disposition of Collateral**.  Grantor shall not sell, lease, transfer or otherwise dispose of any of the Collateral, or attempt or contract to do so, other than (a) the sale of Inventory, (b) the granting of non-exclusive Licenses, or (c) the sale or disposal of old, worn-out, or obsolete Equipment, all of (a), (b) and (c) in the ordinary course of Grantor's business.

5.2    **Change of Name, Jurisdiction of Organization, Relocation of Business or Collateral**.  Grantor shall not change its name or jurisdiction of organization, relocate its chief executive office, principal place of business or its records, or allow the relocation of any Collateral (except as allowed pursuant to **Section 5.1** immediately above) from such address(es) provided to Secured Party pursuant to **Section 4(d)** above without fourteen (14) days prior written notice to Secured Party.

5.3    **Limitation on Liens on Collateral**.  Grantor shall not, directly or indirectly, create, permit or suffer to exist, and shall defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral, except (a) Permitted Liens and (b) the Lien granted to Secured Party under this Security Agreement.  Grantor shall further defend the right, title and interest of Secured Party in and to any of Grantor's rights under the Collateral against the claims and demands of all persons whomsoever.

5.4    **Limitations on Modifications of Accounts, Etc.**  Upon the occurrence and during the continuance of any Event of Default, Grantor shall not, without Secured Party's prior written consent, grant any extension of the time of payment of any of the Accounts, Chattel Paper, Instruments or amounts due under any Contract or Document, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than trade discounts and rebates granted in the ordinary course of Grantor's business.

**5.5**    **Insurance**.    Grantor shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to Grantor, and, in any event, at not less than the fair market value of the Collateral.  Grantor shall deliver to Secured Party, upon Secured Party's request, in form and substance satisfactory to Secured Party, certificates, binders and other instruments or documents evidencing such insurance coverage.  All such policies shall contain a provision whereby they may not be canceled or amended except upon 30 days (10 days for non-payment of premium) prior written notice to Secured Party, and all such policies shall name Secured Party as additional insured and loss payee.  Grantor hereby appoints Secured Party and any employee or agent of Secured Party as Grantor's attorney-in-fact, which appointment is coupled with an interest and is irrevocable, and authorizes Secured Party and any employee or agent of Secured Party, on behalf of Grantor, for the following purposes only: to adjust and compromise any loss under said insurance and to endorse any check or draft payable to Grantor in connection with returned or unearned premiums on said insurance or the proceeds of said insurance, and any amount so collected may be applied toward satisfaction of the Secured Obligations; provided however, that Secured Party shall not be required hereunder so to act.

**5.6**    **Taxes, Assessments, Etc**.    Grantor shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

**5.7**    **Maintenance of Records**.  Grantor shall keep and maintain at its own cost and expense satisfactory and complete records of the Collateral.  Grantor shall not create any Chattel Paper without placing a legend on the Chattel Paper acceptable to Secured Party (which approval by Secured Party shall not be unreasonably withheld, conditioned or delayed) indicating that Secured Party has a security interest in the Chattel Paper.

**5.8**    **[Reserved.]**

**5.9**    **Notification Regarding Changes in Intellectual Property**. Grantor shall:

**(a)**    promptly advise Secured Party in writing of any subsequent ownership right or interest of the Grantor in or to any Copyright, Patent, Trademark or License not specified on **Schedule E** hereto, and shall amend or permit Secured Party to amend such Schedule, as necessary, to reflect any addition or deletion to such ownership rights;

**(b)**    promptly give Secured Party written notice of any applications or registrations of intellectual property rights filed with the United States Patent and Trademark Office, including the date of such filing and the registration or application numbers, if any; and

**(c)**    (i) give Secured Party not less than 30 days prior written notice of the filing of any  applications or registrations with the United States Copyright Office, including the title of such intellectual property rights to be registered, as such title will appear on such applications or registrations, and the date such applications or registrations will be filed, and

(ii) prior to the filing of any such applications or registrations, shall execute such documents as Secured Party may reasonably request for Secured Party to maintain its perfection and priority in such intellectual property rights to be registered by Grantor, and upon the request of Secured Party, shall file such documents simultaneously with the filing of any such applications or registrations. Upon filing any such applications or registrations with the United States Copyright Office, Grantor shall promptly provide Secured Party with (x) a copy of such applications or registrations, without the exhibits, if any, thereto, (y) evidence of the filing of any documents requested by Secured Party to be filed for Secured Party to maintain the perfection and priority of its security interest in such intellectual property rights, and (z) the date of such filing.

(d)     Secured Party may audit Grantor's Intellectual Property to confirm compliance with Section 5.8 and this Section 5.9, provided such audit may not occur more often than twice per year, unless an Event of Default has occurred and is continuing. Secured Party shall have the right, but not the obligation, to take, at Grantor's sole expense, any actions that Grantor is required under this Section 5.9 to take but which Grantor fails to take, after five (5) days' notice to Grantor (provided that no such notice shall be required if an Event of Default has occurred and is continuing). Grantor shall reimburse and indemnify Secured Party for all reasonable costs and expenses incurred in the exercise of its rights under Section 5.8 or this Section 5.9.

**5.10     [Reserved.]**

**5.11     Notices**.   Grantor shall promptly inform Secured Party of any material damage or destruction to or of any of the Collateral.

**5.12     Maintenance of Collateral**.   Grantor shall maintain and protect the Collateral in good order and working repair and condition (taking into consideration ordinary wear and tear) and from time to time make or cause to be made all needful and proper repairs, renewals and replacements thereto; provided, however, that Grantor shall not be obligated to maintain or protect any Collateral in better condition than the condition of such Collateral at the time the same is transferred to Grantor pursuant to the Purchase Agreement.

**5.13     Further Assurances; Pledge of Instruments**.   Upon the written request of Secured Party, and at the sole expense of Grantor (unless an action is required by Grantor and Secured Party jointly, in which case the cost and expense thereof shall be borne equally between the parties), Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as may be reasonably necessary to obtain the full benefits of this Security Agreement, including, without limitation, (a) using its commercially reasonable efforts to secure all consents and approvals necessary or appropriate for the grant of a security interest to Secured Party in any item of Collateral held by Grantor or in which Grantor has any right or interest, (b) executing, delivering and causing to be filed any financing or continuation statements under the UCC with respect to the security interests granted hereby, (c) filing or cooperating with Secured Party in filing any forms or other documents required to be recorded with the United States Patent and Trademark Office or the United States Copyright Office, or in taking any actions or making any filings, recordings or registrations in any foreign jurisdiction or under any international treaty, required to secure or protect Secured Party's interest in the Collateral, (d) transferring the Collateral to Secured Party's possession (if a

security interest in such Collateral can be perfected only by possession), (e) at Secured Party's reasonable request, placing the interest of Secured Party as lienholder on the certificate of title (or similar evidence of ownership) of any vehicle, watercraft or other item of Collateral owned by Grantor which is covered by a certificate of title (or similar evidence of ownership), (f) executing and delivering and causing the applicable depository institution, securities intermediary, commodity intermediary or issuer or nominated party under a Letter of Credit to execute and deliver a collateral control agreement with respect to each Deposit Account, Securities Account or Commodity Account or Letter-of-Credit Right in or to which Grantor now or hereafter has any right or interest in order to perfect the security interest created hereunder in favor of Secured Party (including giving Secured Party "control" over such Collateral within the meaning of the applicable provisions of Article 8 and Article 9 of the UCC), (g) at Secured Party's reasonable request, executing and delivering or causing to be delivered written notice to insurers of Secured Party's security interest in, or claim in or under, any policy of insurance (including unearned premiums) and (h) at Secured Party's reasonable request, using its best efforts to obtain acknowledgments from bailees having possession of any Collateral and waivers of liens from landlords and mortgagees of any location where any of the Collateral may from time to time be stored or located.  Secured Party may, as reasonably necessary, file financing statements, continuation statements and amendments thereto that describe the Collateral as all assets of Grantor or words of similar effect.  Any such financing statements, continuation statements or amendments may be signed by Secured Party on behalf of Grantor and may be filed at any time in any jurisdiction.  Grantor also hereby authorizes Secured Party to file any such financing or continuation statement without the signature of Grantor.  If any amount payable under or in connection with any of the Collateral is or shall become evidenced by any Instrument, such Instrument, other than checks and notes received in the ordinary course of business and any Instrument in the outstanding or stated amount of less than $10,000, shall be duly endorsed in a manner reasonably satisfactory to Secured Party and delivered to Secured Party promptly and in any event within ten (10) business days of Grantor's receipt thereof.

## 6.    SECURED PARTY'S APPOINTMENT AS ATTORNEY-IN-FACT; PERFORMANCE BY SECURED PARTY.

(a)    Subject to **Section 6(b)** below, each Grantor hereby irrevocably constitutes and appoints Secured Party, and any officer or agent of Secured Party, with full power of substitution, as its true and lawful attorney-in-fact with full, irrevocable power and authority in the place and stead of Grantor and in the name of Grantor or in its own name, for the purpose of carrying out the terms of this Security Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments necessary to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, hereby gives Secured Party the power and right, on behalf of Grantor, upon written notice to or assent by Grantor to do the following:

(i)    to ask, demand, collect, receive and give acquittances and receipts for any and all monies due or to become due under any Collateral and, in the name of Grantor, in its own name or otherwise to take possession of, endorse and collect any checks, drafts, notes, acceptances or other Instruments for the payment of monies due under any Collateral and to file any claim or take or commence any other action or proceeding in any court

of law or equity or otherwise deemed appropriate by Secured Party for the purpose of collecting any and all such monies due under any Collateral whenever payable;

        **(ii)**    to pay or discharge any Liens, including, without limitation, any tax lien, levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for by the terms of this Security Agreement and to pay all or any part of the premiums therefor and the costs thereof, which actions shall be for the benefit of Secured Party and not Grantor;

        **(iii)**    to (1) direct any person liable for any payment under or in respect of any of the Collateral to make payment of any and all monies due or to become due thereunder directly to Secured Party or as Secured Party shall direct, (2) receive payment of any and all monies, claims and other amounts due or to become due at any time arising out of or in respect of any Collateral, (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts and other Instruments and Documents constituting or relating to the Collateral, (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral, (5) defend any suit, action or proceeding brought against Grantor with respect to any Collateral, (6) settle, compromise or adjust any suit, action or proceeding described above, and in connection therewith, give such discharges or releases as Secured Party may deem appropriate, (7) license, or, to the extent permitted by an applicable License, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Copyright, Patent or Trademark throughout the world for such term or terms, on such conditions and in such manner as Secured Party shall in its discretion determine and (8) sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Secured Party were the absolute owner thereof for all purposes;

        **(iv)**    to do, at Secured Party's option and Grantor's expense, at any time, or from time to time, all acts and things which Secured Party may reasonably deem necessary to protect, preserve or realize upon the Collateral and Secured Party's security interest therein in order to effect the intent of this Security Agreement, all as fully and effectively as Grantor might do; and

        **(v)**    to file, in Secured Party's sole discretion, one or more financing, continuation or correction statements and amendments thereto, relative to any of the Collateral, and to sign Grantor's name on any documents necessary to perfect or continue the perfection of Secured Party's security interest in the Collateral.

        **(b)**    Secured Party agrees that, except upon the occurrence and during the continuation of an Event of Default, and provided Grantor has been given written notice of such it shall not exercise the power of attorney or any rights granted to Secured Party pursuant to this **Section 6**; provided that Secured Party may take the actions described in **Section 6(a)(v)** regardless of whether an Event of Default has occurred or is continuing.  Grantor hereby ratifies, to the extent permitted by law, all that said attorney shall lawfully do or cause to be done by virtue hereof.  The power of attorney granted pursuant to this **Section 6** is a power coupled with

an interest and shall be irrevocable until the Secured Obligations are completely and indefeasibly paid and performed in full and Secured Party no longer has any commitment to make any Loans to Grantor.

     **(c)**     If Grantor fails to perform or comply with any of its agreements contained herein and Secured Party, as provided for by the terms of this Security Agreement, shall perform or comply, or otherwise cause performance or compliance, with such agreement, the reasonable expenses, including reasonable attorneys' fees and costs, of Secured Party incurred in connection with such performance or compliance, together with interest thereon at a rate of interest equal to the highest legal per annum rate of interest charged on the Loans, shall be payable by Grantor to Secured Party within ten (10) business days of demand and shall constitute Secured Obligations secured hereby.

     7.    **RIGHTS AND REMEDIES UPON DEFAULT.**  After any Event of Default shall have occurred and while such Event of Default is continuing:

     **(a)**     Secured Party may exercise in addition to all other rights and remedies granted to it under this Security Agreement, the Notes or the Purchase Agreement and under any other instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, Grantors expressly agree that in any such event Secured Party, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon Grantors or any other person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the UCC and other applicable law), may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the accounts receivable pledged as Collateral, use any Trademark, Copyright, or process used or owned by  Grantors and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of Secured Party's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  To the extent each Grantor has the right to do so, Grantor authorizes Secured Party, on the terms set forth in this **Section 7** to enter the premises where the Collateral is located, to take possession of the Collateral, or any part of it, and to pay, purchase, contact, or compromise any encumbrance, charge, or lien which, in the opinion of Secured Party, appears to be prior or superior to its security interest.  Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Grantor hereby releases.  Grantors further agree, at Secured Party's request, to assemble the Collateral and make it available to the Secured Party at places, which Secured Party shall select, whether at Grantor's premises or elsewhere.  Secured Party shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in **Section 7(f)**, below and only after so paying over such net proceeds and after the payment by Secured Party of any other amount required by any

provision of law, need Secured Party account for the surplus, if any, to Grantors.  To the maximum extent permitted by applicable law, Grantors waive all claims, damages, and demands against Secured Party arising out of the repossession, retention or sale of the Collateral.  Grantors agree that Secured Party need not give more than ten (10) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters. Grantors shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which Secured Party is entitled from Grantors, Grantors also being liable for the attorney costs of any attorneys employed by Secured Party to collect such deficiency.

(b)     As to any Collateral constituting certificated securities or uncertificated securities, if, at any time when Secured Party shall determine to exercise its right to sell the whole or any part of such Collateral hereunder, such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under Securities Act of 1933, as amended (as so amended the "**Act**"), Secured Party may, in its discretion (subject only to applicable requirements of law), sell such Collateral or part thereof by private sale in such manner and under such circumstances as Secured Party may deem necessary or advisable, but subject to the other requirements of this **Section 7(b)**, and shall not be required to effect such registration or cause the same to be effected.  Without limiting the generality of the foregoing, in any such event Secured Party may, in its sole discretion, (i) in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof could be or shall have been filed under the Act; (ii) approach and negotiate with a single possible purchaser to effect such sale; and (iii) restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.   In addition to a private sale as provided above in this **Section 7(b)**, if any of such Collateral shall not be freely distributable to the public without registration under the Act at the time of any proposed sale hereunder, then Secured Party shall not be required to effect such registration or cause the same to be effected but may, in its sole discretion (subject only to applicable requirements of law), require that any sale hereunder (including a sale at auction) be conducted subject to such restrictions as Secured Party may, in its sole discretion, deem necessary or appropriate in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy Code and other laws affecting the enforcement of creditors' rights and the Act and all applicable state securities laws.

(c)     Grantors agree that in any sale of any of such Collateral, whether at a foreclosure sale or otherwise, Secured Party is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications), or in order to obtain any required approval of the sale or of the purchaser by any governmental authority, and Grantors further agree that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall Secured Party be liable nor accountable to Grantors for any discount allowed by the reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.

**(d)**     Grantors also agree to pay all fees, costs and expenses of Secured Party, including, without limitation, attorneys' fees, incurred in connection with the enforcement of any of its rights and remedies hereunder.

**(e)**     Grantors hereby waive presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Security Agreement or any Collateral.

**(f)**     The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by Secured Party in the following order of priorities:

FIRST, to Secured Party in an amount sufficient to pay in full the costs of Secured Party in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by Secured Party in connection therewith, including, without limitation, attorneys' fees;

SECOND, to Secured Party in an amount equal to the then unpaid Secured Obligations; and

FINALLY, upon payment in full of the Secured Obligations, to Grantors or their representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

**8.     INDEMNITY.**   Each Grantor agrees to defend, indemnify and hold harmless Secured Party and its officers, employees, and agents against (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Security Agreement and (b) all losses or expenses in any way suffered, incurred, or paid by Secured Party as a result of or in any way arising out of, following or consequential to transactions between Secured Party and Grantors, whether under this Security Agreement or otherwise (including without limitation, reasonable attorneys fees and expenses), except for losses arising from or out of Secured Party's gross negligence or willful misconduct.

**9.     LIMITATION ON SECURED PARTY'S DUTY IN RESPECT OF COLLATERAL.** Secured Party shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it takes such action as Grantors request in writing except during an Event of Default, but failure of Secured Party to comply with any such request shall not in itself be deemed a failure to act reasonably, and no failure of Secured Party to do any act not so requested shall be deemed a failure to act reasonably.

**10.    REINSTATEMENT.**  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Grantors for liquidation or reorganization, should Grantors become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of Grantors' property and assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the

Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.    **MISCELLANEOUS**.

**11.1    Waivers; Modifications**.  None of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by Grantors and Secured Party.  Secured Party shall not by any act, delay, omission or otherwise be deemed to have waived any of its respective rights or remedies hereunder, nor shall any single or partial exercise of any right or remedy hereunder on any one occasion preclude the further exercise thereof or the exercise of any other right or remedy.  The rights and remedies hereunder provided are cumulative and may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by law.

**11.2    Termination of this Security Agreement**.  Subject to **Section 10** hereof, this Security Agreement shall terminate upon the payment and performance in full of the Secured Obligations and the expiration or termination of any commitment of Secured Party to make Loans to Grantors.

**11.3    Successor and Assigns**.  This Security Agreement and all obligations of Grantors hereunder shall be binding upon the successors and assigns of Grantors, and shall, together with the rights and remedies of Secured Party hereunder, inure to the benefit of Secured Party, any future holder of any of the Secured Obligations and their respective successors and assigns.  No sales of participations in the Secured Obligations or any portion thereof or interest therein, and no sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Secured Obligations or any portion thereof or interest therein, shall in any manner affect the lien granted to Secured Party hereunder.

**11.4    Governing Law**.  In all respects, including all matters of construction, validity and performance, this Security Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of California applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws, except to the extent that the UCC provides for the application of the law of a different jurisdiction.

**11.5    Counterparts; Facsimile or PDF Copies**.  This Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Executed copies of the signature pages of this Security Agreement sent by facsimile or transmitted electronically in Portable Document Format ("PDF"), or any similar format, shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment.

[*Signature pages follow.*]

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Security Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

| | |
|---|---|
| **ADDRESS OF GRANTOR** | **FORWARD MOTION PICTURES LLC**, as Grantor |
| 6161 S. Rockridge Blvd.<br>Oakland, CA 94618 | By:_____<br><br>Printed Name:_____<br><br>Title:_____ |
| **TAXPAYER IDENTIFICATION NUMBER OF GRANTOR** | **JURISDICTION OF ORGANIZATION OF GRANTOR** |
| **83-2035343** | **CALIFORNIA** |

| | |
|---|---|
| **ADDRESS OF GRANTOR** | **VIRTUAL ACTIVE, INC.**, as Grantor |
| c/o Forward Motion Pictures LLC<br>6161 S. Rockridge Blvd.<br>Oakland, CA 94618 | By:_____<br><br>Printed Name:_____<br><br>Title:_____ |
| **TAXPAYER IDENTIFICATION NUMBER OF GRANTOR** | **JURISDICTION OF ORGANIZATION OF GRANTOR** |
| **83-2035343** | **CALIFORNIA** |

**SIGNATURE PAGE TO FMP SECURITY AGREEMENT**

**ACCEPTED AND ACKNOWLEDGED BY:**

**NEXTPULSE, LLC**, as Secured Party

By: _____
      Thomas A. Proulx, CEO

**SIGNATURE PAGE TO FMP SECURITY AGREEMENT**

SCHEDULE A-1

# LIENS EXISTING ON THE DATE OF THIS SECURITY AGREEMENT
## FORWARD MOTION PICTURES LLC

None

SCHEDULE A-2

# LIENS EXISTING ON THE DATE OF THIS SECURITY AGREEMENT
## VIRTUAL ACTIVE, INC.

None

SCHEDULE B-1

# LOCATION OF GOODS
## FORWARD MOTION PICTURES LLC

ENTITY                                          ADDRESS

Forward Motion Pictures LLC

6161 S. Rockridge Blvd.
Oakland, CA 94618

**SCHEDULE B-2**

# LOCATION OF GOODS
## VIRTUAL ACTIVE, INC.

**ENTITY**                                              **ADDRESS**

                                                c/o Forward Motion Pictures LLC
Virtual Active, Inc.                            6161 S. Rockridge Blvd.
                                                Oakland, CA 94618

**SCHEDULE C-1**

**LIST OF CHATTEL PAPER, INSTRUMENTS, AND INVESTMENT PROPERTY
(CERTIFICATED SECURITIES)
FORWARD MOTION PICTURES LLC**

None

**SCHEDULE C-2**

**LIST OF CHATTEL PAPER, INSTRUMENTS, AND INVESTMENT PROPERTY
(CERTIFICATED SECURITIES)
VIRTUAL ACTIVE, INC.**

1. All of the Company's content library (as itemized in Schedule 1 by Marcus Marotto on behalf of Buyer), including finished content and unfinished content (e.g., scripts, production plans, shot but unreleased or unedited footage, etc.).

2. All of the Company's content metadata and supporting data.

3. All of the Company's computer code to create and/or manage Company media.

4. The Company brand, trademarks, service marks, trade names, copyrights, patents, software, IT systems, and trade secrets.

SCHEDULE D-1

# DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS AND COMMODITY ACCOUNTS
## FORWARD MOTION PICTURES LLC

(Including Type of Account, Account Name, Account Number and Name and Address of Institution/Intermediary)

Azlo
BBVA Compass (or Compass Bank)
15 South 20th Street, Birmingham, AL 35233

Checking account NO. 6767107224

UBS Wealth Management
2000 Avenue Of The Stars 7th Floor North
Los Angeles, CA 90067

Checking account NO. Y627783
DACA account NO. Y627803
Clearing account NO. Y627804

## SCHEDULE D-2

## DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS AND COMMODITY ACCOUNTS
### VIRTUAL ACTIVE, INC.

(Including Type of Account, Account Name, Account Number and Name and Address of Institution/Intermediary)

**BANK OF AMERICA, BUENA VISTA PARK BRANCH, 1275 FELL STREET, SAN FRANCISCO, CALIFORNIA:**

**CHECKING ACCOUNT NO. 02697-41862**

**CLEARING ACCOUNT NO. 2971777592**

SCHEDULE E-1

# INTELLECTUAL PROPERTY
## FORWARD MOTION PICTURES LLC

None

SCHEDULE E-2

# INTELLECTUAL PROPERTY
## VIRTUAL ACTIVE, INC.

1. All of the Company's content library (as itemized in Schedule 1 by Marcus Marotto on behalf of Buyer), including finished content and unfinished content (e.g., scripts, production plans, shot but unreleased or unedited footage, etc.).

2. All of the Company's content metadata and supporting data.

3. All of the Company's computer code to create and/or manage Company media.

4. The Company brand, trademarks, service marks, trade names, copyrights, patents, software, IT systems, and trade secrets.

SCHEDULE F-1

# COMMERCIAL TORT CLAIMS
### FORWARD MOTION PICTURES LLC

None

**SCHEDULE F-2**

# COMMERCIAL TORT CLAIMS
### VIRTUAL ACTIVE, INC.

None

**Exhibit C**
**DISCLOSURE SCHEDULE**

Deferred pay in the amount of $10,000 to Chris Galipo. For the avoidance of doubt, this deferred pay is not a liability of Seller, and such deferred pay will be paid in full by either the Company or Buyer following the Closing.

Virtual Active has no current insurance coverage. Will be provided at the discretion of buyers after closing.

**Exhibit D**
**THIRD PARTY CONTRACTS OF THE COMPANY**

| Full name | Country |
|---|---|
| Exercycle, S.L. Content License Agreement effective 8/10/16 (no address for Exercycle. | Spain |
| Active Theory, Inc. Content License Agreement effective  11/8/2011 | USA |
| DK City Corporation Content License Agreement effective 9/1/14 (contract is under the name of Netpulse, Inc., and is assigned to Seller pursuant to a separate assignment agreement) | Taiwan/China |
| LEXCO Content License Agreement effective 7/15/16 (contract is under the name of Netpulse, Inc., and is assigned to Seller pursuant to a separate assignment agreement) | Korea |
| Peloton Interactive, Inc. Content License Agreement effective  3/22/18 | USA |
| SilverFit B.V. Content License Agreement effective 4/8/16 (contract is under the name of Netpulse, Inc., and is assigned to Seller pursuant to a separate assignment agreement) | Netherlands |

Neither Seller nor the Company makes any representations or warranties as to the accuracy of this Exhibit D, as they have been listed by Mr. Marotto.

# Exhibit 12

SUBMITTED FOR FILING UNDER SEAL

# Exhibit 13

**Jason Keener**
*To Contact Writer Directly:*
312-667-6286
jkeener@irwinip.com



**www.irwinip.com**

August 30, 2024

**VIA EMAIL:** brandstetterlaw@gmail.com

Jeffrey D. Brandstetter
Brandstetter Law, PC
50 California Street, Suite 1500
San Francisco, CA 9411-4612

> **Re:** ***Deficiencies in FMP & VA's Responses to Life Fitness's Subpoenas for Documents***

Dear Jeffrey:

We have identified the following deficiencies in FMP and VA objections and responses to Life Fitness's subpoenas for documents.  We are still reviewing FMP's and VA's document production and may have additional issues to address with you, but as explained below, FMP and VA have withheld documents and asserted improper objections and claims for privilege that need to be addressed before we take the depositions of you and Mr. Galipo.

**We would like to meet and confer with you to discuss the issues set forth below. Please let us know if you are available on September 4th or 5th for a call.**

## I.    FMP's and VA's General Objections Responses to Requests for Production

FMP and VA have asserted numerous General Objections without indicating whether they are withholding any documents based on those objections.  Please indicate whether FMP and VA are withholding any documents based on any of their General Objections, and if so, identify the documents withheld and the General Objection(s) that are the basis for the withholding.

FMP's and VA's General Objection No. 1 states that they object to Life Fitness's requests "to the extent that they seek confidential and/or proprietary business information, which if disclosed could harm Responding Party's competitive position." As you are aware, the court in this case entered a Confidentiality Order that protects FMP's and VA's confidential business information and by which FMP and VA can designate documents as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –

**IRWIN IP**
INTELLECTUAL PROPERTY LITIGATION

ATTORNEYS' EYES ONLY." The Confidentiality Order was attached to the subpoenas. Therefore, this objection is improper.

General Objection No. 4 states that FMP and VA object to Life Fitness's requests "to the extent information demanded is already in Life Fitness's possession, custody, or control, or available to Life Fitness from public sources or other sources less burdensome to Life Fitness than [FMP/VA]." Life Fitness has not received any third-party production from Brunswick Corporation as part of the action between Nextpulse and Brunswick pending in California, and Brunswick has taken the position that it cannot provide third-party production to Life Fitness under the confidentiality provisions of the protective order in that case. Therefore, please confirm that FMP and VA are not withholding any documents based on this objection.

## II.    FMP's and VA's Objections and Responses to Specific Requests

FMP's and VA's responses to Request for Production Nos. 1–15 each stated that "[s]ubject to and without waiving the foregoing objections, [FMP & VA] will produce all relevant, non-privileged, and otherwise non-objectionable documents responsive to this Request that are in its possession, custody and control, to the extent that they have not already produced" or other similar language. This boilerplate language is improper for several reasons. First, it is not proper for FMP and VA to state that they will produce documents "subject to . . . the foregoing objections" without identifying whether they are actually withholding documents subject to any of their objections. Doing so leaves Life Fitness uncertain whether any relevant and responsive information has been withheld on the basis of the objections. See Fed. R. Civ. P. 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest") and Fed. R. Civ. P. 34 Committee Notes ("Rule 34(b)(2)(C) is amended to provide that an objection to a Rule 34 request must state whether anything is being withheld on the basis of the objection. This amendment should end the confusion that frequently arises when a producing party states several objections and still produces information, leaving the requesting party uncertain whether any relevant and responsive information has been withheld on the basis of the objections.")

Second, FMP and VA's statement that documents will be produced "to the extent that they have not already been produced" is improper. FMP and VA did not make any productions in this case before the subpoenas were issued. To the extent that FMP and VA are referring to production made in the related California litigation between



August 30, 2024
Page No. 3

Nextpulse and Brunswick Corporation, Life Fitness does not have access to Virtual Active's production made in that case.

Third, FMP's and VA's responses state that they will produce "all non-objectionable documents."  Life Fitness does not understand what this boilerplate objection means or what "objectional" documents would encompass.  Please confirm that FMP and VA are not withholding documents on the basis that documents are "objectionable."

## III.    FMP and VA's Privilege Log

Life Fitness has received only a four-part production titled "VA1 through VA4" and a privilege log titled "VA Privilege Log 8-26-24."  However, no production or privilege log has been provided from FMP.  Please confirm whether the production and privilege log you sent pertains to both VA and FMP.  If so, the privilege log is insufficient, as it fails to specify which documents or log entries are associated with each company.  Please provide an amended or supplemental privilege log with this information.

It appears that FMP and VA have withheld over 2,300 documents under some claim of privilege or immunity.  As an initial matter, FMP's and VA's privilege log is insufficient because it does not provide sufficient information for Life Fitness to ascertain the basis for the privilege.  As set forth in Fed. R. Civ. P. 26(b)(5), for any documents or portions of documents that FMP and VA withhold based on a claim of privilege, they are required to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  *See also* Fed. R. Civ. P. 26 Committee Notes ("The party must also provide sufficient information to enable other parties to evaluate the applicability of the claimed privilege or protection.").  Please provide an amended or supplemental privilege log with this information.

Moreover, Life Fitness is unable to identify whether the individuals who sent or received communications on the VA's privilege log are attorneys or otherwise within the sphere of individuals to which a privilege would apply.  By way of example, the log entry for VA026213 identifies several non-VA individuals from USB.  Life Fitness does not know who those individuals are.  Please provide us with a list of senders and recipients so that we can assess the privilege claims.

Also, Tom Proulx is identified as a sender and recipient of numerous emails.  He is associated with eGym and Nextpulse, and therefore any communications with Mr.



August 30, 2024
Page No. 4

Proulx in the 2019 and later time frame involving the alleged arm-length Stock Purchase and Sale Agreement with VA and FMP cannot be privileged.

Additionally, we note that over 651 documents are being withheld based on either a purported "privacy privilege" or "trade secret privilege."  FMP and VA cannot withhold documents based on "privacy" or "trade secret."  There is no privacy or trade secret claim of privilege or immunity that would allow FMP and VA to withhold documents. If, instead, these assertions are intended to protect confidential information, we note that the Confidentiality Order protects such information and provides mechanisms for restricted access to such documents.  FMP and VA are not, however, permitted to withhold confidential information unless they can make a valid claim of privilege or immunity.

Lastly, please confirm that you have searched for and produced all documents in your possession, custody, or control on behalf of FMP and VA responsive to the subpoenas.


Respectfully,

_____*/s/ Jason Keener*_____

Jason Keener
**Irwin IP LLP**

# Exhibit 14

**Joseph F. Marinelli**
*To Contact Writer Directly:*
312-248-1584
jmarinelli@irwinip.com



**www.irwinip.com**

September 25, 2024

**VIA EMAIL:** brandstetterlaw@gmail.com

Jeffrey D. Brandstetter
Brandstetter Law, PC
50 California Street, Suite 1500
San Francisco, CA 9411-4612

> ***Re:    Deficiencies in FMP & VA's Document Productions***

Dear Jeff:

We have identified the following deficiencies in FMP's and VA's document production pursuant to Life Fitness's subpoenas for documents. These deficiencies are in addition to identified in our August 30, 2024, letter and discussed in our September 17, 2024, meet confer that was summarized in our email of September 18, 2024.

We would like to meet and confer on issues set forth below after we receive FMP's and VA's supplemental privilege log on October 1. Please let us know when you can be available on October 2nd or 3rd for a call.

## I.    Deficiencies in FMP's and VA's Document Production

<u>Request No. 4</u>. FMP and VA have not produced all documents responsive to Request No. 4. Request No. 4 asks for:

> All documents and communications relating to the negotiation of the Second Agreement, including but not limited to negotiations regarding the sale, assignment, license, or transfer of any intellectual property or rights to any intellectual property between or among FMP, Virtual Active, or Nextpulse in VA Content or Software or negotiations regarding the assignment, license or transfer by Virtual Active to Nextpulse of rights against Brunswick and Life Fitness.

FMP and VA produced a limited number of emails that relate to the Second Agreement, but no emails were produced that were sent or received earlier than June 7, 2022. Life Fitness expects that given the "Effective Date" of the Second Agreement was June 9, 2022, non-privileged documents, drafts, and emails dated well-before June 7 exist regarding the negotiation of the Second

**IRWIN IP**
INTELLECTUAL PROPERTY LITIGATION

September 25, 2024
Page No. 2

Agreement.  Further, we note that a "Copyright Assignment Agreement" with an effective date of June 9, 2022, was superseded by the Second Agreement. We would also expect that non-privileged documents, drafts, and emails relating to the negotiation of this earlier agreement exist as well.  Again, documents responsive to this request are relevant to Nextpulse's ownership claim to the alleged copyrights involved in the underlying action, and the timing thereof.  We note that because FMP's and VA's privilege log does not contain sufficient descriptions regarding the withheld documents (see our August 30 letter), Life Fitness cannot ascertain whether responsive emails were withheld.

Request No. 5.  Request No. 5 asks for:

> All documents and communications supporting or refuting the statements in Recitals C and E of the Second Agreement.

FMP and VA have not produced any documents supporting or refuting the statements in Recitals C and E of the Second Agreement.  Given that that one of the stated purposes of the Second Agreement was to "clarify the terms of the SPA as they relate to Recital C" (*see* Recital E), Life Fitness expects that documents exist that either support or refute the statements in Recitals C and E.  Please produce all responsive documents.

Request No. 7.  FMP and VA have not produced documents responsive to Request No. 7.  Request No. 7 asks for:

> All documents and communications related to any reasons why the Second Agreement was entered into by the parties thereto, including but not limited to any emails, letters, memos, meeting minutes, and notes.

FMP and VA have not produced documents relating to the reasons why the Second Agreement was entered into.  Life Fitness expects that parties entering into an agreement of this nature at arms-length would have communicated why such an agreement was necessary.  Please confirm that FMP and VA have produced all responsive documents.

Request No. 9.  FMP and VA have not produced documents responsive to Request No. 9.  Request No. 9 asks for:

> All documents and communications referring to any reasons for the sale, assignment, license or transfer of intellectual property or rights to any intellectual property between or among FMP, Virtual Active, or



Nextpulse, including but not limited to reasons for the sale, assignment, license or transfer of rights between FMP, Virtual Active, or Nextpulse in VA Content or Software or the reasons for any transfer by Virtual Active to Nextpulse of rights against Brunswick and Life Fitness.

FMP and VA have not produced documents relating to the reasons VA or FMP allegedly transferred intellectual property to Nextpulse at the time of the Second Agreement or the preceding Assignment. Please produce all responsive documents.

Request No. 11. Request No. 11 asks for:

All documents relating to any employment agreements or consulting agreements for any individuals or entities involved in the development of any VA Content or Software, including but not limited to employment or consulting agreements including provisions related to the assignment, transfer, or ownership of intellectual property rights in VA content or Software.

VA and FMP produced agreements with several individuals, but the production appears to be incomplete. For example, FMP and VA did not produce any employment or signed consulting agreements between VA and Chris Galipo, Stu Cantrell, or Shawn Otis. FMP and VA produced an agreement for one, but not both, "John Fords" (John Ford Jr. and John Ford. Sr.). Please confirm that all responsive agreements have been produced.

Request No. 12. Request No. 12 asks for:

Documents sufficient to identify all proposed or actual grant of rights by Virtual Active, Nextpulse, or FMP to any VA Content or Software, including but not limited to any licenses or offers to license, security interests, covenants, assignments, conveyances, sales, offers to sell, or transfers, and any related communications, drafts, agreements, proposals, and documentation evidencing or relating to such grants of rights.

VA and FMP produced some license agreements, but the production appears to be incomplete. For example, the SPSA references a content license agreement with Active Theory, Inc., but FMP's and VA's production does not include the agreement. Please confirm that all responsive agreements have been produced.

Request No. 13. Request No. 13 asks for:

> Documents sufficient to identify the amount and source of any revenue received by FMP, Virtual Active, or Nextpulse on a quarterly basis from February 28, 2019, to the present for the use, licensing, or sale of VA content or Software.

FMP and VA produced a single spreadsheet that includes revenue information up to December 2018.  We have not identified revenue information from 2019 to the present.  FMP acquired VA in February 2019, so it should be in possession of revenue data for the use, licensing, or sale of VA Content or Software from February 2019 to the present.  Please supplement the revenue data.

Request No. 15.  Request No. 15 asks for:

> All documents and communications related to the date the Second Agreement was actually signed (either electronically or by wet signature) by Thomas A. Proulx and Christopher Galipo, including but not limited to any communications exchanging drafts of the Second Agreement for signature and any letters, memos, meeting minutes, notes, and other documentation that reference the planning, discussion, or finalization of the execution date of the agreement.

VA and FMP produced documents indicating that the Agreement effective June 9, 2022, was not fully executed until much later than June 9, 2022.  However, VA and FMP have not produced documents sufficient to identify the date the agreement was actually signed.  Please produce documents responsive to this request or confirm that VA and FMP are not in possession of responsive documents.

## II.    Deficiencies in FMP's and VA's Privilege Log

As set forth in our August 30, 2024, letter and discussed in our September 17, 2024, meet confer that is summarized in Emad Mahou's email of September 18, 2024, FMP's and VA's privilege log is deficient.  In addition to the deficiencies previously identified, Life Fitness identifies below additional deficiencies.

First, FMP and VA have logged attachments to emails without providing any independent basis for a claim of privilege other than the fact that the attachment is associated with an email that is allegedly privileged.  An email attachment is not privileged merely because it is attached to an email that is allegedly privileged.  There must be an independent basis to assert that attachment contains privileged information.  "[A]ttachments which do not, by their content, fall within the realm of the [attorney-client] privilege cannot become privileged by merely attaching them to

September 25, 2024
Page No. 5

**IRWIN IP**
INTELLECTUAL PROPERTY LITIGATION

a communication with the attorney." *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1088 (N.D. Cal. 2015) (internal citation omitted); *see also Garcia v. Cnty. of Stanislaus*, 2022 WL 4237960, at *18 (E.D. Cal. 2022) (quoting *United State v. City of Hesperia*, 2021 WL 5034381, at *6 (C.D. Cal. 2021) (ordering defendants to produce attachments to privileged emails, unless they could show the attachments were "privileged in their own right," as "attachments to privileged emails are not themselves privileged simply by association."). Moreover, to the extent that attachments contain any privileged information, FMP and VA should produce non-privileged portions of the attachments by producing a redacted copy. We have identified improper privilege log entries for email attachments by highlighting them in yellow in the attached printout of the privilege log. *See Garcia v. Cnty. of Stanislaus*, 2022 WL 4237960, at *18 (E.D. Cal. 2022) (quoting *In re New Century*, 2009 WL 10691336, at *7 (C.D. Cal. 2009) ("any document that contains both protected and responsive information shall be redacted to eliminate any reference to attorney-client matters").

Second, FMP and VA have logged numerous documents as privileged that were sent to or from third parties that waives any claim of privilege or other work product doctrine. For example, the log includes entries for emails that were sent to or from Tom Proulx or someone from UBS Bank. Communication to or from Tom Proulx or individuals from USB Bank are not privileged. We have identified improper privilege log entries that were sent to or from Tom Proulx or others outside the sphere of privilege in blue in the attached printout of the privilege log.

Respectfully,

Joseph F. Marinelli
**Irwin IP LLP**

# Exhibit 15

| | |
|---|---|
| From: | Jeffrey Brandstetter <brandstetterlaw@gmail.com> |
| Sent: | Wednesday, November 20, 2024 8:27 PM |
| To: | Emad Mahou; Joseph Marinelli |
| Cc: | Jason Keener; NextPulse v. Life Fitness |
| Subject: | Re: Nextpulse v. Life Fitness; October 9, 2024 Summary of Our Meet and Confer |
| Attachments: | VA Privilege Log 11-20-24.xlsx; VA5 VA26403-VA26575.zip |

//EXTERNAL//
Gentlemen,

After triple checking all documents in our clients' possession responsive to Life Fitness' RFPs 4, 5, 7, and 9, they were able to locate some additional documents, all of which are either produced herewith via the attached zip file (password to follow in a separate email) or logged on the attached updated/augmented privilege log, which is being provided on behalf of both Virtual Active, Inc. and Forward Motion Pictures, LLC.

We can now confirm that, to the best of our and our clients' knowledge, all documents responsive to Life Fitness' RFPs 4, 5, 7, and 9 have either been produced or logged on the privilege log produced herewith.

Jeff

_____
Jeffrey D. Brandstetter
BRANDSTETTER LAW, PC
ENTERTAINMENT, INTELLECTUAL PROPERTY & BUSINESS LAW
50 California Street, Suite 1500
San Francisco, CA 94111-4612
p: 415.571.8600  |  f: 415.571.8601  |  e: brandstetterlaw@gmail.com

CONFIDENTIAL AND PRIVILEGED COMMUNICATION: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited.  If you think that you have received this email message in error, please email the sender at brandstetterlaw@gmail.com.

On Nov 18, 2024, at 8:06 PM, Jeffrey Brandstetter <brandstetterlaw@gmail.com> wrote:

Emad/Joseph,

Please find responses inline to Request Nos. 2-4 from your Nov. 4th email, copied below.  Our client is still triple-checking Request No. 1 now, which I should have a definitive response to by tomorrow:

1) Confirm that all documents responsive to RFPs 4, 5, 7, and 9 have been produced or logged on VA's and FMP's privilege log.
JB: See response above.

2) Confirm that all employment agreements with individuals involved in the development of VA Content or Software have been produced.
JB: All VA employees became Netpulse employees once Netpulse acquired VA.  VA does not have access to those employment agreements.  There were no employment agreements entered into after FMP acquired VA.

3) Provide a basis for withholding the documents we highlighted in blue in the attached annotated privilege log that we sent on September 25, 2024.
JB: See updated/augmented privilege log, attached.

4) Please let us know if you will supplement the log with more information about the documents withheld as privileged so that Life Fitness can assess the claim of privilege, and if so, by when.
JB: See updated/augmented privilege log, attached.

As a courtesy to you for ease of reference, we have highlighted those entries where the privileges asserted and factual bases provided have been updated/augmented from the previous version provided to you.  We hope that the attached updated and augmented privilege log satisfies your concerns as we have made every effort to comply with applicable statutory and case law, as well as the judge's standing order re privilege logs.  Consequently, this will be VA and FMP's final set of updates in response to LF's previously propounded document requests to our clients.

In addition to the updated/augmented privilege log, attached please find a zip file of the 19 docs for which we are removing any claim of privilege.  The password for this zip file will follow in a separate email immediately following this email.

Thank you,
Jeff
_____
Jeffrey D. Brandstetter
BRANDSTETTER LAW, PC
ENTERTAINMENT, INTELLECTUAL PROPERTY & BUSINESS LAW
50 California Street, Suite 1500
San Francisco, CA  94111-4612
p: 415.571.8600  |  f: 415.571.8601  |  e: brandstetterlaw@gmail.com

CONFIDENTIAL AND PRIVILEGED COMMUNICATION: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited.  If you think that you have received this email message in error, please email the sender at brandstetterlaw@gmail.com.

<VA Privilege Log 11-18-24.xlsx>
<VA_De-PrivilegedDocs.zip>

On Nov 8, 2024, at 5:33 PM, Jeffrey Brandstetter
<brandstetterlaw@gmail.com> wrote:

Emad,

I still haven't heard back from our client regarding certain of your
questions.  I suspect that he may be out on a shoot or otherwise occupied,
as he is normally quite prompt in responding to my emails.

In the meantime, in an effort to provide you with the most comprehensive
responses reasonably obtainable, I've put 3 attorneys on this matter to
augment our privilege log.  However, given the number of documents listed
on our privilege log (2,356 total), plus the fact that Monday is a holiday,
realistically, I don't think that we will have a revised privilege log to you until
this coming Friday or Monday, Nov. 18th.

Please be patient and know that we are working diligently to get you
substantive responses to your requests.

Enjoy your weekend,
Jeff
_____
Jeffrey D. Brandstetter
BRANDSTETTER LAW, PC
ENTERTAINMENT, INTELLECTUAL PROPERTY & BUSINESS LAW
50 California Street, Suite 1500
San Francisco, CA  94111-4612
p: 415.571.8600  |  f: 415.571.8601  |  e: brandstetterlaw@gmail.com

CONFIDENTIAL AND PRIVILEGED COMMUNICATION: This email is covered
by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and
is legally privileged, confidential and protected from disclosure.  If you are
not the intended recipient, any dissemination, distribution or copying of this
communication is strictly prohibited.  If you think that you have received this
email message in error, please email the sender
at brandstetterlaw@gmail.com.


On Nov 7, 2024, at 6:56 AM, Emad Mahou
<emahou@irwinip.com> wrote:

Jeff,

Thank you for the email.

We hope to hear back from you by the end of the week. As you know, we have been waiting for a response on these issues for almost 4 weeks.

Thank you,
Emad

---

From: Jeffrey Brandstetter <brandstetterlaw@gmail.com>
Sent: Thursday, November 7, 2024 1:48 AM
To: Emad Mahou <emahou@irwinip.com>
Cc: Jason Keener <jkeener@irwinip.com>; Joseph Marinelli <jmarinelli@irwinip.com>; NextPulse v. Life Fitness <NextPulsev.LifeFitness@irwinip.com>
Subject: Re: Nextpulse v. Life Fitness; October 9, 2024 Summary of Our Meet and Confer

//EXTERNAL//
Emad,
FYI: I'm still waiting to hear back from our client re the questions you asked previously.  I'll be traveling and out of the office through Sunday, but reachable by email and hope to hear back from them before EOW this week.  Please know that we are pursuing this diligently, though.
Jeff
_____
Jeffrey D. Brandstetter
BRANDSTETTER LAW, PC
ENTERTAINMENT, INTELLECTUAL PROPERTY & BUSINESS LAW
50 California Street, Suite 1500
San Francisco, CA  94111-4612
p: 415.571.8600  |  f: 415.571.8601  |  e: brandstetterlaw@gmail.com

CONFIDENTIAL AND PRIVILEGED COMMUNICATION: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged, confidential and protected from disclosure.  If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited.  If you think that you have received this email message in error, please email the sender at brandstetterlaw@gmail.com.

> On Nov 5, 2024, at 10:17 AM, Jeffrey Brandstetter <brandstetterlaw@gmail.com> wrote:
>
> Emad,
> I'm still waiting to hear back form our client in response to the questions you asked.  I hope to hear back from them in the next day or so, and will respond thereafter.
> Jeff
>
> _____
> Jeffrey D. Brandstetter
> BRANDSTETTER LAW, PC
> ENTERTAINMENT, INTELLECTUAL PROPERTY & BUSINESS LAW

50 California Street, Suite 1500
San Francisco, CA  94111-4612
p:
415.571.8600  |  f: 415.571.8601  |  e: brandstetterlaw
@gmail.com

CONFIDENTIAL AND PRIVILEGED COMMUNICATION: This
email is covered by the Electronic Communications Privacy
Act, 18 U.S.C. §§ 2510-2521 and is legally privileged,
confidential and protected from disclosure.  If you are not
the intended recipient, any dissemination, distribution
or copying of this communication is strictly prohibited.  If
you think that you have received this email message in
error, please email the sender
at brandstetterlaw@gmail.com.

> On Nov 4, 2024, at 12:36 PM, Emad
> Mahou <emahou@irwinip.com> wrote:
>
> Jeff,
>
> We have not yet received a response
> to our initial requests from October
> 10, nor our follow-up requests on
> October 16 and October 23. As a
> reminder, we are seeking VA's and
> FMP's position on the following items:
>
> - Confirm that all
>   documents
>   responsive to RFPs 4,
>   5, 7, and 9 have been
>   produced or logged on
>   VA's and FMP's
>   privilege log.
> - Confirm that all
>   employment
>   agreements with
>   individuals involved in
>   the development of VA
>   Content or Software
>   have been produced.
> - Provide a basis for
>   withholding the
>   documents we
>   highlighted in blue in
>   the attached
>   annotated privilege log
>   that we sent on
>   September 25, 2024.
> - Please let us know if
>   you will supplement

5

the log with more
information about the
documents withheld
as privileged so that
Life Fitness can
assess the claim of
privilege, and if so, by
when.

To address these outstanding items,
we would like to schedule a brief
meet and confer in the next day or so.
Please let us know your availability for
a quick discussion on these issues.

Thank you,

Emad

Emad S. Mahou

## Irwin IP LLP

### Intellectual Property Litigation

150 N. Wacker Drive | Suite 700 |
Chicago, IL 60606
Direct 312.248.4034 | Mobile
773.691.9603
emahou@irwinip.com |
www.irwinip.com

Land Acknowledgement:
I live and work on the traditional
homelands of the Council of the
Three Fires: the Ojibwe, Odawa,
and Potawatomi Nations. Many
other tribes such as the Miami,
Ho-Chunk, Menominee, Sac, and
Fox also called this area home.

Confidentiality Notice: This e-mail transmission and
any attachments may contain confidential or legally
privileged information. If you are not the intended
recipient, you are hereby notified that any disclosure,
copying, distribution, or reliance upon the contents of
this e-mail is strictly prohibited. If you have received
this e-mail transmission in error, please immediately
notify the sender by reply e-mail and delete the
message from your system. Thank you.

**From:** Jeffrey Brandstetter
<brandstetterlaw@gmail.com>
**Sent:** Wednesday, October 23, 2024
11:50 PM
**To:** Emad Mahou

<emahou@irwinip.com>
**Cc:** Jason Keener
<jkeener@irwinip.com>; Joseph
Marinelli <jmarinelli@irwinip.com>;
NextPulse v. Life Fitness
<NextPulsev.LifeFitness@irwinip.co
m>
**Subject:** Re: Nextpulse v. Life Fitness;
October 9, 2024 Summary of Our
Meet and Confer

//EXTERNAL//
Emad,
Apologies for my delay in
responding.  We're still working through
things here and hope to have
substantive responses for you by next
week.
Jeff
_____
_____
Jeffrey D. Brandstetter
BRANDSTETTER LAW, PC
ENTERTAINMENT,
INTELLECTUAL PROPERTY & BUSINESS
LAW
50 California Street, Suite 1500
San Francisco, CA  94111-4612
p:
415.571.8600  |  f: 415.571.8601  |  e:
brandstetterlaw@gmail.com

CONFIDENTIAL AND
PRIVILEGED COMMUNICATION: This
email is covered by the
Electronic Communications Privacy
Act, 18 U.S.C. §§ 2510-2521 and is
legally privileged, confidential
and protected from disclosure.  If
you are not the intended recipient,
any dissemination, distribution
or copying of this communication
is strictly prohibited.  If you think
that you have received this
email message in error, please email
the sender
at brandstetterlaw@gmail.com.

On Oct 23, 2024, at
3:27 PM, Emad Mahou
<emahou@irwinip.com
> wrote:

Good evening Jeff,

7

We have not received an answer to our request. Will you be able to provide us with an answer to the questions outlined in our October 10th email.

Best,
Emad

Emad S. Mahou |
Associate

## Irwin IP LLP

Intellectual Property Litigation

150 N. Wacker Drive | Suite 700 | Chicago, IL 60606
Direct 312.248.4034 | Mobile 773.691.9603
emahou@irwinip.com | www.irwinip.com

Land Acknowledgement: I live and work on the traditional homelands of the Council of the Three Fires: the Ojibwe, Odawa, and Potawatomi Nations. Many other tribes such as the Miami, Ho-Chunk, Menominee, Sac, and Fox also called this area home.

Confidentiality Notice: This e-mail transmission and any attachments may contain confidential or legally privileged information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please

immediately notify the sender by
reply e-mail and delete the
message from your system.
Thank you.

---

**From:** Emad Mahou
<emahou@irwinip.com>
**Sent:** Wednesday,
October 16, 2024 2:32
PM
**To:** Jeffrey
Brandstetter
<brandstetterlaw@gmail.com>
**Cc:** Jason Keener
<jkeener@irwinip.com>; Joseph Marinelli
<jmarinelli@irwinip.com>; NextPulse v. Life
Fitness
<NextPulsev.LifeFitness@irwinip.com>
**Subject:** Re:
Nextpulse v. Life
Fitness; October 9,
2024 Summary of Our
Meet and Confer

Jeff,

We are following up on
October
10th email.  Please
provide a response to
the four questions
below by the end of
the week.

Best,
Emad

Emad S. Mahou |
Associate

## Irwin IP LLP

Intellectual Property
Litigation
150 N. Wacker Drive |
Suite 700 | Chicago, IL
60606

9

Direct 312.248.4034 |
Mobile 773.691.9603
emahou@irwinip.com |
www.irwinip.com

---

Confidentiality Notice: This e-mail transmission and any attachments may contain confidential or legally privileged information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please immediately notify the sender by reply e-mail and delete the message from your system. Thank you.

---

**From:** Emad Mahou
**Sent:** Thursday, October 10, 2024 1:25 PM
**To:** Jeffrey Brandstetter <brandstetterlaw@gmail.com>
**Cc:** Jason Keener <jkeener@irwinip.com>; Joseph Marinelli <jmarinelli@irwinip.com>; NextPulse v. Life Fitness <NextPulsev.LifeFitness@irwinip.com>
**Subject:** Nextpulse v. Life Fitness; October 9, 2024 Summary of Our Meet and Confer

Jeff,

Thank you for meeting with us again to discuss the outstanding discovery issues. Below is our summary of the conference.

We began by discussing our September 25, 2024,

letter. RFP 4 seeks documents related to the Second Agreement, which has an effective date of June 9, 2022. As we discussed, FMP and VA produced a limited number of emails that relate to the Second Agreement and the earlier Copyright Assignment Agreement, but no emails were produced that were sent or received earlier than June 7, 2022, and we expected drafts and emails would have been sent and received well-before June 7, 2022. You agreed to inquire whether all responsive documents were either produced or had been logged on the privilege log.

We discussed RFPs 5, 7, and 9, which related to the reasons the parties entered into the Second Agreement and the reasons for the transfer of intellectual property and rights against Brunswick and Life Fitness between VA, FMP and Nextpulse. You agreed to inquire whether all responsive documents had been produced or logged on the privilege log.

Regarding RFP 11, you indicated that you thought the employment agreements involving

Shawn Otis and Stu Cantrell had been with Nextpulse and not Virtual Active. That may be the case; however, RFP 11 seeks employment agreements with anyone involved in the development of the VA Content or Software, irrespective of whether the agreement was with Virtual Active or Netpulse/Nextpulse. We note that Virtual Active produced employment agreements with Netpulse, which means that at least some Netpulse employment agreements must be in Virtual Active's possession. Please confirm whether Virtual Active has produced all employment agreements with anyone involved in the development of the VA Content or Software, including but not limited to employment agreements for Stu Cantrell, Chris Galipo, and Shawn Otis.

Turning to RFP 12, you stated that VA and FMP believe their license agreements are trade secrets and, therefore, are subject to a privilege. We pointed out that a Protective Order is in place, but you explained that your client is unwilling to share the documents under the

Attorney's Eyes Only ("AEO") designation because VA and FMP believe that Life Fitness is a competitor and VA and FMP do not trust that with even with an AEO designation, the information will not be disclosed to people inside Life Fitness.

In regard to RFP 13, you stated that VA's and FMP's revenue documents are privileged based on trade secrets and privacy concerns, and your client is unwilling to share the documents under an AEO designation for the same reasons expressed above for RFP 12.

With respect to RFP 15, you stated that the date the Second Agreement and Copyright Assignment Agreement were actually signed was not as important as the date defined as the effective date. We explained that the date the Second Agreement was signed was relevant to Life Fitness's standing defense.

We then discussed FMP's and VA's assertion of a "joint defense privilege" in the supplemental privilege log. We explained that documents related to the negotiation of the

Second Agreement concern asset transfers and do not pertain to litigation or in furtherance of litigation or a common litigation strategy. You disagreed.

With regard to the supplemental privilege log, we also discussed FMP's and VA's assertion of privileges for email attachments. We pointed out that an attachment to an email is not privileged merely because it is attached to an email that may be privileged. You assured us that each attachment was independently assessed for privilege, and that each attachment was privileged for reasons not dependent on the parent email.

We also requested clarification regarding the documents we annotated in blue in the version of the privilege log attached to our September letter that appear to have been sent to individuals outside the privilege group, e.g., Tom Proulx and UBS Bank. You agreed to review the Bates numbers and provide further information as to the basis the documents were withheld. You asked us to resend the

highlighted privilege log, which we are attaching. We also noted that the privilege log did not contain a list of senders and recipients and their positions. Please provide that information, as we asked in our earlier letter on August 30, 2024.

We next addressed FMP's and VA's asserted "tax return" privilege. You stated that the tax information was irrelevant and related to the financial standing of your client, as Life Fitness is a potential competitor. We noted that we are not looking for tax documents *per se*, however, if tax documents contained evidence of the valuation of copyrighted materials, such as the VA courses, then that information is relevant to our case and our damages analysis. You maintained that the tax return information was privileged, and your client was not willing to share them as Life Fitness is a competitor.

Regarding FMP's and VA's supplemental log, we stated that the information in the log was still insufficient for

Life Fitness to assess whether a privilege applied and therefore the log did not comply with FRCP 26 and the EDCA's requirements for privilege logs. You disagreed but agreed to explore whether a general description of each privileged document could be provided. Please let us know whether VA and FMP are willing to supplement their privilege log further, and if so, when it will be complete.

We then raised concerns about drafts of the Second Agreement and the SPSA that were produced in some instances but withheld in others. You committed to investigating the reason for this discrepancy.

Finally, we discussed VA's and FMP's production of documents to BC. You confirmed that FMP and VA are not relying on Brunswick's production for VA's and FMP's response to Life Fitness's subpoena, and assured us that no documents were withheld as a result of their earlier production to Brunswick.

In summary, please respond to the following:

1. Confirm that all documents responsive to RFPs 4, 5, 7, and 9 have been produced or logged on VA's and FMP's privilege log.

2. Confirm that all employment agreements with individuals involved in the development of VA Content or Software have been produced.

3. Provide a basis for withholding the documents we highlig

hted in blue in the attached annotated privilege log that we sent on September 25, 2024.

4. Please let us know if you will supplement the log with more information about the documents withheld as privileged so that Life Fitness can assess the claim of privilege, and if so, by when.

Sincerely,
Emad

Emad S. Mahou | Associate

### Irwin IP LLP

Intellectual Property Litigation

150 N. Wacker Drive | Suite 700 | Chicago, IL 60606
Direct 312.248.4034 | Mobile 773.691.9603
emahou@irwinip.com | www.irwinip.com

Land Acknowledgement: I live and work on the traditional homelands of the Council of the Three Fires: the Ojibwe, Odawa, and Potawatomi Nations. Many other tribes such as the Miami, Ho-Chunk, Menominee, Sac, and Fox also called this area home.

---

Confidentiality Notice: This e-mail transmission and any attachments may contain confidential or legally privileged information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please immediately notify the sender by reply e-mail and delete the message from your system. Thank you.

Exhibit 16

California
*Secretary of State*

Business    UCC

Login

# Business Search

*The California Business Search provides access to available information for **corporations**, **limited liability companies** and **limited partnerships** of record with the California Secretary of State, with **free PDF copies** of over 17 million imaged business entity documents, including the most recent imaged Statements of Information filed for Corporations and Limited Liability Companies.*

*Currently, information for Limited Liability Partnerships (e.g. law firms, architecture firms, engineering firms, public accountancy firms, and land survey firms), General Partnerships, and other entity types are **not contained** in the California Business Search. If you wish to obtain information about LLPs and GPs, submit a Business Entities Order paper form to request copies of filings for these entity types. Note: This search is not intended to serve as a name reservation search. To reserve an entity name, select Forms on the left panel and select Entity Name Reservation ? Corporation, LLC, LP.*

### Basic Search

*A Basic search can be performed using an entity name or entity number. When conducting a search by an entity number, where applicable, **remove "C"** from the entity number. Note, **a basic search** will search **only ACTIVE entities** (Corporations, Limited Liability Companies, Limited Partnerships, Cooperatives, Name Reservations, Foreign Name Reservations, Unincorporated Common Interest Developments, and Out of State Associations). The basic search performs a contains ?keyword? search. The Advanced search allows for a ?starts with? filter. To search entities that have a status other than active or to refine search criteria, use the **Advanced** search feature.*

### Advanced Search

*An Advanced search is required when searching for publicly traded disclosure information or a status other than active.*

*An Advanced search allows for searching by specific entity types (e.g., Nonprofit Mutual Benefit Corporation) or by entity groups (e.g., All Corporations) as well as*

Home

Search

Forms

Help

## FORWARD MOTION PICTURES LLC (201826910568)



Request
Certificate

| | |
|---|---|
| *Initial Filing Date* | 09/24/2018 |
| *Status* | Active |
| *Standing - SOS* | Good |
| *Standing - FTB* | Good |
| *Standing - Agent* | Good |
| *Standing - VCFCF* | Good |
| *Formed In* | CALIFORNIA |
| *Entity Type* | Limited Liability Company - CA |
| *Principal Address* | 2108 N ST STE C SACRAMENTO, CA 95816 |
| *Mailing Address* | 2108 N ST STE C SACRAMENTO,CA95816 |
| *Statement of Info Due Date* | 09/30/2026 |
| *Agent* | 1505 Corporation CALIFORNIA CORPORATE AGENTS, INC. |
| *CA Registered Corporate (1505) Agent Authorized Employee(s)* | CHRIS JOHNSON 2108 N ST STE C, SACRAMENTO, CA |



View History        Request Access

Business    UCC

Home

Search

Forms

Help

**Disclaimer:** *Search results are limited to the 500 entities closest matching the entered search criteria. If your desired search result is not found within the 500 entities provided, please refine the search criteria using the Advanced search function for additional results/entities. The California Business Search is updated as documents are approved. The data provided is not a complete or certified record.*

*Although every attempt has been made to ensure that the information contained in the database is accurate, the Secretary of State's office is not responsible for any loss, consequence, or damage resulting directly or indirectly from reliance on the accuracy, reliability, or timeliness of the information that is provided. All such information is provided "as is." To order certified copies or certificates of status, (1) locate an entity using the search; (2)select Request Certificate in the right-hand detail drawer; and (3) complete your request online.*

| forward motion pict 🔍 |
| --- |

Advanced ⌄

## FORWARD MOTION PICTURES LLC (201826910568)



Request
Certificate

| | |
| --- | --- |
| Initial Filing Date | 09/24/2018 |
| Status | Active |
| Standing - SOS | Good |
| Standing - FTB | Good |
| Standing - Agent | Good |
| Standing - VCFCF | Good |
| Formed In | CALIFORNIA |
| Entity Type | Limited Liability Company - CA |
| Principal Address | 2108 N ST STE C SACRAMENTO, CA 95816 |
| Mailing Address | 2108 N ST STE C SACRAMENTO, CA95816 |
| Statement of Info Due Date | 09/30/2026 |
| Agent | 1505 Corporation CALIFORNIA CORPORATE AGENTS, INC. |
| CA Registered Corporate (1505) Agent Authorized Employee(s) | CHRIS JOHNSON 2108 N ST STE C, SACRAMENTO, CA |

Results: 3

| Entity Information | Initial Filing Date | Status |
| --- | --- | --- |
| FORWARD MOTION PICTURES LLC (201826910568) > | 09/24/2018 | Active |
| FORWARD MOTION PICTURES, INC. (3304895) > | 06/23/2010 | Terminate |
| FORWARD MOTION PICTURES, INC. (4679275) > | 12/31/2020 | Suspended - FTB |



View History          Request Access

California
*Secretary of State*

Business    UCC

Login

VIRTUAL ACTIVE, INC. (2782393)

Home

Search

Forms

Help

# Business Search

*The California Business Search provides access to available information for **corporations**, **limited liability companies** and **limited partnerships** of record with the California Secretary of State, with **free PDF copies** of over 17 million imaged business entity documents, including the most recent imaged Statements of Information filed for Corporations and Limited Liability Companies.*

*Currently, information for Limited Liability Partnerships (e.g. law firms, architecture firms, engineering firms, public accountancy firms, and land survey firms), General Partnerships, and other entity types are **not contained** in the California Business Search. If you wish to obtain information about LLPs and GPs, submit a Business Entities Order paper form to request copies of filings for these entity types. Note: This search is not intended to serve as a name reservation search. To reserve an entity name, select Forms on the left panel and select Entity Name Reservation ? Corporation, LLC, LP.*

### Basic Search

*A Basic search can be performed using an entity name or entity number. When conducting a search by an entity number, where applicable, **remove "C"** from the entity number. Note, **a basic search** will search **only ACTIVE entities** (Corporations, Limited Liability Companies, Limited Partnerships, Cooperatives, Name Reservations, Foreign Name Reservations, Unincorporated Common Interest Developments, and Out of State Associations). The basic search performs a contains ? keyword? search. The Advanced search allows for a ?starts with? filter. To search entities that have a status other than active or to*



Request
Certificate

| | |
|---|---|
| *Initial Filing Date* | 07/01/2005 |
| *Status* | Active |
| *Standing - SOS* | Good |
| *Standing - FTB* | Good |
| *Standing - Agent* | Good |
| *Standing - VCFCF* | Good |
| *Formed In* | CALIFORNIA |
| *Entity Type* | Stock Corporation - CA - General |
| *Principal Address* | 2108 N ST STE C SACRAMENTO, CA 95816 |
| *Mailing Address* | 2108 N ST STE C SACRAMENTO,CA95816 |
| *Statement of Info Due Date* | 07/31/2025 |
| *Agent* | 1505 Corporation CALIFORNIA CORPORATE AGENTS, INC. |
| *CA Registered Corporate (1505) Agent Authorized Employee(s)* | CHRIS JOHNSON 2108 N ST STE C, SACRAMENTO, CA |



View History



Request Access

Business    UCC

*Advanced Search*

Home

Search

Forms

Help

An Advanced search is required when searching for publicly traded disclosure information or a status other than active.

An Advanced search allows for searching by specific entity types (e.g., Nonprofit Mutual Benefit Corporation) or by entity groups (e.g., All Corporations) as well as searching by ?begins with? specific search criteria.

**Disclaimer:** Search results are limited to the 500 entities closest matching the entered search criteria. If your desired search result is not found within the 500 entities provided, please refine the search criteria using the Advanced search function for additional results/entities. The California Business Search is updated as documents are approved. The data provided is not a complete or certified record.

Although every attempt has been made to ensure that the information contained in the database is accurate, the Secretary of State's office is not responsible for any loss, consequence, or damage resulting directly or indirectly from reliance on the accuracy, reliability, or timeliness of the information that is provided. All such information is provided "as is." To order certified copies or certificates of status, (1) locate an entity using the search; (2)select Request Certificate in the right-hand detail drawer; and (3) complete your request online.

| virtual active, ir 🔍 |

Advanced ⌄

## VIRTUAL ACTIVE, INC. (2782393)



Request Certificate

| | |
|---|---|
| Initial Filing Date | 07/01/2005 |
| Status | Active |
| Standing - SOS | Good |
| Standing - FTB | Good |
| Standing - Agent | Good |
| Standing - VCFCF | Good |
| Formed In | CALIFORNIA |
| Entity Type | Stock Corporation - CA - General |
| Principal Address | 2108 N ST STE C SACRAMENTO, CA 95816 |
| Mailing Address | 2108 N ST STE C SACRAMENTO,CA95816 |
| Statement of Info Due Date | 07/31/2025 |
| Agent | 1505 Corporation CALIFORNIA CORPORATE AGENTS, INC. |
| CA Registered Corporate (1505) Agent Authorized Employee(s) | CHRIS JOHNSON 2108 N ST STE C, SACRAMENTO, CA |



View History



Request Access

Results: 2

| Entity Information ⇅ | Initial Filing Date ⇅ | Status |
|---|---|---|



Business    UCC

Home

Search

Forms

Help

| | | | |
|---|---|---|---|
| VIRTUAL ACTIVE MERGER SUB, INC. (3410759) | > | 09/20/2011 | Merged Out |
| VIRTUAL ACTIVE, INC. (2782393) | > | 07/01/2005 | Active |

## VIRTUAL ACTIVE, INC. (2782393)



Request Certificate

| | |
|---|---|
| *Initial Filing Date* | 07/01/2005 |
| *Status* | Active |
| *Standing - SOS* | Good |
| *Standing - FTB* | Good |
| *Standing - Agent* | Good |
| *Standing - VCFCF* | Good |
| *Formed In* | CALIFORNIA |
| *Entity Type* | Stock Corporation - CA - General |
| *Principal Address* | 2108 N ST<br> STE C<br>SACRAMENTO, CA 95816 |
| *Mailing Address* | 2108 N ST<br> STE C<br>SACRAMENTO,CA95816 |
| *Statement of Info Due Date* | 07/31/2025 |
| *Agent* | 1505 Corporation CALIFORNIA CORPORATE AGENTS, INC. |
| *CA Registered Corporate (1505) Agent Authorized Employee(s)* | CHRIS JOHNSON 2108 N ST STE C, SACRAMENTO, CA |

View History          Request Access

Exhibit 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NEXTPULSE, LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>LIFE FITNESS, LLC, KPS CAPITAL PARTNERS, LP, and LUMOS INTERNATIONAL HOLDINGS, B.V.,<br><br>　　　　　　　Defendants. | Civil Action No.: 1:22-cv-3239<br><br>Judge Nancy L. Maldonado<br><br>**JURY TRIAL DEMANDED** |

## NEXTPULSE, LLC'S AMENDED COMPLAINT (CORRECTED)

Plaintiff NEXTPULSE, LLC, for its claims against Defendants LIFE FITNESS, LLC, KPS CAPITAL PARTNERS, LP, and LUMOS INTERNATIONAL HOLDINGS, B.V., alleges as follows:

## THE PARTIES

1.　　　NEXTPULSE, LLC ("NP") is a Delaware limited liability company with its principal place of business located in the Town of Atherton, County of San Mateo, and State of California.

2.　　　NP is informed and believes, and thereon alleges, that Defendant LIFE FITNESS, LLC ("LF") is a Delaware limited liability company registered to do business in Illinois, with its principal place of business located in the City of Franklin Park, County of Cook, and State of Illinois.

3.　　　NP is informed and believes, and thereon alleges, that Defendant KPS Capital Partners, LP ("KPS") is a New York limited partnership, with its principal place of business located in New York.

1

4.      NP is informed and believes, and thereon alleges, that Defendant Lumos International Holdings, B.V. ("Lumos") is a private limited liability company and an affiliate of KPS, with its principal place of business in Amsterdam. LF, KPS and Lumos are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the first claim alleged herein (copyright infringement under the federal copyright laws) pursuant to 17 U.S.C. Section 501 and 28 U.S.C. Sections 1331 and 1338(a) in that said claim arises under the laws of the United States.

6.      This Court has subject matter jurisdiction over the second claim alleged herein (tortious interference with contractual rights) pursuant to 28 U.S.C. Section 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000, and pursuant to 28 U.S.C. Section 1367, because the claim is related to other claims in this action that are within the Court's original jurisdiction.

7.      This Court has subject matter jurisdiction over the third claim alleged herein (trade secret misappropriation under the federal Defend Trade Secrets Act) pursuant to 28 U.S.C. Sections 1836-39 *et seq.* and 28 U.S.C. Section 1331.

8.      NP's claims arise in whole or in part in this District.  LF operates in, resides in, and/or exists in this District. Accordingly, pursuant to 28 U.S.C. Sections 1391(b) and 1400(a), venue is proper in this District.

## SUMMARY OF THE FACTS

9.      Netpulse, Inc. ("Netpulse"), the predecessor of NP, was a Delaware corporation duly licensed and qualified to do business in California and had its principal

place of business in San Francisco, California. Netpulse developed software applications, content delivery systems, and network-based services related to exercise equipment.

10.     In 2011, Virtual Active, Inc. ("VA") was a San Francisco based media and technology company that developed video content specifically targeted to entertain and motivate cardio fitness equipment users ("VA Content").

11.     In 2011, Life Fitness was a division of Brunswick Corporation ("BC"). BC's Life Fitness division designed, manufactured, marketed, and sold fitness equipment products, including cardio exercise equipment such as treadmills, exercise bicycles, and elliptical machines.

12.     In 2011, BC's Life Fitness division and Netpulse each made separate offers to purchase VA. Netpulse's offer was accepted and in October of 2011, Netpulse acquired VA, including its intellectual property rights to the VA Content, such as copyrights to its video library.

13.     Netpulse developed an entertainment and advertising platform for exercise equipment and wanted to partner with BC, the largest manufacturer of commercial health club equipment, to incorporate Netpulse's platform on BC's Life Fitness consoles (*i.e.,* screens) featured on BC's cardio fitness equipment products (*e.g.,* its treadmills, exercise bicycles, and elliptical machines). Based on Netpulse's prior experience selling advertising on consoles, the volume of BC's cardio equipment sales, and the significant usage by health club members of cardio exercise equipment, Netpulse knew that its advertising platform would generate significant recurring income for Netpulse. Knowing that BC had wanted the VA Content for its exercise consoles, Netpulse offered to license the VA Content to BC in exchange for BC's agreement to put Netpulse's entertainment

3

and advertising platform on BC's Life Fitness consoles.

14.     Netpulse and BC entered into a written Customized Development and
Software Licensing Agreement, effective December 12, 2011, and several amendments
thereto, specifically a First Amendment, effective March 12, 2012, a Second
Amendment, effective September 26, 2012, and a Third Amendment, effective February
13, 2014. Netpulse and BC were each required to perform various obligations under the
Customized Development and Software Licensing Agreement and the amendments
thereto (collectively, "SLA").

15.     Netpulse and BC also entered into the following agreements effective July
30, 2015: a Virtual Active License Agreement ("VALA") and an Advertising Services
Agreement ("ASA") (collectively, the "2015 Contracts").

16.     Pursuant to the SLA and the 2015 Contracts (the "Contracts"), Netpulse
provided BC with significant technology, including source code, executable code, videos,
and other intellectual property. This included the "Netpulse Interface," as defined in the
Contracts, a touchscreen interface designed to work with BC's equipment and that
controlled the Netpulse entertainment platform and enabled content display and network
connectivity. Netpulse also provided various VA materials, as further described and
defined in the Contracts, including a library of VA videos designed to be used in
conjunction with the Netpulse Interface and BC's fitness equipment.  This technology,
the related intellectual property, and the videos, as further described in the Contracts, are
referred to herein as the "Netpulse Technology." The Netpulse Technology was provided
to BC subject to constraints and limitations, as provided under the Contracts.

17.     In conjunction with the Netpulse Technology, Netpulse provided BC with
extensive confidential information, including but not limited to development information;

details regarding the Netpulse Interface; detailed information regarding the VA library of

videos and how to interface with them; communications (such as emails) containing

technology details; testing data; computer software information (including developer

notes, revisions, corrections, bug fixes, and related information); sales and marketing

information; ideas, concepts, methodologies; and solutions relating to the interfaces and

connections allowing for effective operation and incorporation of the VA videos and

interactive features into consoles and machines, collectively referred to herein as the

"Netpulse Confidential Information." The Netpulse Confidential Information was provided to BC

under the confidentiality provisions of the SLA, VALA, and ASA.

18.    Under the SLA, Netpulse granted BC a "non-exclusive, non-sublicensable,

non-transferable – right and license" to the Netpulse Code, including the VA Programs,

as those terms were defined in the SLA; an "exclusive, non-sublicensable, non-

transferable right and license" to manufacture, sell, and distribute certain equipment with

the Netpulse attachable personal viewing screen and VA Programs, as defined in the

SLA, with interactivity and additional features; and a perpetual, non-sublicensable, non-

transferable license to make internal copies of, incorporate, and distribute the object code

version of the Life Fitness Interface, as further described in the SLA.

19.    Under the SLA, each party retained all right, title, and interest in its

intellectual property. The SLA also allowed each party to use the other party's

confidential information only as authorized. Upon termination, all licenses granted under

the SLA were to terminate, BC was to cease manufacturing products under the agreement

and within 6 months BC was to cease all marketing and offering for sale of such

products. However, even after termination of the SLA, certain terms, including the

confidentiality clause, survived.

5

20.     Under the SLA, "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances.  BC was only permitted to assign the SLA to a "surviving entity in a merger or consolidation in which [BC] participates or to a purchaser of all of substantially all of [BC's] assets."

21.     Under the VALA, Netpulse granted BC "an unlimited, perpetual, nontransferable, non-sublicensable and nonassignable license" to integrate certain VA products into BC's exercise equipment, to make certain VA courses available via BC's consoles, and to use and distribute updates to its customers. BC was not permitted to "sublicense Licensed Software [as defined in the VALA] to any third party, or otherwise cause any third party to use the Licensed Software in any way other than in [BC's] own consoles without prior written approval of Netpulse."

22.     The VALA also allowed each party "to use the other party's Confidential Information only as authorized." The "Confidential Information" described in the VALA included, *inter alia,* the Licensed Software and the parties' research and development. Upon termination, all licenses granted under the VALA were to terminate and BC was to cease all marketing, offering for sale, etc., of its products with the Licensed Software. Even if the VALA were terminated, certain terms including the confidentiality clause survived termination.

23.     Under the VALA "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances not applicable here. BC was only permitted to assign the VALA to a "surviving entity in a merger or consolidation in which [BC] participates or to a purchaser of all of

6

substantially all of [BC's] assets."

24.    Under the ASA, Netpulse granted BC "a limited, non-exclusive, non-transferable license to use the applicable Netpulse Software solely in accordance with the instructions provided to [BC] by Netpulse and for the sole purposes of receipt of the Advertising Services [as defined in the ASA]." BC was not permitted to otherwise use the Netpulse Software, as defined in the ASA, nor to modify, reverse engineer, create derivative works, sublicense, assign, or otherwise use the Netpulse Software in any way not permitted under the ASA. Netpulse retained all rights and title to the Netpulse Software and all intellectual property rights contained therein and associated therewith.

25.    The ASA also required each party to use the other party's "Confidential Information" only as authorized. The "Confidential Information" described under the ASA included, *inter alia,* the Advertising Service (as defined in the ASA) and the parties' research and development. Upon termination, all licenses granted under the ASA were to terminate. Even if the ASA were terminated, certain terms including the confidentiality clause survived termination.

26.    Under the ASA "neither party may assign any rights or delegate any duties … without the other party's prior written consent, and any attempt to do so without that consent will be void," except in certain specifically permitted circumstances. BC was only permitted to assign the ASA to a "surviving entity in a merger or consolidation in which it participates or to a purchaser of all of substantially all of its assets."

27.    Netpulse performed all of its obligations under the SLA, VALA, and ASA, except those that it was excused from performing. Netpulse's performance included providing BC with software, in both source code and executable code forms; providing confidential information, including confidential research, development,

7

analysis, and testing; and providing various VA content, including VA videos.

28.    BC failed to meet its obligations under the SLA, VALA, and ASA by, *inter alia,* failing to enable Netpulse's advertising software on BC's consoles and taking unearned and fraudulent rebates. Effective at latest by 30 days after the filing of the California Litigation referenced in paragraph 30 below, if not earlier, the SLA, VALA, and ASA were terminated as a result of BC's breaches of its obligations under each of those agreements. However, even though the SLA, VALA, and ASA were terminated, BC remained obligated to comply with many terms under the agreements, including the confidentiality obligations set forth in each agreement.

29.    On or about May 4, 2018, in connection with a tax-free reorganization pursuant to Section 368(a)(1)(C) of the Internal Revenue Code, Netpulse was merged into Nextpulse, LLC ("NP"), and thereupon NP became Netpulse's successor in interest.

30.    On November 2, 2018, NP filed a lawsuit against BC in the Superior Court of California, in and for the County of San Francisco (the "California Litigation"). The California Litigation includes causes of action for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, and Misappropriation of Trade Secrets relating to the actions associated with the SLA, VALA, ASA, and other agreements between Netpulse and BC. BC also brought cross-claims. The California Litigation remains pending. While the SLA was found to have been novated by the 2015 Contracts in the California Litigation, that decision is not yet a final decision since the case remains pending.

31.    At some point, which NP believes to have been in approximately 2018, KPS engaged in negotiations to potentially acquire BC's Life Fitness Division. Based

on information and belief, NP alleges that KPS engaged in due diligence during the
course of its negotiations with BC and, among other things, learned of the existence of
the SLA, VALA, and ASA and evaluated those agreements as part of the due diligence
process.

32.    On information and belief NP alleges that, in December of 2018, BC did
an internal reorganization pursuant to which it created a wholly owned subsidiary of BC
known as Life Fitness, LLC.

33.    NP is informed and believes, and on that basis alleges, that KPS created
Lumos as an affiliate so that Lumos could be the acquiring entity of Life Fitness, LLC.
NP is informed and believes, and on that basis alleges, that at some point Lumos also
became involved in the negotiations and due diligence process with BC in connection
with the purchase of BC's fitness business, including its wholly owned subsidiary, Life
Fitness, LLC.  As with KPS, NP is informed and believes, and on that basis alleges, that
during the course of Lumos's negotiations with BC it learned, among other things, of
the terms of the SLA, VALA, and ASA and evaluated those agreements as part of the
due diligence process.

34.    On or about June 27, 2019, BC sold its entire fitness business (including
its wholly owned subsidiary Life Fitness, LLC) to Lumos, an affiliate of KPS, a private
investment firm, in an all-cash transaction for approximately $490 million. NP is not
presently aware of the details of that transaction. As a result of that transaction, for the
first time Life Fitness, LLC, became a legal entity that was no longer a wholly owned
subsidiary of BC.  LF has never been a party to any of the Contracts and never had any
rights under any of the Contracts.

35.    During the California Litigation, BC initially denied assigning or

transferring the Contracts or any rights thereunder to LF when or after LF became a

separate legal entity. BC even stated under penalty of perjury that the Contracts were

"not contemplated in the sale [of BC's fitness business, including Life Fitness, LLC], in

part, because each of the contracts had either been novated, terminated, not-renewed, or

expired." In the early part of 2022, NP learned for the first time that BC had in fact

transferred to LF significant confidential information and intellectual property BC

obtained from Netpulse or had rights to pursuant to the Contracts with Netpulse.

36.     After BC sold its fitness business, LF became a separate legal entity that

was no longer owned by BC. LF was a third party that had no contractual rights under the

Contracts and, pursuant to the explicit terms of each of the agreements, BC was not

capable of assigning any rights under any of these agreements to LF without Netpulse's

consent, which was never requested by BC nor ever given by Netpulse or NP.

37.     NP is informed and believes, and thereon alleges, that upon completion of

the sale of LF by BC, BC transferred to LF all of the Netpulse Technology, Netpulse

Confidential Information, and various forms of intellectual property Netpulse provided to

BC during Netpulse's and BC's contractual relationship associated with the Contracts.

38.     NP is informed and believes, and thereon alleges, that upon completion of

the sale of LF by BC on or about June 27, 2019, LF began using the Netpulse

Technology and Netpulse Confidential Information, despite having no legal right to do

so since BC had no right to transfer or assign any right or license to use such technology

and confidential information. NP is informed and believes, and thereon alleges, that at

all times relevant to this matter, LF has knowingly, deliberately, and willfully used, and

threatens in the future to use, the Netpulse Technology and Netpulse Confidential

Information without any right, license, or authorization to do so, in willful violation of

NP's rights.

39.    NP is informed and believes, and thereon alleges, that each of the Defendants was aware of the Contracts and the terms of those Contracts, including the fact that the rights under the Contracts could not be transferred or assigned, since many of the persons employed by LF were previously employed in BC's Life Fitness division and further since these Contracts certainly should have been reviewed and evaluated by Lumos and KPS during the due diligence process associated with the acquisition of LF.

40.    NP is informed and believes, and thereon alleges, that despite being well aware of the contractual terms prohibiting transfer or assignment and requiring confidential information to be kept confidential, Defendants intentionally interfered with the contractual relationship between Netpulse and BC, and induced BC to breach the Contracts by causing BC to illegally, and in breach of the agreements, transfer Netpulse's confidential and proprietary information to LF and/or violate the confidentiality clauses in those agreements.

41.    NP had ownership of certain trade secrets, copyrights, and other intellectual property described herein as a result of its predecessor in interest Netpulse's development of these rights and interests, while other rights were obtained as a result of acquisitions, transfers, or assignments.  In 2019, NP entered into a contract with VA and Forward Motion Partners LLC ("FMP") through which certain intellectual property was transferred to VA and/or FMP. Subsequently, in 2022, VA and FMP transferred ownership and rights to specified video content, to the extent such rights were held by VA and/or FMP, to NP. NP registered copyrights in certain VA videos and has ownership of those copyrights.

11

42.     NP owns and has title to registered copyrights in its computer software, as set forth in Exhibit A to this Amended Complaint.

43.     Based on the foregoing, NP is informed and believes, and thereon alleges, that LF has unlawfully used, reproduced, distributed, and/or made into a derivative work NP's copyrighted computer software, without authorization or right to do so, has infringed NP's valuable intellectual property rights, including its copyrighted computer software, and has threatened to, and will continue to, infringe NP's intellectual property rights unless restrained by this Court.

44.     NP owns and has title to registered copyrights in numerous VA videos, as set forth in Exhibit B to this Amended Complaint.

45.     Based on the foregoing, NP is informed and believes, and thereon alleges, that LF has unlawfully reproduced, distributed, publicly displayed, and/or created derivative works of NP's copyrighted VA videos, without authorization or right to do so, has infringed NP's valuable intellectual property rights, including its copyrighted videos, and has threatened to, and will continue to, infringe NP's intellectual property rights unless restrained by this Court.

46.     At all times herein relevant, NP has complied in all respects with the Copyright Act, 17 U.S.C. Sections 101, *et seq*., to secure the exclusive rights and privileges in and to the copyrights in the NP computer software and videos referenced herein. The NP computer software and the videos set forth in Exhibits A and B that are the subject of this Amended Complaint consist of original works of authorship that are copyrightable under the Copyright Act. Copyrights in this computer software and these videos have been registered in full compliance with the Copyright Act, and NP has received certificates of registration from the Registrar of Copyrights for them. NP is the

owner of all rights, title, and interest to said federal copyright registrations.

47.     LF's reproduction, distribution, public display, and/or creation of derivative works of NP's copyrighted computer software and videos is without permission or valid license. No legitimate basis exists for LF's unauthorized use of NP's copyrighted computer software and videos.

48.     NP seeks through this Amended Complaint to obtain preliminary and permanent injunctive relief enjoining LF, its affiliates, officers, directors, employees, agents, representatives, and all persons in active concert or participation with any of them from the unauthorized use and/or copying of NP's computer software and related documentation. NP further seeks monetary relief, including damages actually sustained by NP and/or statutory damages, and attorneys' fees and costs in this action, pursuant to 17 U.S.C. Section 502 *et seq.*, and all other relief to which NP may be entitled.

49.     NP is informed and believes, and thereon alleges, that LF continues to use the NP computer software and videos knowingly, deliberately, and willfully, without any right, license, or authorization to do so, and, as a result, is deliberately and willfully infringing NP's valid copyrights in said software and videos.

## **FIRST CLAIM FOR RELIEF**

### **(For Copyright Infringement Against LF)**

50.     NP realleges and incorporates herein, as if set forth in full, the allegations of Paragraphs 1 through 49, inclusive, of this Amended Complaint.

51.     In this action NP is asserting a claim against LF for copyright infringement under the federal Copyright Act, 17 U.S.C. Sections 106 *et seq*. NP is seeking injunctive relief, restitution, damages (actual and/or statutory, if applicable) and attorneys' fees as permitted by federal law.

52.     LF's acts constitute infringement of NP's copyrights in the NP software and videos identified in Exhibits A and B in violation of the Copyright Act, 17 U.S.C. Sections 101 *et seq*.

53.     NP is informed and believes, and thereon alleges, that LF's infringement of the copyrights in the NP computer software and videos was, and continues to be, deliberate and willful and without regard to NP's rights.

54.     LF's copyright infringement has caused, and will continue to cause, NP to suffer substantial injuries, loss, and damage to its proprietary and exclusive rights to, and copyrights in, the NP computer software and videos and, further, has damaged NP's business, reputation, and goodwill, diverted trade, and caused a loss of profits, all in an amount not yet ascertained but to be proven at trial.

55.     LF's copyright infringement and the threat of continuing infringement have caused, and will continue to cause, NP repeated and irreparable injury. It is difficult to ascertain the amount of money damages that would afford NP adequate relief at law for LF's continuing acts, and a multiplicity of judicial proceedings could be required to address the same. Accordingly, NP's remedy at law is inadequate to compensate it for the injuries threatened and inflicted by LF, and LF should be restrained and enjoined, both preliminarily and permanently, pursuant to the appropriate provisions of the Copyright Act, 17 U.S.C. Section 502.

## SECOND CLAIM FOR RELIEF

### (For Tortious Interference with Contractual Rights

### Against All Defendants)

56.     NP realleges and incorporates herein, as if set forth in full, the allegations

of Paragraphs 1 through 55, inclusive, of this Amended Complaint.

57.    As set forth in detail above, Netpulse and BC entered into valid and enforceable Contracts, to wit, the SLA, VALA, and ASA. Plaintiff NP is the successor in interest to Netpulse and has the right to pursue causes of action based on these Contracts. None of the Defendants were ever parties to any of the Contracts.

58.    When LF became a separate legal entity but a wholly owned subsidiary of BC in December 2018, it had knowledge of the Contracts. LF also knew of the Contracts in that many of LF's employees, officers, and board members were employed by BC during the negotiation of the Contracts and/or when Netpulse and BC were complying with or working toward compliance with the terms of the Contracts.

59.    As alleged above, based on information and belief, Lumos and KPS became aware of the terms of the Contracts as a result of the due diligence process in connection with their purchase of BC's fitness division, which included BC's wholly owned subsidiary, Life Fitness, LLC.

60.    Defendants intentionally and unjustifiably induced BC to breach the Contracts by illegally and intentionally persuading, encouraging, or inciting BC to assign and/or transfer rights, intellectual property, and/or confidential information to LF, including but not limited to providing access to confidential information, intellectual property, computer software, and videos that were only available to BC under the Contracts, and that were not assignable or transferrable. Such confidential information, intellectual property, computer software, and videos were valuable and were an important part of the property transferred as part of the sale of the resulting separate business entity.

15

61.     The wrongful conduct of Defendants, including the transfers and/or assignments referenced above, the illegal use of confidential information set forth above, and the infringement of NP's copyrights, was the cause or a significant factor in BC's breach of these agreements.

62.     As a result of Defendants' wrongful conduct, NP has suffered damages, consisting of at least loss of licensing revenue and loss of opportunities to engage in a license agreement through which NP should have received revenue.  Additionally, Defendants benefitted by receiving far more than they were entitled to receive in LF as a separate entity from BC. Defendants benefitted and were unjustly enriched by their illegal acts, to the detriment of NP. This has caused significant damage to NP in an amount to be proven in trial.

## THIRD CLAIM FOR RELIEF

### (For Trade Secret Misappropriation under the Federal

### Defend Trade Secrets Act Against LF)

63.     NP realleges and incorporates herein, as if set forth in full, the allegations of Paragraphs 1 through 62, inclusive, of this Amended Complaint.

64.     Pursuant to the Contracts, Netpulse provided BC with certain Netpulse Technology that was confidential and subject to strict limitations on its disclosure, transfer, and use, including computer software (both object code and source code). Additionally, Netpulse provided BC with the Netpulse Confidential Information, defined above, as well as all of the confidential information identified and defined under the Contracts. The Netpulse Technology, the Netpulse Confidential Information, and the confidential information identified and defined under the Contracts are collectively referred to as the Netpulse Trade Secrets. The Netpulse Trade Secrets were provided to

16

BC under the confidentiality terms and pursuant to other limitations in the Contracts.

65.     The Netpulse Trade Secrets derive independent economic value, actual and potential, from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. Netpulse spent many thousands of hours of employee and contractor time and related costs to develop the Netpulse Trade Secrets. If the Netpulse Trade Secrets were available to the general public or other companies in this field, it would sharply decrease the value of these trade secrets to NP.

66.     NP and its predecessor in interest, Netpulse, have taken efforts that are reasonable under the circumstances to maintain the secrecy of the Netpulse Trade Secrets, including but not limited to requiring confidentiality clauses and strict limitations on disclosure in the agreements with BC. The Netpulse Trade Secrets relate to a product and were incorporated into a product used in, or intended for use in, interstate commerce.

67.     Each agreement alleged herein that was entered into by Netpulse and BC contained a confidentiality clause that required BC to maintain the Netpulse Trade Secrets in strict confidence. LF was familiar with these terms of the Contracts and knew that the Netpulse Trade Secrets were to be held in strict confidence.

68.     LF misappropriated the Netpulse Trade Secrets by taking possession custody, and control of the Netpulse Trade Secrets; using the Netpulse Trade Secrets to develop, create, and market its own software; and more easily developing, enhancing, testing, and implementing similar software, solutions, and capabilities based on information from the Netpulse Trade Secrets. BC and LF have admitted in the California Litigation that BC no longer has possession, custody, and control of the code repositories containing the computer software, the engineering notes, testing details, and other highly confidential Netpulse Trade Secrets because all of that information was transferred to LF.

17

69.     NP is informed and believes, and thereupon alleges, that LF has incorporated the Netpulse Trade Secrets into LF's products which it sells in interstate commerce.  LF has and continues to this date to use the Netpulse Trade Secrets to allow running of software and providing of support for products, *inter alia,* in interstate commerce.

70.     This misappropriation by LF was made in bad faith and was willful and malicious because LF knew it had no rights to the Netpulse Trade Secrets. LF participated in the transfer of the Netpulse Trade Secrets and then used the Netpulse Trade Secrets in order to more easily succeed as a separate entity after it was divested from BC. LF's use of the Netpulse Trade Secrets was without authorization and was for LF's own commercial gain.

71.     As a result of this misappropriation of the Netpulse Trade Secrets by LF, NP has suffered damages, and LF has been unjustly enriched and has profited. Accordingly, NP has suffered damages in an amount to be proven at trial.

72.     As a direct and proximate result of LF's continued misappropriation of the Netpulse Trade Secrets, NP will suffer imminent and irreparable harm. Unless enjoined by this Court, LF's acts of misappropriation will continue, and NP will continue to suffer irreparable harm. Plaintiff has no adequate remedy at law and is entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A).

73.     On information and belief, LF's continued unauthorized use of the Netpulse Trade Secrets is willful and malicious, based on the allegations set forth above. LF was aware it had no rights under the Contracts and could not use any of the Netpulse Trade Secrets when it was no longer part of BC.  It engaged in willful and intentional acts of misappropriation, and further attempted to mislead NP as to the true facts of the

18

misappropriation. Plaintiff is entitled to recover enhanced damages and its reasonable

attorneys' fees under 18 U.S.C. §§ 1836(b)(3).

WHEREFORE, NP prays for relief as set forth herein.

## RELIEF REQUESTED

Plaintiff Nextpulse prays that this Court enter judgment in its favor on its claims

set forth above and award it relief, including, but not limited to, the following:

A.    Ordering a preliminary injunction enjoining and restraining LF and its

respective affiliates, officers, directors, employees, agents, servants, representatives,

successors and assigns, and all persons in active concert or participation with LF, from:

(1) Copying, reproducing, duplicating, or using the NP copyrighted

material, or any copies thereof, or any related documentation; or,

(2)  Otherwise infringing any of NP's copyrights;

B.    That the Court issue a permanent injunction, making permanent the orders

requested in paragraphs (A)(1) and (A)(2) above;

C.    That NP be awarded, on account of LF's willful copyright infringement to

date, either: (1) actual damages and/or restitution in an amount to be determined at trial;

or (2) statutory damages (if applicable) for each act of infringement in an amount

provided by law, including an increase in the award of statutory damages to a sum of not

more than $150,000 for each infringement, as set forth in 17 U.S.C. Section 504, as may

be permitted by law and according to NP's election before entry of a final judgment;

D.    That the Court issue an order requiring LF to file with this Court and serve

on NP, within not more than thirty (30) days after service of the injunction, a written

report, under oath, setting forth in detail the manner and form in which LF has complied

with said injunction;

E.      That the Court order LF to destroy all infringing copies of NP's copyrighted material;

F.      That NP be awarded actual damages according to proof resulting from Defendants' tortious interference with contractual rights, including at least the benefit NP would have received but for Defendants' wrongful interference;

G.      That NP be awarded punitive damages based on LF's willful, intentional interference with the contractual relations between Netpulse and BC and, if deemed appropriate, attorneys' fees;

H.      That NP be awarded actual damages according to proof resulting from LF's misappropriation of trade secrets, including but not limited to damages necessary to compensate NP for the damage caused by LF's misappropriation;

I.      That the Court issue an order requiring LF to return and/or destroy all trade secret materials that remain in its possession, custody, and control and file with this Court and serve on NP, within not more than thirty (30) days after service of the injunction, a written report, under oath, setting forth in detail the manner and form in which LF has complied with said injunction;

J.      That the Court order LF to destroy all misappropriated copies of the Netpulse Trade Secrets;

K.      That NP be awarded punitive damages based on LF's willful, intentional misappropriation of trade secrets and, if deemed appropriate, attorneys' fees;

L.      For costs of suit herein; and,

M.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 15, 2022                     Respectfully submitted,

Sara Tonnies Horton (shorton@willkie.com)    **NEXTPULSE, LLC**
Michael G. Babbitt (mbabbitt@willkie.com)
Skyler J. Silvertrust (ssilvertrust@willkie.com)    By:    _/s/ Sara Tonnies Horton_
Willkie Farr & Gallagher LLP                        Sara Tonnies Horton
300 North LaSalle Dr.
Chicago, IL 60654-3406
(312) 728-9000

E. David Marks (dmarks@gcalaw.com)
Kathryn C. Curry (kcurry@gcalaw.com)
Kimberly A. Donovan (kdonovan@gcalaw.com)
GCA Law Partners LLP
2570 W. El Camino Real, Suite 400
Mountain View, CA 94040
(650) 428-3900
_Admitted Pro Hac Vice_

# EXHIBIT A

## Computer Program Copyrights

|   | Registration Number | Title of Work |
|---|---|---|
| 1. | TXu002320357 | Apollo2Release |

# EXHIBIT B

## Video Copyrights

| | Registration Number | Title of Work |
|---|---|---|
| 1. | PA0002353281 | Champagne Bike |
| 2. | PA0002353283 | Costa Rica Bike |
| 3. | PA0002353299 | Costa Rica Forests Hike |
| 4. | PA0002353300 | Maui Hike |
| 5. | PA0002353301 | Kauai Hike |
| 6. | PA0002353397 | Acadia National Park Bike |
| 7. | PA0002353399 | Argentine Patagonia Bike |
| 8. | PA0002353400 | Argentine Patagonia Hike |
| 9. | PA0002353401 | Auckland and Wellington Run |
| 10. | PA0002353402 | Big Island Run |
| 11. | PA0002353404 | British Columbia Rockies Hike |
| 12. | PA0002353411 | British Columbia Rockies Run |
| 13. | PA0002353412 | British Columbia Sea to Sky Hike |
| 14. | PA0002353413 | Buenos Aires Run |
| 15. | PA0002353415 | California Deserts Bike |
| 16. | PA0002353447 | Chicago Run |
| 17. | PA0002353449 | Col de la Colombiere Bike |
| 18. | PA0002353451 | Costa Rica Run |
| 19. | PA0002353459 | East Taiwan Bike |
| 20. | PA0002353460 | Germany Run |
| 21. | PA0002353461 | Grand Staircase Hike |
| 22. | PA0002353463 | Languedoc Roussillon Bike |
| 23. | PA0002353465 | Loire River Valley Bike |
| 24. | PA0002353466 | New Zealand Hike |
| 25. | PA0002353469 | North Island, New Zealand Run |
| 26. | PA0002353470 | Panama Hike |
| 27. | PA0002353471 | Panama Run |
| 28. | PA0002353473 | Paris and Reims Bike |

|     | **Registration Number** | **Title of Work** |
| --- | --- | --- |
| 29. | PA0002353474 | Provence-Alpes-Cote d' Azur Bike |
| 30. | PA0002353475 | Rhone-Alpes Bike |
| 31. | PA0002353476 | San Francisco Bay Area Bike |
| 32. | PA0002353477 | San Francisco Run |
| 33. | PA0002353479 | Sierra Nevada Hike |
| 34. | PA0002353480 | South Island, New Zealand Run |
| 35. | PA0002353491 | Swiss Alps Run |
| 36. | PA0002353492 | Trinity Mountains Hike |
| 37. | PA0002353493 | Trinity Mountains Run |
| 38. | PA0002353494 | Utah Canyons Hike |
| 39. | PA0002353495 | Yosemite Hike |

Exhibit 18

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1**
**Eastern Division**

Nextpulse, LLC

                              Plaintiff,

v.                                              Case No.: 1:22–cv–03239
                                                Honorable Nancy L. Maldonado

Life Fitness, LLC, et al.

                              Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, May 22, 2024:

     MINUTE entry before the Honorable Nancy L. Maldonado: The Court has reviewed the parties' joint status report [97] wherein Plaintiff Nextpulse requests that the discovery stay continue pending resolution of Nextpulse's action against Brunswick Corporation in California state court (the "California Action"), which is set for trial in five months. Nextpulse asserts that the Court should evaluate whether a stay is appropriate under the factors courts generally use to decide whether to exercise their discretion to stay discovery. See Abbott Lab'ys v. Matrix Lab'ys, Inc., No. 09–CV–1586, 2009 WL 3719214, at *2 (N.D. Ill. Nov. 5, 2009) ("(i) whether a stay will unduly prejudice or tactically disadvantage the non–moving party; (ii) whether a stay will simplify the issues in question and streamline the trial, and (iii) whether a stay will reduce the burden of litigation on the parties and on the court"). Defendant Life Fitness opposes continuing the stay and argues that this Court should apply Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976) in staying this action. While the Court is dubious of the application of Colorado River abstention here, the parties' dispute over the applicable standard is immaterial as the Court denies Nextpulse's request for a continued stay. Discovery has been stayed in this case since 2022, and the Court finds that Life Fitness would be prejudiced by further delays in litigation, especially when Life Fitness may be subject to discovery in the California Action. The Court is further unpersuaded that the resolution of the California Action will streamline the issues or mitigate the burdens of litigation in the instant action. While a stay may be helpful to Nextpulse, this is Nextpulse's case to prosecute, and the Court finds that Nextpulse has not adequately explained how a state court decision in another case involving a different defendant will simplify the present litigation or ease the burden of litigation for the parties here or the Courtnot just itself. See Hayes v. Bd. of Educ. for City of Chicago, No. 21 C 1198, 2021 WL 8153761, at *1 (N.D. Ill. Dec. 22, 2021) ("It is the movant's burden to show that good cause exists for a stay."). Accordingly, the following discovery schedule is entered: (1) Rule 26(a)(1) disclosures should be exchanged by June 4, 2024; (2) Parties can issue written discovery starting June 4, 2024; and (3) Fact discovery to be completed by April 3, 2025, a very generous deadline. The Court will defer entry of expert dates to the assigned magistrate judge who shall have authority to modify and enter discovery deadlines. This matter is referred to Judge Valdez for discovery supervision and settlement conference, if and when one is desired. (ca, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

Exhibit 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NEXTPULSE, LLC, | |
| Plaintiff, | |
| v. | Civil Action No.:  1:22-cv-03239 |
| LIFE FITNESS, LLC, | |
| Defendants. | |

## NEXTPULSE, LLC'S INITIAL DISCLOSURES PURSUANT TO RULE 26 OF THE FEDERAL RULES OF CIVIL PROCEDURE

**TO DEFENDANT LIFE FITNESS, LLC AND ITS ATTORNEYS OF
RECORD:**

PLAINTIFF NEXTPULSE, LLC, referred to below as the "disclosing party," or
"Plaintiff" or "Nextpulse" hereby submits the following disclosures in accordance with
Fed. R. Civ. P. 26 ("Rule 26").

**Preliminary Statement**.  These initial disclosures are based on information
reasonably available to Plaintiff as of the date hereof.  Plaintiff reserves the right to
modify, amend, or otherwise supplement these initial disclosures if additional
information becomes available in the development of the lawsuit. In making these initial
disclosures, Plaintiff does not represent that it is identifying every document, tangible
thing, or witness possibly germane to the matter at hand. However, Plaintiff's initial
disclosures represent a good-faith effort to identify all information reasonably believed to
be required by Rule 26(a)(1).  Plaintiff's initial disclosures are made without in any way
waiving: (1) the right to object on the grounds of competency, privilege, relevancy and
materiality, hearsay, or any other proper ground to the use of such information, for any
purpose, in whole or in part, in any subsequent proceeding in this action or any other
action; and (2) the right to object on any and all grounds, at any time, to any other
discovery request or proceeding involving or relating to the subject matter of these
disclosures.

**Rule 26(a)(1)(A)(i)** – The name and, if known, the address and telephone number
of each individual likely to have discoverable information—along with the subjects of
that information—that the disclosing party may use to support its claims or defenses,
unless the use would be solely for impeachment:

| Name | Contact Information | Subject Matter |
|------|--------------------|----------------|
| Thomas Proulx | May be contacted through counsel for Nextpulse | Nextpulse's ownership of the copyrighted material and trade secrets.<br><br>Nextpulse's trade secrets.<br><br>Actions taken by Nextpulse to maintain the confidentiality of its trade secrets. |
| John Ford | 2408 150th Court SE<br>Mill Creek, WA 98012<br><br>Mr. Ford may be contacted through counsel for Nextpulse | Nextpulse's purchase of Virtual Active, Inc. in 2011.<br><br>Netpulse's Licensing of the VA Player and VA courses.<br><br>Creation of VA videos. |
| Chris Galipo | Jeffrey Brandstetter, Esq.<br>BRANDSTETTER LAW PC<br>50 California Street, Suite 1500<br>San Francisco, CA  94111-4612<br>phone: (415) 571-8600<br>email: brandstetterlaw@gmail.com<br><br>Counsel for Virtual Active Inc. | Creation of VA videos.<br><br>Nextpulse, LLC's sale to Virtual Active, Inc. and Forward Motion Pictures LLC in 2019.<br><br>Nextpulse's retention of claims against Life Fitness and associated intellectual property rights.<br><br>The licensing of VA courses. |
| Peter Hale | Last known address:<br><br>1541 Longford Ct., Walnut Creek, CA 94598 | Creation of VA Player.<br><br>Creation and protection of Netpulse advertising code. |
| Andy Arvanitis | Last known address:<br><br>2400 W El Camino Real #412, Mountain View, CA | Creation of VA Player.<br><br>Creation and protection of Netpulse advertising code. |

3

| | | |
|---|---|---|
| | 94040 | |
| Thibaut Alix | Last known address:<br><br>760 N 7th St., #4314<br>San Jose, CA 95112 | Creation of VA Player.<br><br>Creation and protection of Netpulse advertising code. |
| Vladimir Kerkez | Last known address:<br><br>2210 Durant Ave., Apt 7,<br>Berkeley, CA 94704 | Creation of VA Player.<br><br>Creation of and protection of Netpulse advertising code. |
| Dmitry Shkil<br><br>(Cogniance Employee/contractor for Netpulse)) | Last known employer:<br><br>Star Global (formerly Cogniance)<br>Okhtyrskyi Lane 7<br>Kyiv 03066<br>Ukraine | Creation of VA Player.<br><br>Creation and protection of Netpulse advertising code. |
| Rodion Altshuler<br><br>(Cogniance Employee/contractor for Netpulse) | Last known employer:<br><br>Star Global (formerly Cogniance)<br>Okhtyrskyi Lane 7<br>Kyiv 03066<br><br>Ukraine | Creation of VA Player.<br><br>Creation and protection of Netpulse advertising code. |
| Mike Milne | Last Known Adress:<br><br>4410 Driftwood Ct.,<br>Discovery Bay, CA 94505<br><br>Mr. Milne may be contacted through counsel for Nextpulse | Creation and protection of Netpulse advertising code. |
| Tim Childs | Last Known Adress:<br><br>66 Fairmount Avenue, Apt 304, Oakland, 94611 | Creation and protection of Netpulse advertising code. |

| | | |
|---|---|---|
| | Mr. Childs may be contacted through counsel for Nextpulse. | |
| Jeffrey Mroczkowski | Last Known Address:<br><br>200 Brannan St., #206<br>San Francisco, CA 94107<br><br>Mr. Mroczkowski can be contacted through counsel for Nextpulse. | Creation and protection of Netpulse advertising code. |
| Manny Aldanese | Last Known Address:<br><br>971 Pacific Ave Apt 2<br>San Francisco CA 94133-4242<br><br>Mr. Aldanese can be contacted through counsel for Nextpulse | Quality Assurance for Netpulse advertising code. |
| Madhavi Vudumula | Last Known Address:<br><br>5216 Fioli Loop<br>San Ramon, CA 94582 | Creation and protection of Netpulse's advertising code. |
| Jason LeCount | Last Known Address:<br><br>5913 Santa Cruz Ave.,<br>Richmond, CA 94804 | Creation and protection of Netpulse advertising code. |
| Gregory Chew | Last Known Address:<br><br>245 Montecito Ave., #105,<br>Oakland, CA 94610 | Creation and protection of Netpulse advertising code. |
| Peter Banks | Last Known Address: | Creation and protection of Netpulse advertising code. |

| | 1931 Diamond St., #4, San Francisco, CA 94131 | |
|---|---|---|
| Taras Mazepa, Vitalii Iamborak, Vyacheslav Demidyuk<br><br>(Cogniance Employees/contractor for Netpulse) | Last known employer:<br><br>Star Global (formerly Cogniance) Okhtyrskyi Lane 7 Kyiv 03066<br><br>Ukraine | Creation and protection of Netpulse advertising code. |
| Mariusz Kociubinski | Life Fitness, LLC | Transfer of Netpulse's confidential information from Brunswick Corporation to Life Fitness, LLC. |
| Andrew Tutkus | Life Fitness, LLC | Life Fitness, LLC's infringement. |
| Other persons employed by Brunswick Corporation or Life Fitness, LLC with knowledge of the copyrighted material and trade secrets described in the Amended Complaint, including any unlawful transfer of such information to and infringement by Life Fitness, LLC | Brunswick Corporation<br><br>Life Fitness, LLC | Nextpulse's copyrighted material and trade secrets, including any unlawful transfer of such information to and infringement by Life Fitness, LLC. |
| Nextpulse's experts, including but not limited to the following: expert reviewer of the Life | Exchange will occur pursuant to case management schedule (TBD). | Code review and comparison, trade secret review and comparison, and royalty and damage calculations. |

6

| | | |
|---|---|---|
| Fitness server(s) that were accessed by customers to download the copyrighted materials; reviewers, code review and comparison; trade secret review and comparison; and royalty and damage calculations. | | |

**Rule 26(a)(1)(A)(ii)** – A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

| Description | Location |
|---|---|
| Certificates of registration from the Registrar of Copyrights for the copyrighted works at issue. | Nextpulse, LLC |
| Source Code VA Player. | Nextpulse, LLC |
| Source Code VA courses. | Nextpulse, LLC |
| Licensing Agreements for the Virtual Active Videos and VA Player. | Attached as Exhibit 1 to Life Fitness, LLC's Motion to Dismiss (ECF 19). The other licensing agreement is in the possession, custody, or control of Nextpulse, LLC and Virtual Active, Inc. |

| | |
|---|---|
| Advertising Services Agreement between Brunswick Corporation and Netpulse LLC dated July 30, 2015. | Attached as Exhibit 2 to Life Fitness, LLC's Motion to Dismiss (ECF 19). |
| Non-disclosure agreements entered into with Netpulse. | Nextpulse, LLC |
| Life Fitness, LLC Entity Information from the Illinois Office of the Secretary of State stating that Life Fitness, LLC was organized/admitted on December 31, 2018. | Illinois Secretary of State |
| Source code for Nextpulse's advertising software. | Nextpulse, LLC |
| Incumbency Certificate and Stock Purchase and Sale Agreement between Virtual Active, Inc., Nextpulse, LLC, and Forward Motion Pictures, LLC. dated February 28, 2019. | Attached as Exhibit 3 to Life Fitness, LLC's Motion to Dismiss (ECF 19). |
| Agreement dated June 9, 2022, between Virtual Active, Inc., Nextpulse, LLC, and Forward Motion Pictures, LLC. | Attached as Exhibit 1 to Decl. of Kimberly Donvan filed November 11, 2022 (ECF 39). |
| Declaration of Mariusz Kociubinski dated January 21, 2022 | Attached as Exhibit 4 to Decl. of Kimberly Donvan filed November 11, 2022 (ECF 39). |
| Agreement and Plan of Merger Dated October 4, 2011, between Netpulse Inc., Virtual Active, Inc. et al. | Nextpulse, LLC |
| Agreement and Plan of Merger dated May 4, 2018, between Netpulse, Inc. and Nextpulse, LLC. | Nextpulse, LLC |

| | |
|---|---|
| SEC filings by Brunswick Corporation relating to the sale of its Life Fitness division. | Nextpulse, LLC, Brunswick Corporation and SEC |
| Brunswick Second Amended Responses to Nextpulse LLC's Special Interrogatories dated January 26, 2022. | Nextpulse, LLC and Brunswick Corporation |
| Declaration of Kelly Kaiser dated March 8, 2021. | Life Fitness, LLC, Brunswick Corporation, and Nextpulse, LLC |
| Relevant emails and documents produced by Brunswick LLC in the California action. | Brunswick, LLC, which also produced to Nextpulse LLC but pursuant to a Protective Order preventing disclosure in this action |
| Emails between Netpulse and Brunswick Corporation regarding Brunswick's access to and receipt of the VA Videos, VA player, source code, and Netpulse's trade secrets. | Nextpulse, LLC |
| Defendant Life Fitness, LLC's publicly available websites, announcements, and publications. | Life Fitness, LLC |
| Documents and things from Life Fitness, LLC evidencing the sale, transfer, or downloading of Plaintiff's copyrighted materials. | Life Fitness, LLC |

**Rule 26(a)(1)(A)(iii)** – A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

<u>Damages for Copyright Infringement</u>:

(1)     Plaintiff seeks actual damages for Defendant's copyright infringement as follows:

    a.  $90 (which is the license fee charged by Netpulse to Brunswick Corporation for the Virtual Active courses and VA player) multiplied by the number of products sold by Life Fitness, LLC with the Virtual Active Courses and VA Player from inception of infringement to the date of trial; **<u>plus</u>**

    b.  $90 (which is the license fee charged by Netpulse to Brunswick Corporation for the Virtual Active courses) multiplied by the number of downloads of the VA courses or VA player from Life Fitness, LLC's servers from inception of infringement to the date of trial; and

(2)     Disgorgement of profits received by Life Fitness, LLC from using the copyrighted material.

(3)     In the alternative, statutory damages including enhancements for willful infringement, if available, for infringement after the materials were copyrighted.

<u>Damages for Misappropriation of Trade Secrets:</u>

(1)     Disgorgement of Life Fitness, LLC's profits from the use of Nextpulse's

trade secrets; or

(2)     Reasonable Royalty for the use of Nextpulse's trade secrets.  Calculated as

follows (subject to refinement or revision):

    a.   Reasonable Royalty:

        i.   $366—Life Fitness' anticipated revenue per unit, per year,

        under the contract between Netpulse, Inc. and Brunswick (the

        Advertising Services Agreement).

        ii.   Multiplied by 35% - Netpulse's agreed upon revenue share

        under the Advertising Services Agreement.  (15% to Life

        Fitness; 15% to the Customer; 70% to Netpulse (of which

        Netpulse paid 50% to Zoom Media)

    b.   multiplied by number of units sold by Life Fitness, LLC with

        Nextpulse's trade secrets.

(3)     Exemplary damages.

<u>For Both Copyright Infringement and Misappropriation of Trade Secrets:</u>

- Costs and attorney's fees.

- Injunctive relief enjoining Life Fitness, LLC, its affiliates, officers,

directors, employees, agents, representatives, and all persons in active

concert or participation with any of them from the unauthorized use and/or

copying of Nextpulse's copyrighted and trade secret materials and related

documentation.

- An Order requiring Life Fitness, LLC to destroy Nextpulse's confidential and trade secret information in its possession, including but not limited to in its emails and code repositories after the conclusion of the present litigation.

**Rule 26(a)(1)(A)(iv)** – For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment:

Not applicable.

Dated:  June 4, 2024

Respectfully submitted,

**NEXTPULSE, LLC**

By:    /s/ *Sara Tonnies Horton*
       Sara Tonnies Horton

Sara Tonnies Horton (shorton@willkie.com)
Michael G. Babbitt (mbabbitt@willkie.com)
Skyler J. Silvertrust (ssilvertrust@willkie.com)
Willkie Farr & Gallagher LLP
300 North LaSalle Dr.
Chicago, IL 60654-3406
(312) 728 9000

Kathryn C. Curry (kcurry@gcalaw.com)
Kimberly A. Donovan (kdonovan@gcalaw.com)
GCA Law Partners LLP
2570 W. El Camino Real, Suite 400
Mountain View, CA 94040
(650) 428-3900
*Admitted Pro Hac Vice*

For Plaintiff Nextpulse LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2024, I caused a copy of the foregoing to be served upon counsel of record as of this date by email at the email addresses for counsel listed on the docket sheet for this case.

By:    <u>/s/ *Skyler J. Silvertrust*</u>
Skyler J. Silvertrust

Sara Tonnies Horton (shorton@willkie.com)
Michael G. Babbitt (mbabbitt@willkie.com)
Skyler J. Silvertrust (ssilvertrust@willkie.com)
Willkie Farr & Gallagher LLP
300 North LaSalle Dr.
Chicago, IL 60654-3406
(312) 728 9000

Kathryn C. Curry (kcurry@gcalaw.com)
Kimberly A. Donovan (kdonovan@gcalaw.com)
GCA Law Partners LLP
2570 W. El Camino Real, Suite 400
Mountain View, CA 94040
(650) 428-3900
*Admitted Pro Hac Vice*

For Plaintiff Nextpulse LLC

Exhibit 20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NEXTPULSE, LLC,<br><br>Plaintiff<br><br><br>v.<br><br><br>LIFE FITNESS, LLC,<br><br>Defendant | Civil Action No. 1:22-CV-03239<br><br><br>The Honorable Nancy L. Maldonado<br>The Honorable Maria Valdez |

<u>**CONFIDENTIALITY ORDER**</u>

The parties to this action have moved that the Court enter a confidentiality order. The Court has determined that the terms set forth herein are appropriate to protect the respective interests of the parties, the public, and the Court.

Accordingly, it is ORDERED:

1.    **Scope.**  All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order concerning Confidential Information as defined below.  This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

2.    **Confidential Information.**  As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" - by a producing party that falls within one or more of the

following categories: (a) information prohibited from disclosure by statute; (b) information that

reveals trade secrets; (c) research, technical, commercial or financial information that the party

has maintained as confidential; (d) medical information concerning any individual; (e) personal

identity information; (f) income tax returns (including attached schedules and forms), W-2 forms

and 1099 forms; or (g) personnel or employment records of a person who is not a party to the

case. Confidential treatment of information falling within one or more of the foregoing categories

is necessary because the public dissemination of such information may cause irreparable harm to

the economic value and competitive position of a party (categories (a)–(c) or may constitute a

serious violation of personal privacy (categories (a) and (d)–(g)). Information or documents that

are available to the public may not be designated as Confidential Information.  A party may

designate Confidential Information as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

ONLY" only after making a good-faith determination that the information includes or constitutes

confidential proprietary information which, if disclosed to the other party, rather than his, her, or

its counsel, could result in significant harm to the party's competitive position, or the disclosure of

which would contravene an obligation of confidentiality to a third person or to a Court.

      **3.**      **Designation.**

      **(a)**      A party may designate a document as Confidential Information for

protection under this Order by placing or affixing the words "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – ATTORNEYS' EYES ONLY" on the document and on all copies in a manner

that will not interfere with the legibility of the document.  As used in this Order, "copies" includes

electronic images, duplicates, extracts, summaries or descriptions that contain the Confidential

Information.  The marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS'

EYES ONLY" shall be applied prior to or at the time of the documents are produced or disclosed.

Applying the marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY" to a document does not mean that the document has any status or protection by
statute or otherwise except to the extent and for the purposes of this Order.  Any copies that are
made of any documents marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" shall also be so marked, except that indices, electronic databases or
lists of documents that do not contain substantial portions or images of the text of marked
documents and do not otherwise disclose the substance of the Confidential Information are not
required to be marked.

     **(b)**     The designation of a document as Confidential Information is a
certification by an attorney or a party appearing pro se that the document contains Confidential
Information as defined in this order.[1]

     **4.**     **Depositions.**

     Unless all parties agree on the record at the time the deposition testimony is taken, all
deposition testimony taken in this case shall be treated as HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY Confidential Information until the expiration of the following: No
later than the fourteenth day after the transcript is delivered to any party or the witness, and in no
event later than 60 days after the testimony was given, within this time period, a party may serve
a Notice of Designation to all parties of record as to specific portions of the testimony that are
designated Confidential Information and the applicable designations, and thereafter only those

---

[1] An attorney who reviews the documents and designates them as CONFIDENTIAL - or
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY must be admitted to the Bar of at
least one state but need not be admitted to practice in the Northern District of Illinois unless the
lawyer is appearing generally in the case on behalf of a party.  By designating documents
confidential pursuant to this Order, counsel submits to the jurisdiction and sanctions of this
Court on the subject matter of the designation.

portions identified in the Notice of Designation shall be protected by the terms of this Order. The failure to serve a timely Notice of Designation shall waive any designation of testimony taken in that deposition as Confidential Information, unless otherwise ordered by the Court.

**5.      Protection of Confidential Material.**

(a)      **General Protections.**  Absent agreement by the parties or a specific request for disclosure of particular document outside of these proceedings, Confidential Information shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in subparagraphs (b) and (c) for any purpose whatsoever other than in this litigation, including any appeal thereof.

(b)      **Limited Third-Party Disclosures.**  The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any third person or entity except as set forth in subparagraphs (1)–(9) below. Subject to these requirements, the following categories of persons may be allowed to review documents designated CONFIDENTIAL:

    (1)      **Counsel.** Counsel for the parties and employees of counsel who have responsibility for the action;

    (2)      **Parties.**  Individual parties and employees of a party but only to the extent counsel determines in good faith that the employee's assistance is reasonably necessary to the conduct of the litigation in which the information is disclosed;

    (3)      **The Court and its personnel;**

    (4)      **Court Reporters and Recorders.**  Court reporters and recorders engaged for depositions;

(5)     **Contractors.** Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

(6)     **Consultants and Experts.** Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound ("Acknowledgement");

(7)     **Witnesses at depositions.** During their depositions, witnesses in this action to whom disclosure is reasonably necessary.  Witnesses shall not retain a copy of documents containing Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts.  Pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

(8)     **Author or recipient.** The author or recipient of the document (not including a person who received the document in the course of litigation); and

(9)     **Others by Consent.** Other persons only by written consent of the

producing party or upon order of the Court and on such conditions as may

be agreed or ordered.

(c)     Subject to these requirements, the following categories of persons may be

allowed to review documents designated HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

ONLY:

(1)     **Outside Counsel of Record.** Outside counsel of record for the parties and

employees and agents of counsel who have responsibility for the action;

(2)     **The Court and its personnel;**

(3)     **Court Reporters and Recorders.**  Court reporters and recorders engaged

for depositions;

(4)     **Contractors.** Those persons specifically engaged for the limited purpose of

making copies of documents or organizing or processing documents,

including outside vendors hired to process electronically stored documents;

(5)     **Independent Consultants and Experts.**  Independent consultants,

investigators, or experts employed by the parties or counsel for the parties

to assist in the preparation and trial of this action ("Independent

Consultants and Experts"), but only after such persons have completed the

Acknowledgment and provided that each such person is not a current

officer, director, or employee of a party or of a direct competitor of a party

nor has knowledge at the time of retention that they will become an officer,

director, or employee of a party or of a direct competitor of a party.  A party

shall follow the disclosure process outlined in Paragraph 6 below before

any documents designated for protection under this Order are disclosed to the Independent Consultant or Expert.

(6)    **Author or recipient.** The author or recipient of the document (not including a person who received the document in the course of litigation); and

(7)    **Others by Consent.** Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

**(d)    Control of Documents.**  Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information.  Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of one year after the termination of the case.

**(e)    Use of Information by Producing Party.**  Nothing in this Order shall restrict any party to this lawsuit or its attorneys from disclosing or using, in any manner and for any purpose, its own documents designated for protection under this Order.

**6.    Disclosure Procedures for Independent Consultants and Experts.**  The party obtaining an Acknowledgment must serve it on all other parties at least five (5) business days before the first disclosure of documents designated for protection under this Order to an independent expert, consultant, or investigator (or member of their staff). The party proposing to make the disclosure must serve the producing party with a written identification of the expert, consultant, or investigator and a copy of his or her curriculum vitae. If the producing party has good cause to object to the disclosure (which does not include challenging the qualifications of the expert, investigator, or consultant), it must serve the party proposing to make the disclosure

with a written objection within five (5) business days after service of the identification. Unless the parties resolve the dispute within five (5) business days after service of the objection, the producing party must move the Court promptly for a ruling, and the documents designated for protection under this Order may not be disclosed to the expert, investigator, or consultant without the Court's approval.

7.     **Inadvertent Failure to Designate.**  An inadvertent failure to designate a document as Confidential Information does not, standing alone, waive the right to so designate the document; provided, however, that a failure to serve a timely Notice of Designation of deposition testimony as required by this Order, even if inadvertent, waives any protection for deposition testimony. If a party designates a document as Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to assure that the document is treated in accordance with the provisions of this Order.  No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information.

8.     **Filing of Confidential Information**.  This Order does not, by itself, authorize the filing of any document under seal. No document may be filed under seal absent an order by the Court granting a motion showing good cause for sealing that particular document or portion of document.  Any party wishing to file a document designated as Confidential Information in connection with a motion, brief or other submission to the Court must comply with LR 26.2.

9.     **No Greater Protection of Specific Documents.** Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it

requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.

10.     **Challenges by a Party to Designation as Confidential Information.** The designation of any material or document as Confidential Information is subject to challenge by any party.  The following procedure shall apply to any such challenge.

(a)     **Meet and Confer.**  A party challenging the designation of Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party.  In conferring, the challenging party must explain the basis for its belief that the confidentiality designation was not proper and must give the designating party an opportunity to review the designated material, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation.  The designating party must respond to the challenge within five (5) business days.

(b)     **Judicial Intervention.**  A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge.  Each such motion must be accompanied by a competent declaration that affirms that the movant has complied with the meet and confer requirements of this procedure.  The burden of persuasion in any such challenge proceeding shall be on the designating party.  Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information under the terms of this Order.

11.     **Action by the Court.**  Applications to the Court for an order relating to materials or documents designated Confidential Information shall be by motion. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

12.     **Use of Confidential Documents or Information at Trial.**  Nothing in this Order shall be construed to affect the use of any document, material, or information at any trial or hearing. A party that intends to present or that anticipates that another party may present Confidential information at a hearing or trial shall bring that issue to the Court's and parties' attention by motion or in a pretrial memorandum without disclosing the Confidential Information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

13.     **Confidential Information Subpoenaed or Ordered Produced in Other Litigation.**

(a)     If a receiving party is served with a subpoena or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than three court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

(b)     The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order.  In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Confidential Information in the court from which the subpoena or order issued.  The designating party shall bear the burden and the expense of seeking protection in that court of its

Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody or control Confidential Information by the other party to this case.

14.    **Source Code.**

To the extent production of source code becomes necessary in this case, a producing party may designate source code as "HIGHLY CONFIDENTIAL – SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code, as defined below.

(a)    "Source Code" shall mean extremely sensitive HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY information representing computer code, source code, executable code, register transfer language code, and/or any other human-readable code, and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another party or non-party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

(b)    Source Code designated as HIGHLY CONFIDENTIAL – SOURCE CODE shall be subject to all of the protections afforded to material designated HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY and may be disclosed only to the individuals to whom HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY information may be disclosed.

(c)    Any HIGHLY CONFIDENTIAL – SOURCE CODE shall be made available for inspection after 14 days written notice from the requesting party. HIGHLY CONFIDENTIAL – SOURCE CODE shall be made available for inspection, in its original electronic format, allowing it to be reasonably reviewed and searched, during normal business

hours or at other mutually agreeable times at an office of the producing party or its counsel.  The

Source Code shall be made available for inspection in a secured room, on one "stand-alone"

secured computer provided by the producing party. At all times that the producing party's Source

Code is on the stand-alone computer, the stand-alone computer must be without Internet access or

network access to other computers, including a local area network ("LAN") or an intranet. The

stand-alone computer may not be linked to any network, computer, tablet, smartphone,

photographic or video recording devices, or any recording media itself (including without

limitation camera phones, cameras, video recorders, portable hard drives, and/or USB flash

drives) (collectively "external access devices").[2]

> **(d)**      The requesting party may bring in a laptop, tablet, or smartphone to take
>
> notes during the inspection, but cannot use such devices to transcribe Source Code, take photos,
>
> or otherwise cause any transfer of Source Code from the stand-alone computer. The requesting
>
> party shall have the ability to connect a removable drive to a USB port of the stand-alone
>
> computer, such removable drive containing only a copy of the requesting party's Source Code so
>
> that a code comparison may take place. After the code inspection, the requesting party may
>
> disconnect and retrieve the removable drive so long as the removable drive contains only the
>
> requesting party's Source Code.  The requesting party shall not copy, remove, or otherwise
>
> transfer any portion of the producing party's Source Code onto any recordable media or
>
> recordable device.

---

[2] The requesting party may upload its own Source Code and source code review tools before the producing party's Source Code is uploaded to the stand-alone computer.  Any external access devices or network connections utilized by the requesting party to upload Source Code or source code review tools to the stand-alone computer must be fully disconnected prior to the upload of the producing party's Source Code.

(e)    The requesting party will notify the producing party of the required operating system for the stand-alone computer, and the producing party will produce a stand-alone computer with the required operating system. The requesting party will provide instructions to the producing party on how to obtain code analysis tools, and the requesting party will install those tools on the stand-alone computer. The requesting party will be responsible for activating any required licenses for the tools.

(f)    The requesting party shall make all reasonable efforts to limit its review of Source Code to that which is reasonably necessary to support the requesting party's actively pleaded claims. The producing party may visually monitor the activities of the requesting party's representatives during any Source Code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the Source Code.

(g)    The requesting party may save limited portions of Source Code to files on the stand-alone computer and request those files to be printed on Bates-numbered paper by the producing party.  Such printouts must be reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but not for the purposes of reviewing the Source Code.  Any printed portion of Source Code that consists of more than twenty (20) pages of a continuous block of Source Code shall be presumed to be unreasonable and unnecessary.  Any total number of printed pages of Source Code beyond 100 shall be presumed to be unreasonable and unnecessary.  Any such printouts of Source Code shall be marked "HIGHLY CONFIDENTIAL - SOURCE CODE." The producing party may challenge (1) the amount of Source Code requested in hard copy form, (2) requests for Source Code that is not relevant, necessary and essential to the actively-pleaded claims, or (3) any other request for

Source Code it believes to be improper. Any such challenges shall be brought by the producing party.

(h)    The requesting party shall maintain a log indicating the names of any individuals inspecting the Source Code and dates and times of inspection, and the names of any individuals to whom paper copies of portions of Source Code are provided. The log shall be provided to the producing party and to the Court, if requested.

(i)    The requesting party shall maintain all paper copies of any printed portions of the Source Code in a secured, locked area. The requesting party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. The requesting party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used by the requesting party during a deposition shall be retrieved by the producing party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.

(j)    The requesting party shall provide notice to the producing party seven days before including "HIGHLY CONFIDENTIAL — SOURCE CODE" information in a court filing, pleading, or expert report, to provide sufficient time for the producing party to ensure the Source Code is protected from authorized disclosure. At no time, and under no circumstances, shall the requesting party submit Source Code with court filings without prior notification, without ensuring the Source Code is relevant, necessary, and essential to the pleading, and without conferring with the producing party to ensure all protective measure against inadvertent disclosure are taken.

(k)     Any retained experts to whom the paper copies of the Source Code were provided must certify in writing that all copies of the Source Code were destroyed or returned to the counsel who provided it to them and that they will make no use of such Source Code, or of any knowledge gained from the Source Code in any future endeavor.

**15.     Challenges by Members of the Public to Sealing Orders.**  A party or interested member of the public has a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

**16.     Obligations on Conclusion of Litigation.**

(a)     **Order Continues in Force.**  Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b)     **Obligations at Conclusion of Litigation.** Within sixty-three days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and documents designated under this Order, including copies as defined in ¶ 3(a), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction to the extent practicable in lieu of return;[3] or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so.

---

[3] The parties may choose to agree that the receiving party shall destroy documents containing Confidential Information and certify the fact of destruction, and that the receiving party shall not be required to locate, isolate and return e-mails (including attachments to e-mails) that may include Confidential Information, or Confidential Information contained in deposition transcripts or drafts or final expert reports.

(c)    **Retention of Work Product and one set of Filed Documents.**

Notwithstanding the above requirements to return or destroy documents, counsel may retain (1)

attorney work product, including an index that refers or relates to designated Confidential

Information so long as that work product does not duplicate verbatim substantial portions of

Confidential Information, and (2) one complete set of all documents filed with the Court

including those filed under seal.  Any retained Confidential Information shall continue to be

protected under this Order.  An attorney may use his or her work product in subsequent litigation,

provided that its use does not disclose or use Confidential Information.

(d)    **Deletion of Documents filed under Seal from Electronic Case Filing**

**(ECF) System.**  Filings under seal shall be deleted from the ECF system only upon order of the

Court.

17.    **Order Subject to Modification.** This Order shall be subject to modification by the

Court on its own initiative or on motion of a party or any other person with standing concerning

the subject matter.

18.    **No Prior Judicial Determination.** This Order is entered based on the

representations and agreements of the parties and for the purpose of facilitating discovery.

Nothing herein shall be construed or presented as a judicial determination that any document or

material designated Confidential Information by counsel or the parties is entitled to protection

under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court

may rule on a specific document or issue.

19.    **No Effect on Admissibility.**  Nothing in this Order shall be construed to affect the

admissibility of any document, materials or information at any trial or hearing; any request for

confidentiality, closure or sealing of any hearing or trial must be made to the judge then presiding.

20.    **Persons Bound.**  This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.


**SO ORDERED.**                              **ENTERED:**


**DATE:    July 9, 2024**                    _____

                                             **HON. MARIA VALDEZ**
                                             **United States Magistrate Judge**

ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NEXTPULSE, LLC,

Plaintiff

v.

LIFE FITNESS, LLC,

Defendant

Civil Action No. 1:22-CV-03239

The Honorable Nancy L. Maldonado
The Honorable Maria Valdez

ACKNOWLEDGMENT
AND
AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she has read the Confidentiality Order dated

_____in the above-captioned action and attached hereto, understands the terms thereof, and

agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States

District Court for the Northern District of Illinois in matters relating to the Confidentiality Order

and understands that the terms of the Confidentiality Order obligate him/her to use materials

designated as Confidential Information in accordance with the Order solely for the purposes of the

above-captioned action, and not to disclose any such Confidential Information to any other person,

firm or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

Name:

Job Title: _____

Employer: _____

Business Address: _____

_____

_____

Date: _____     _____
                                 Signature

Adopted 06/29/12